685 F.2d 459
 17 ERC 1457, 18 ERC 1519, 222
U.S.App.D.C. 9,
12 Envtl. L. Rep. 20,465
 NATURAL RESOURCES DEFENSE COUNCIL, INC. and Consolidated
National Intervenors, Petitioners,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION and United
States of America, Respondents,
Baltimore Gas and Electric Co., et al., Intervenors.
NATURAL RESOURCES DEFENSE COUNCIL, INC., Petitioner,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION and United
States of America, Respondents,
Baltimore Gas and Electric Company, et al., Commonwealth
Edison Company, Pacific Legal Foundation, Intervenors.
The STATE OF NEW YORK, Petitioner,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION and the United
States of America, Respondents,
Commonwealth Edison Company, et al., Tennessee Valley
Authority, Baltimore Gas and Electric Co., et al.,
State of Wisconsin, Intervenors.
NATURAL RESOURCES DEFENSE COUNCIL, INC., Petitioner,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION and United
States of America, Respondents, Commonwealth
Edison Company, et al., Tennessee Valley Authority,
Baltimore Gas and Electric Company, et al., Intervenors.
 Nos. 74-1586, 77-1448, 79-2110 and 79-2131.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 17, 1980.
Decided April 27, 1982.
Rehearing and Rehearing En Banc Denied June 30, 1982.
As Amended Oct. 6, 1982.
Certiorari Granted Nov. 29, 1982.
See 103 S.Ct. 443.
 
 Ronald J. Wilson, Washington, D. C., for Natural Resources Defense Council, petitioner in Nos. 74-1586, 77-1448 and 79-2131. Roger Beers, San Francisco, Cal., also entered an appearance for petitioner, Natural Resources Defense Council.
 E. Leo Slaggie, Atty., Nuclear Regulatory Commission, with whom Sanford Sagalkin, Acting Asst. Atty. Gen., David Shilton, Atty. Dept. of Justice, and Stephen F. Eilperin, Sol., Nuclear Regulatory Commission, Washington, D. C., were on the brief, for respondents. George R. Hyde, Edward J. Shawaker and John J. Zimmerman, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondents.
 
 
 1
 Ezra I. Bialik, Asst. Atty. Gen., State of New York, New York City, with whom Robert Abrams, Atty. Gen., State of New York, Albany, N. Y., and Bronson C. LaFollette, Atty. Gen. and Patrick Walsh, Asst. Atty. Gen., State of Wisconsin, Madison, Wis., were on the joint brief, for petitioner, State of New York, and intervenor, State of Wisconsin, in No. 79-2110.
 
 
 2
 Donald P. Irwin and K. Dennis Sisk, Richmond, Va., were on the brief for intervenors Baltimore Gas and Electric Co. et al., in Nos. 74-1586, 77-1448, 79-2110 and 79-2131. George C. Freeman, Jr., Richmond, Va., also entered an appearance for intervenors, Baltimore Gas and Electric Co. et al.
 
 
 3
 Herbert S. Sanger, Jr., Gen.Counsel, Lewis E, Wallace, Dep.Gen.Counsel, Charles W. Van Beke and M. Elizabeth Culbreth, Knoxville, Tenn., for intervenor Tennessee Valley Authority in Nos. 79-2110 and 79-2131.
 
 
 4
 James P. McGranery, Jr. and Margaret R. A. Paradis, Washington, D. C., were on the brief for intervenors and amici curiae, Commonwealth Edison Co., in Nos. 74-1586, 77-1448, 79-2110 and 79-2131. Richard D. Cudahy, Washington, D. C., entered an appearance for intervenor, Commonwealth Edison Co.
 
 
 5
 Ronald A. Zumbrun, Sacramento, Cal., Raymond M. Momboisse, Albert Ferri, Jr., and Lawrence P. Jones, Washington, D. C., entered appearances for intervenor, Pac. Legal Foundation.
 
 
 6
 Before BAZELON, Senior Circuit Judge, GEORGE CLIFTON EDWARDS, Jr.,* Circuit Judge for the Sixth Circuit, and WILKEY, Circuit Judge.
 
 
 7
 Opinion for the Court filed by Senior Circuit Judge BAZELON.
 
 
 8
 Opinion concurring in part and dissenting in part filed by Circuit Judge GEORGE CLIFTON EDWARDS, Jr.
 
 
 9
 Dissenting opinion filed by Circuit Judge WILKEY.
 
 PER CURIAM:
 
 10
 Judge Bazelon's opinion constitutes the opinion of the court. Judge George Clifton Edwards, Jr., concurs in all but Part IV-D of the opinion, and Judge Wilkey concurs in only Part IV-D.
 
 BAZELON, Senior Circuit Judge:
 
 11
 These consolidated cases involve the continuing efforts of the Nuclear Regulatory Commission (NRC)[1] to establish a system by which to consider and disclose the environmental impact of the uranium fuel cycle in compliance with the National Environmental Policy Act (NEPA).[2] The present controversy centers upon the radiological effluents associated with the "back end" of the fuel cycle: the reprocessing,[3] storage, and "disposal"[4] of spent fuel and other wastes. At issue are three versions-the original,[5] interim,[6] and final versions[7]-of the "Table S-3 Rule," which provide a set of numerical values intended to reflect the environmental effects of the uranium fuel cycle.[8] Under the Rule, Table S-3 is to be included in the environmental impact statement (EIS)[9] of each proposed light water nuclear power reactor, and thereby substitute for repeated individualized consideration of the environmental impact of the fuel-cycle activities needed to support each plant.[10]
 
 
 12
 Table S-3.--Table of Uranium Fuel Cycle Environment Data[1]
 
 
 13
 (Normalized to model LWR annual fuel requirement (WASH-1248)
 or reference reactor year (NUREG-0116))
-------------------------------------------------------------------------------
 Maximum effect per annual fuel
Environmental Total requirement or reference reactor
 considerations year of model 1,000 MWe LWR
-------------------------------------------------------------------------------
 NATURAL RESOURCES USE
Land (acres):
 Temporarily committed 2 ......... 100
 Undisturbed area ............... 79
 Disturbed area ................. 22 Equivalent to a 110 MWe coal-fired
 power plant.
 Permanently committed ............ 13
 Overburden moved
 (millions of MT) .............. 2.8 Equivalent to 95 MWe coal-fired
 ------ power plant.
Water (millions of
 gallons):
 Discharged to air ............... 160 =2 percent of model 1,000 MWe LWR
 with cooling tower.
 Discharged to water
 bodies ....................... 11,090
 Discharged to ground ............ 127
 ------
 Total ...................... 11,377 4 percent of model 1,000 MWe LWR
 ------ with once-through cooling.
Fossil fuel:
 Electrical energy
 (thousands of MW-hour) ........ 323 5 percent of model 1,000 MWe LWR
 output.
 Equivalent coal
 (thousands of MT) ............. 118 Equivalent to the consumption of a 45
 MWe coal-fired power plant.
 Natural gas
 (millions of scf) ............. 135 0.4 percent of model 1,000 MWe energy
 output.
 EFFLUENTS--CHEMICAL (MT)
Gases (including
 entrainment): 3
 SO subx ....................... 4,400
 NO subx 4 ..................... 1,190 Equivalent to emissions from 45 MWe
 coal-fired plant for a year.
 Hydrocarbons ..................... 14
 CO ............................. 29.6
 Particulates .................. 1,154
Other gases:
 F ............................... .67 Principally from UF sub6 production,
 enrichment, and reprocessing.
 Concentration within range of
 state standards--below level
 that has effects on human
 health.
 HCl ............................ .014
Liquids:
 SO- sub4 ........................ 9.9 From enrichment, fuel fabrication,
 NO- sub3 ....................... 25.8 and reprocessing steps.
 Fluoride ....................... 12.9 Components that constitute a
 Cakk ............................ 5.4 potential for adverse environmental
 Cl- ............................. 8.5 effect are present in dilute
 Nak ............................ 12.1 concentrations and receive
 NH sub3 ........................ 10.0 additional dilution by receiving
 Fe ............................... .4 bodies of water to levels below
 permissible standards. The
 constituents that require
 dilution and the flow of
 dilution water are:
 NH sub3 --600 cfs.
 NO sub3 --20 cfs.
 Fluoride--70 cfs.
Tailings solutions
 (thousands of MT) ............... 240 From mills only--no significant
 effluents to environment.
Solids ......................... 91,000 Principally from mills--no
 significant effluents to
 environment.
 EFFLUENTS--RADIOLOGICAL
 (CURIES)
Gases (including entrainment):
 Rn-222 ............................... Presently under reconsideration by the
 Commission.
 Ra-226 .......................... .02
 Th-230 .......................... .02
 Uranium ........................ .034
 Tritium (thousands) ............ 18.1
 C-14 ............................. 24
 Kr-85 (thousands) ............... 400
 Ru-106 .......................... .14 Principally from fuel reprocessing
 plants.
 I-129 ........................... 1.3
 I-131 ........................... .83
 Tc-99 ................................ Presently under consideration by the
 Commission.
 Fission products
 and transuranics ............. .203
Liquids:
 Uranium and daughters ........... 2.1 Principally from milling--including
 tailings liquor and returned to
 ground--no effluents, therefore,
 no effect on environment.
 Ra-226 ........................ .0034 From UF sub6 production.
 Th-230 ........................ .0015
 Th-234 .......................... .01 From fuel fabrication
 plants--concentration
 10 percent of 10 CFR 20 for total
 processing
 26 annual fuel requirements for
 model LWR.
Fission and
 activation products ..... 5.9 X 10- 6
Solids (burned on site):
 Other than high level
 (shallow) .................... 11,300 9,110 Ci comes from low level reactor
 wastes and 1,500 Ci comes from
 reactor decontamination and
 decommissioning--buried at land
 burial facilities. 600 Ci comes
 from mills-- included in tailings
 returned to ground. Approximately
 60 Ci comes from conversion and
 spent fuel storage. No significant
 effluent to the environment.
 TRU and HLW (deep) ....... 1.1 X 10 7 Buried at Federal Repository.
Effluents--Thermal
 (billions of
 British thermal units) ........ 4,063 5 percent of model 1,000 MWe LWR.
Transportation
 (person-rem):
 Exposure of workers and
 general public ................ 2.5
 Occupational exposure
 (person-rem) ................. 22.6 From reprocessing and waste
 management.
------------------------------------------------------------------------------
1. In some cases where no entry appears it is clear from the background
documentts that the matter was addressed and that, in effect, the Table should
be read as if a specific zero entry had been made. However, there are other
areas that are not addressed at all in the Table. Table S-3 does not include
health effects from the effluents described in the Table, or estimates of
releasess of Radon-222 from the uranium fuel cycle or estimates of
Technetiium-99 released from waste management or reprocessing activities.
These issues may be the subject of litigation in the individual licensing
proceediings.
2. The contributions to temporarily committed land from reprocessing are not
proratedd over 30 years, since the complete temporary impact accrues
regardleess of whether the plant services one reactor for one year or 57
reactorss for 30 years.
3. Estimated effluents based upon combustion of equivalent coal for power
generatiion.
4. 1.2 percent from natural gas use and process.
 
 
 14
 The issues in this case largely concern the use of numerical values to depict the environmental effects of fuel-cycle activities. By describing such effects in this manner, the issue arises whether there is more to the fuel cycle's environmental impact than the bare numbers in the Table reveal, and, if so, whether licensing boards are prevented from looking beyond the Table to consider additional elements of the fuel cycle's environmental impact. One omission from the Table is explicit recognition of the uncertainties that underlie the projected effluent releases. This omission is particularly glaring in the Table's treatment of the long-term effects of solid high-level and transuranic wastes, which remain toxic for at least 250,000 years.[11] The Commission expects to dispose of those wastes, perhaps by first reprocessing a portion of them, and in any event, by burying them in salt mines beneath the continental United States. The Tables indicate that the wastes will have no effect on the environment after they are sealed in salt mines.[12] In effect, therefore, the Table S-3 Rules instruct all licensing boards, when analyzing the environmental impact of a particular plant, to conclusively assume that such wastes will emit no radiological effluents into the environment after final burial.
 
 
 15
 The second omission from the Table is a description of the health, socioeconomic, and cumulative effects of the projected releases. The Table describes effluent releases in units of radioactivity per year. It does not evaluate the actual effects of those releases on human health, or on social and economic well-being, as an increasing number of plants continue to produce wastes. The issue raised by this aspect of the Table is whether the Table S-3 Rule allows licensing boards to take evidence on and consider those effects in individual licensing proceedings.[13] Finally, the effluent releases predicted in the Table are based on assumptions concerning the future availability of certain types of waste-management and disposal technology. The issue arises, therefore, whether the Commission has correctly found that the predicted releases represent technological goals that are economically feasible.
 
 
 16
 We conclude that the Table S-3 Rules are invalid because they fail to allow for proper consideration of the uncertainties concerning the long-term isolation of high-level and transuranic wastes, and because they fail to allow for proper consideration of the health, socioeconomic and cumulative effects of fuel-cycle activities. Therefore, we remand.
 
 I. BACKGROUND
 
 17
 Although a great deal remains to be learned about radioactive wastes, this much is known: 1) many of the wastes remain extremely toxic for a very long time;[14] 2) the NRC has yet to settle upon a method for permanently disposing of radioactive wastes;[15] and 3) none of the current proposals for disposal is certain to succeed.[16] For more than a decade, and in several different arenas, the Natural Resources Defense Council (NRDC) has sought to force the Commission to factor this knowledge into its licensing decisions, each of which represents a decision to create additional nuclear wastes.[17]
 
 A. The Original Table S-3 Rule
 
 18
 In April 1971, the NRDC attempted to raise the environmental impact of nuclear waste as a relevant consideration in the operating license proceeding for the Vermont Yankee Nuclear Power Station.[18] NRDC argued that such a licensing proceeding was the only decisionmaking stage at which the issue could be raised effectively, for at any later stage a commitment to produce potentially dangerous waste would have already been made. The Atomic Safety and Licensing Board (ASLB), however, rejected the NRDC's request.[19] It refused to admit evidence or permit questions on the environmental impact of Vermont Yankee's spent fuel or other radioactive waste products.[20]
 
 
 19
 In June 1972 the Atomic Safety and Licensing Appeal Board (ASLAB) upheld the ASLB's decision. The Appeal Board based its ruling on the fact that fuel-cycle effects were both speculative and remote. Because spent fuel and wastes would be removed from the plant, the Board stated, their effects should be considered in proceedings to license future reprocessing plants and waste repositories-not in Vermont Yankee's licensing proceeding.[21]
 
 
 20
 In November 1972, the Commission responded to the ASLAB's Vermont Yankee decision by publishing a notice of proposed rulemaking to determine whether, and if so, how, it should consider the environmental impact of the fuel cycle as it continued licensing nuclear facilities.[22] The notice proposed two alternatives. The first alternative would have precluded any consideration of the environmental effects of radioactive wastes on the ground that those effects would not significantly affect the outcome of any licensing decision.[23] The second alternative would have limited disclosure and consideration of the environmental effects of these wastes to a table of predetermined numerical values, which was reproduced in the notice.[24] The values were standardized to represent the expected contribution of one 1,000 megawatt light water nuclear reactor. The Commission staff had already derived the necessary values and reported them in Table S-3 of the Commission's Environmental Survey of the Nuclear Fuel Cycle.[25] The Table contained entries for the environmental effects of most stages of the uranium fuel cycle, but it contained no entry for the radiological effluents from solidified high-level and transuranic wastes. These wastes, which must be isolated from the environment for hundreds of thousands of years, were expected to be buried eventually in a federal repository somewhere beneath the continental United States. The original Table contained no values for the environmental impact of this final stage of the fuel cycle because the Commission staff believed that technology would be developed by which to isolate the wastes from the environment for an indefinite period of time.[26] Thus, both alternative proposals were based on the assumption that long-term waste-disposal systems, yet to be developed, would work perfectly. On the basis of such assumptions, the Commission proposed to mandate that licensing boards presume, in their decisions to grant nuclear power plant licenses, that there would be no risk of waste-disposal failure.
 
 
 21
 On April 16, 1974, the Commission adopted the Table S-3 alternative and amended its NEPA regulations to allow for consideration of the environmental effects of the uranium fuel cycle by including Table S-3 in the EIS for each light water nuclear reactor.[27] The Rule also provided that the environmental effects of the fuel cycle "shall be as set forth in Table S-3," and that "no further discussion of such environmental effects shall be required."[28] In the meantime, the Vermont Yankee plant itself had been granted a full-term, full-power operating license,[29] and the Appeal Board had expressly declined to reexamine their earlier decisions precluding inquiry into the environmental impact of the fuel cycle.[30]
 
 
 22
 The NRDC challenged both the Table S-3 Rule and Vermont Yankee's license in this court.[31] We found that the procedures that the Commission employed in adopting the Rule failed to generate a record sufficient to support the optimistic conclusion that high-level and transuranic wastes would be isolated from the environment for the requisite number of centuries.[32] The court noted that the portion of the rule precluding inquiry into these matters was based on a few conclusory reassurances from a member of the Commission's staff who was not questioned or cross-examined.[33] That part of the Rule was therefore held to be arbitrary and capricious, and was set aside and remanded. We also held that in the absence of a valid generic rule, the environmental impact of fuel-cycle activities must be considered in individual licensing proceedings. Because the Commission had granted Vermont Yankee's operating license without such consideration, we remanded the order granting that license to await the outcome of further generic proceedings.[34] These decisions were rendered July 21, 1976.
 
 B. The Supreme Court's Decision
 
 23
 In April 1978, the Supreme Court reversed this court's decision to set aside the original Table S-3 Rule,[35] finding that we had overturned the Rule because of deficiencies in the Commission's rulemaking procedures.[36] The Court held that if an agency complies with the procedures required by statute, a rule may be struck down because of procedural shortcomings only in unusual circumstances.[37] The Supreme Court agreed, however, that the Rule should be vacated if it lacks support in the administrative record, and remanded the case to us "so that the Court of Appeals may review the rule as the Administrative Procedure Act provides."[38] That case, No. 74-1586, is, therefore, among the four consolidated cases now before us.
 
 
 24
 The Supreme Court also noted that the Commission had promulgated an interim Rule pending the issuance of a final Rule. It stated that this court, on remand, could consolidate the challenge to the original Rule with the appeal from the interim rulemaking proceeding, which was already pending. The Court further noted that this court could decide those cases on the basis of an expanded record, which is what we have done.[39]
 
 C. The Interim Table S-3 Rule
 
 25
 On October 18, 1976, in response to this court's decision but prior to the Supreme Court's remand, the Commission initiated proceedings to review the waste-management and disposal aspects of the Table S-3 Rule, and to develop a revised and adequately supported fuel-cycle rule.[40] The Commission announced that a special Task Force had completed a revised Environmental Survey of the Reprocessing and Waste Management Portions of the LWR Fuel Cycle,[41] and invited comments on the Survey and the revised Table S-3, both of which would constitute the basis of a final or interim rule.[42] Also in response to this court's ruling, the Commission had reconvened a licensing board to consider suspending the operating license of Vermont Yankee, which, by then, was fully operational.[43] The Commission suspended that proceeding, however, when it decided that an interim rule, similar to the original, could issue shortly.[44]
 
 
 26
 In announcing that it was reconsidering the Table S-3 Rule, the Commission stated:
 
 
 27
 (T)here are still uncertainties in areas such as the effect of waste presence on repository stability; the probabilities and consequences of various types of intrusive acts by humans; the availability of data to be used in modeling studies; the design and regulatory actions needed to minimize possibilities of repository failure; projection of future societal habits and demography; and, finally, the relative importance of the various potential initiating events. Research programs are underway which should resolve most of these uncertainties over the next few years.[45]
 
 
 28
 Nonetheless, the Survey and proposed Table S-3 still provided that solidified high-level and transuranic wastes, which were to be buried in a permanent repository, would have no effect on the environment. Unlike the original Table, the revised Table S-3 did contain an entry for solidified high-level and transuranic wastes. It provided that 11 million curies of radiation would be released from the solidified waste per reference reactor year. Under the "maximum effect" column, however, the Table simply stated "Buried at Federal Repository."[46] The materials referenced by the footnotes to the Table make clear that this meant that the radiation would remain wholly contained within the repository once the repository is sealed.[47]
 
 
 29
 The NRDC filed comments stating that the Survey and Table were based on only an assumption that technology could be developed to isolate long-term wastes from the environment, and that the consequences of the failure of such development were left unanalyzed. The NRDC's comments also stated that the numerical values in the Table failed to reveal the health effects of environmental impacts or the cumulative effects of the continuous creation of radioactive wastes.[48] In addition, the State of New York filed comments objecting to the NRC's failure to consider the economic feasibility of the projected waste-management and disposal methods.[49] The Commission staff and, ultimately the Commission, rejected all of these complaints and refused to modify the proposed rule.[50]
 
 
 30
 In March 1977, on the basis of the revised Survey and the comments received, the Commission promulgated an interim Table S-3 Rule,[51] which, as indicated in the Commission's notice, explicitly stated that releases from the solidified high-level and transuranic wastes would remain buried in a repository and, therefore, have no effect on the environment.[52] Like the original Table S-3 Rule, the interim Rule stated that the environmental effects of the fuel cycle "shall be as set forth in Table S-3," and that "(n)o further discussion of such environmental effects shall be required."[53] The Commission amended the interim Rule in April 1978, however, to allow licensing boards to consider environmental impacts not specifically "addressed by the Table."[54]
 
 
 31
 In April 1977, the Commission issued an order directing the Appeal Board to reconsider the cost-benefit balances which had been struck in the licensing proceedings of Vermont Yankee and several other plants.[55] The following July, the Board ruled that the values in Table S-3 did not change the cost-benefit balance of the Vermont Yankee plant, particularly because the plant was already operating.[56] In connection with this reconsideration, the Board expressed concern over the proper interpretation of the Table S-3 entry for high-level and transuranic wastes, given the fact that the Commission openly admitted that the assumption of no environmental effect was uncertain.[57] The Board strongly implied that its interpretation of that aspect of the Table could alter the outcome of particular decisions.[58] Ultimately, however, the Appeal Board concluded that the Commission had intended it to assume that there would be no effluent releases from the permanent repository, once it is sealed.[59]
 
 
 32
 In No. 77-1448, the second of the four cases now before this court, NRDC challenges the interim Rule.[60]
 
 D. The Final Table S-3 Rule
 
 33
 In May 1977, following the adoption of the interim Rule, the Commission reopened hearings to determine whether the interim Rule should be made final or altered in any way.[61] The hearings employed some procedures not used in the original rulemaking, and participants were given an additional opportunity to comment on the Hearing Board's recommendations to the Commission.[62] The NRDC criticized the Rule for the failure of the numerical values to communicate either the uncertainties of underlying assumptions, or the health, cumulative, or socioeconomic effects of waste-management and disposal activities.[63]
 
 
 34
 The States of New York and Wisconsin again objected to the Commission's failure to analyze the economic viability of the proposed waste-management and disposal methods. The Commission staff initially argued that the economics of the proposed methods should not be considered.[64] The Hearing Board, however, and later the Commission, ordered that evidence concerning the economic feasibility of the proposed technologies be considered in the rulemaking.[65] The States of New York, Ohio, and Wisconsin submitted such evidence, criticizing the cost projections and the economic feasibility of the anticipated disposal methods.[66] In response, the Commission staff and industry groups submitted evidence in support of the cost estimates used.[67]
 
 
 35
 In July 1979, the Commission promulgated the final Table S-3 Rule.[68] The final Rule made only minor adjustments in the Table's numerical values and left unchanged the assumption that radiological effluents from solidified high-level and transuranic wastes would have no effect on the environment once sealed in a federal repository.[69] The Commission also stated its intention to add an explanatory narrative to Table S-3 to convey the significance of the numerical values.[70] In addition, the Commission confirmed its intention that the Table should be supplemented by individual presentations on the health, socioeconomic, and cumulative effects of fuel-cycle activities, pending the adoption of such a narrative.[71]
 
 
 36
 As it had done before, the Commission noted the uncertainties regarding both the likelihood of finding a site for a permanent repository and the likelihood that the repository will perform as expected.[72] Nonetheless, the Commission explicitly rejected the option of expressing uncertainties in the Table S-3 Rule. The Commission stated:
 
 
 37
 In view of the uncertainties noted regarding waste disposal, the question then arises whether these uncertainties can or should be reflected explicitly in the fuel cycle rule. The Commission has concluded that the rule should not be so modified. On the individual reactor licensing level, where the proceedings deal with fuel cycle issues only peripherally, the Commission sees no advantage in having licensing boards repeatedly weigh for themselves the effect of uncertainties on the selection of fuel cycle impacts for use in cost-benefit balancing. This is a generic question properly dealt with in this rulemaking as part of choosing what impact values should go into the fuel cycle rule. The Commission concludes, having noted that uncertainties exist, that for the limited purpose of the fuel cycle rule it is reasonable to base impacts on the assumption which the Commission believes the probabilities favor, i.e., that bedded-salt repository sites can be found which will provide effective isolation of radioactive waste from the biosphere.[73]
 
 
 38
 Thus the Commission's final Rule, like its two predecessors, does not permit licensing boards to consider either the risk that permanent waste management facilities will not be developed or the risk that they will fail to perform as intended if they are developed. In addition, the Commission accepted the Hearing Board's recommendation and conclusion that the projected facilities were economically feasible because they were not "outlandishly expensive."[74]
 
 
 39
 In 79-2110, the State of New York challenges the final Rule on the ground that the Commission's finding of economic feasibility is arbitrary and capricious. In 79-2131, the NRDC challenges the final Rule because it inadequately discloses, and fails to allow proper consideration of, the uncertainties underlying the environmental impacts embodied in the final Table.
 
 II. STANDARDS OF REVIEW
 
 40
 As the Supreme Court has stated, we must review the Table S-3 Rule under the standards provided in the Administrative Procedure Act (APA).[75] The applicable provision of the APA is section 706(2)(A), which provides that a reviewing court shall "hold unlawful and set aside agency action, findings and conclusions found to be-arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[76] In this case, both the "arbitrary and capricious" and the "not in accordance with law" standards are appropriate. Under the latter standard, we must determine whether the Table S-3 Rule, as applied to individual licensing decisions, violates NEPA,[77] while under the "arbitrary and capricious" standard, our task is to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."[78] Of course, other laws must give content to the phrase "relevant factors." Because the Table S-3 Rule governs the preparation of environmental impact statements for individual nuclear reactors, NEPA provides the relevant factors that the Commission was required to consider in formulating the Rule. Therefore, there is an area of overlap between the "arbitrary and capricious" standard and the "in accordance with law" standard.
 
 III. NEPA
 
 41
 It is well settled that the licensure of a nuclear power plant constitutes a "major Federal action( ) significantly affecting the quality of the human environment."[79] Therefore, there can be no doubt that the Commission must comply with section 102(2)(C) of NEPA[80] prior to licensing such a plant. That section provides:The Congress authorizes and directs that, to the fullest extent possible ... all agencies of the Federal Government shall ... include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on-
 
 
 42
 (i) the environmental impact of the proposed action, (and)
 
 
 43
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (and)
 
 
 44
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 
 
 45
 Furthermore, as the Supreme Court has stated,
 
 
 46
 (i)t is hard to argue that (nuclear wastes) do not constitute "adverse environmental effects which cannot be avoided should the proposal be implemented," or that by operating nuclear power plants we are not making "irreversible and irretrievable commitments of resources."[81]
 
 
 47
 Therefore, the Commission must fully consider and disclose the environmental impact of nuclear wastes during the course of its decisions to license nuclear power plants.[82]
 
 
 48
 It is well recognized that section 102(2)(C) of NEPA has a dual function: Its first function is "to inject environmental considerations into (federal agencies') decisionmaking process(es);"[83] and its second function is to inform the public of the nature of the agencies' decisions, and to "inform the public that (agencies have) considered environmental concerns in (their) decisionmaking process(es)."[84] With respect to these statutory purposes, the Supreme Court has stated, and recently reiterated,[85] that "(t)he thrust of § 102(2)(C) is ... that environmental concerns be integrated into the very process of agency decisionmaking. The 'detailed statement' it requires is the outward sign that the environmental values and consequences have been considered during the planning stage of agency actions."[86] In Calvert Cliffs' Coordinating Committee, Inc. v. AEC,[87] one of the first cases decided under NEPA, this court analyzed these aspects of the Act in further detail. We stated that "(c)ompliance to the 'fullest' extent possible would seem to demand that environmental issues be considered at every important stage in the decisionmaking process concerning a particular action-at every stage where an overall balancing of environmental and nonenvironmental factors is appropriate and where alterations might be made in the proposed action to minimize environmental costs."[88] Thus, decisionmaking under NEPA must be organized in such a manner that all of the reasonably foreseeable environmental effects of a proposed action enter into an agency's decision to take the action.[89] The environmental impact statement, the centerpiece of NEPA's procedural requirements, both facilitates and provides a record of this decisionmaking process. As we noted in Calvert Cliffs, two related purposes of the EIS are to provide evidence that the mandated decisionmaking process has taken place, and to "allow ( ) those removed from the initial process to evaluate and balance the (environmental) factors on their own."[90] The decisionmaking structure mandated by section 102(2)(C) is not inherently flexible, nor are the particular requirements that it entails discretionary.[91] It is the role of the courts to ensure that agencies comply with these provisions of NEPA.[92]
 
 
 49
 The NRC's promulgation of the Table S-3 Rule represents both an attempt to implement, and a limitation on other means of implementing, these aspects of NEPA.[93] The validity of the Rule, therefore, turns largely on whether the decisionmaking structure it mandates conforms to the procedures, and thereby poses no obstacles to the substantive calculus, required by NEPA.[94] Specifically, we must determine whether the Table S-3 Rule (1) violates NEPA; or (2) is arbitrary and capricious, given the considerations made relevant by NEPA.
 
 IV. ANALYSIS
 
 50
 Petitioners, the NRDC and the State of New York, challenge the Table S-3 Rules on three grounds. First, the NRDC argues that the original, interim and final versions of the Table S-3 Rule are arbitrary and capricious and not in accordance with NEPA because they preclude proper consideration and disclosure of uncertainties that underlie the Tables' numerical values. Second, the NRDC argues that the original and interim Table S-3 Rules are arbitrary and capricious and not in accordance with NEPA because they preclude proper consideration and disclosure of the tangible environmental effects of the waste created by nuclear power plants. Finally, the State of New York argues that the release levels projected in the final Table S-3 Rule are based on a finding of economic feasibility that was arbitrary and capricious.
 
 
 51
 We conclude that the Table S-3 Rules are arbitrary and in violation of NEPA because they fail to allow for consideration of uncertainties underlying the assumption that no radiological effluents will be released into the biosphere once wastes are sealed in a permanent repository. Similarly, we conclude that the original Rule and the interim Rule, prior to amendment, are arbitrary and in violation of NEPA in their failure to allow consideration of health, socioeconomic, and cumulative effects of fuel-cycle activities. We also conclude, however, that the Commission's finding that the predicted waste-management and disposal methods would be economically feasible was neither arbitrary nor capricious.
 
 
 52
 A. The Zero-Release Assumption and Uncertainty Over Permanent Storage
 
 
 53
 The original, interim, and final Rules all prohibit licensing boards from considering the uncertainties surrounding the Table S-3 Rules.[95] In particular, no challenges were allowed to the assumption that a suitable final repository site would be found, constructed, and would operate flawlessly.[96] The assumption underlying Table S-3 that no radiological effluents will be released from the permanent repository, once the repository is sealed, can be interpreted in either of two ways: It can be read as a factual finding, or, as a decisionmaking device by which the Commission retains exclusive responsibility for considering the uncertainties concerning long-term waste disposal. Particularly in the interim and final Rules, it appears that the latter is the correct characterization.[97] Nonetheless, for the sake of completeness, we review the validity of the zero-release assumption under each interpretation.[98]
 
 
 54
 1. The Zero-Release Assumption as a Factual Finding
 
 
 55
 As stated in Part II, above, a reviewing court must set aside an agency finding as arbitrary if it determines that the finding is not based upon consideration of relevant factors or if it is based on a clear error of judgment.[99] The "relevant factors" in this case are those whose consideration is mandated by NEPA.
 
 
 56
 Among the environmental costs that an agency must consider under section 102(2)(C) are significant environmental risks-probabilities or possibilities of environmental damage.[100] Such risks may be present due to the underlying randomness of nature. Or they may be due to human uncertainty over either the character of both random and nonrandom phenomena or the ability of future technology to cope with those phenomena. Regardless of the source, environmental risks are environmental costs that must be factored into the NEPA calculus.[101] They must also be included in an EIS. Where such risks are attributable to a lack of knowledge, the agency can be asked to do no more than to reveal that which it knows and that which it does not know. It may not be permitted, however, to do any less.[102]
 
 
 57
 An agency could state in an EIS, as a matter of factual prediction, that a particular environmental effect will not have to be endured as a result of a proposed action. Of course, if it believes that to be the case, it can omit entirely any discussion of the would-be effect. Similarly, an agency could provide, by generic rule, that a particular environmental effect will not be caused by a class of actions, and that the effect should not be addressed in individual environmental impact statements. Because the risk of an environmental effect is the overriding "relevant factor" that an agency must consider in making such a factual finding, the agency may treat an environmental effect in this manner only if it finds that there is no significant risk that the environmental effect will occur. It may not do so if it finds only that the effect is unlikely to occur. Otherwise, NEPA's requirement that agencies consider and disclose uncertainty would be subverted. When faced with uncertainty concerning an environmental effect, an agency could evade its obligations under NEPA simply by finding that the effect will not occur. Thus, in the context of compliance with NEPA's procedural requirements, a court must interpret an agency's finding of no environmental effect as a finding that there is no significant risk of an environmental effect.
 
 
 58
 It is against that background that we review the Commission's finding that nuclear wastes that are sealed in a permanent repository will have no impact on the environment. When read as a finding that such wastes pose no significant risk of environmental damage, we conclude that the finding represents a "clear error in judgment."[103]
 
 
 59
 In each version of the Table S-3 Rule, the Commission based its zero-release assumption on a prediction that technology would be developed by which to isolate long-lived wastes from the biosphere indefinitely. In the Environmental Survey,[104] which constituted the technical basis of the original Table S-3, the Commission staff reported that "(i)t was planned to construct a Federal repository in a salt mine for long-term geological storage of solid high-level wastes by the mid-1970's. However, subsequent events have deferred the site selection and construction of such a facility."[105] The plan at that time, therefore, was to build a Retrievable Surface Storage Facility (RSSF) in which to store the wastes until a permanent repository became available. The Environmental Survey said no more than that the permanent repository that would be developed "is intended to isolate the waste from man and the biosphere."[106] A few years later, in the report that formed the basis of the interim and final Rules, the Commission staff continued to assume that a bedded-salt repository could be developed, but noted that other systems were also under consideration.[107] The other systems included the use of alternative geological media for isolation, and the "eliminat(ion of) portions of the wastes from existence on earth."[108] The Commission still had not worked out the technological details of any permanent disposal techniques. Nonetheless, it concluded that a system would be developed that would fully protect the environment. Until such a system is developed, the Commission still plans to store waste in an RSSF.[109]
 
 
 60
 Scientists with the United States Geological Survey testified to the technical uncertainties surrounding the zero-release assumption.[110] Similarly, the Report to the President by the Interagency Review Group on Nuclear Waste Management[111] pointed out that risk assessments "based on idealized repository characteristics ... are subject to significant uncertainties,"[112] and concluded that the "zero release of radionuclides (from a permanent repository) cannot be assured."[113] In addition, the record indicates that serious concerns were raised over the likelihood of developing the human institutions or political consensus necessary to establish and maintain the hypothesized facilities.[114] 4] The IRG Report noted, in fact, "that the resolution of institutional issues may well be more difficult than finding solutions to remaining technical problems."[115] Moreover, even the Commission's own staff recognized that there were many uncertainties surrounding the assumption that a permanent repository could be developed that would fully contain the effluents emitted from high-level and transuranic wastes.[116]
 
 
 61
 There is no need, however, to comb the record further for evidence of uncertainty, for the Commission itself has explicitly-although somewhat belatedly-acknowledged its presence. In its Statement of Consideration for the final Rule, "the Commission note(d) and agree(d) ... that areas of uncertainty remain regarding both the likelihood of finding a site and the probability that it will perform as expected."[117] The Commission nevertheless accepted its staff's zero-release assumption, stating that the staff's conclusion that there would be no release from the sealed repository had a "reasonable basis." Moreover, revealing even more of the uncertain nature of its judgment, the Commission concluded that the evidence, although "tentative" and general in nature, "favors the view that suitable sites can be found."[118]
 
 
 62
 The evidence in the record and the Commission's own recent statements indicate the existence of such uncertainty concerning permanent disposal of high-level and transuranic wastes that the zero-release assumption, taken as a finding of fact, cannot stand. If read as a finding of no significant risk, which we acknowledge may not have been its intent, the zero-release assumption represents a self-evident error in judgment. Therefore, we conclude that the finding is arbitrary and capricious.
 
 
 63
 2. The Zero-Release Assumption as a Decisionmaking Device
 
 
 64
 As stated above, the Commission's zero-release assumption is probably characterized better as a decisionmaking device than as a finding of fact, particularly in the interim and final Rules. By instructing licensing boards to assume that nuclear waste will have no impact on the environment once it is sealed in a repository, the Table S-3 Rule has served to allocate to the Commission sole responsibility for considering the risk that long-lived wastes will not be disposed of with complete success. Under that decisionmaking scheme, the Commission considered the possibility of unsuccessful isolation of wastes prior to promulgating the Table S-3 Rule. The Rule itself represents the Commission's statement that it has done so, and that licensing boards should go forward licensing plants without duplicating its effort.
 
 
 65
 Just as the Commission avoided describing the zero-release assumption as a finding of fact, it did not describe the assumption in precisely these terms either. In more recent years, however, the Commission has, at various times, seemed to indicate that this is essentially its view of the assumption. For instance, in its Statement of Consideration for the Final Rule, the Commission stated:
 
 
 66
 In view of the uncertainties noted regarding waste disposal, the question then arises whether these uncertainties can or should be reflected explicitly in the fuel cycle rule. The Commission has concluded that the rule should not be so modified. On the individual reactor licensing level, where the proceedings deal with fuel cycle issues only peripherally, the Commission sees no advantage in having licensing boards repeatedly weigh for themselves the effect of uncertainties on the selection of fuel cycle impacts for use in cost-benefit balancing. This is a generic question properly dealt with in this rulemaking as part of choosing what impact values should go into the fuel cycle rule. The Commission concludes, having noted that uncertainties exist, that for the limited purpose of the fuel cycle rule it is reasonable to base impacts on the assumption which the Commission believes the probabilities favor, i.e., that bedded-salt repository sites can be found which will provide effective isolation of radioactive waste from the biosphere.[119]
 
 
 67
 Our inquiry, therefore, must focus on whether the decisionmaking device of the Rule-including the Commission's investigation, analysis, and deliberation prior to the Rule's promulgation-has provided the type of consideration and disclosure of uncertainties that NEPA requires.
 
 
 68
 In general, an agency in the position of the Commission is free to implement NEPA through generic rulemaking. If certain types of environmental costs are common to a class of actions, NEPA does not require that an agency engage in duplicative and possibly inconsistent individual determinations, but allows it, in the alternative, to conduct a single rulemaking to determine generic values to be considered together with case-specific costs and benefits in individual proceedings.[120] Similarly, if there are both costs and benefits common to a class of individual actions, an agency is free, not only to determine generic values for those costs and benefits, but also to weigh the costs and benefits against each other to produce a generic "net value." To the extent that certain costs and benefits cannot be compared on a single scale, the generic determination of net value is necessarily more complex. It may involve instructing case-specific decisionmakers to insert fictional values into their cost-benefit analyses. A generic rule might be promulgated, for instance, designating that certain entries on one side of an individual actions' ledger should be treated as zero, or nonexistent, and assigning offsetting values to certain entries on the other side of the ledger. The agency may even determine that certain classes of generic costs and benefits so balance each other that both can be treated as zero for purposes of individual decisions. In the abstract, such generic structuring of individual decisionmaking is acceptable as long as it is based on the agency's reasoned judgments about how the generic costs and benefits weigh against each other.[121] In the course of such a generic rulemaking, however, the agency must consider and disclose the actual environmental effects it has assessed in a manner that will ensure that the overall process, including both the generic rulemaking and the individual proceedings, brings those effects to bear on decisions to take particular actions that significantly affect the environment. If the overall decisionmaking process allows for this type of consideration-which is precisely that described in Calvert Cliffs'[122]-the agency may then direct case-specific decisionmakers to abide by the generic rule, and thereby preclude their reevaluation of either the underlying determinations of costs and benefits or the process by which those costs and benefits were assessed against each other.
 
 
 69
 Under the Table S-3 Rule, licensing boards consider virtually all factors relevant to the construction and operation of a nuclear power plant. The zero-release assumption, however, excludes from their consideration two factors: 1) uncertainty concerning the integrity of the permanent repository, if such a repository is ever built; and 2) uncertainty over whether and when such a repository, or equivalent system of disposal, will be developed. These uncertainties reflect two environmental costs of licensing a plant. The first cost is the risk that wastes created by the plant will eventually damage the environment by emitting radiological effluents from a faulty permanent repository. The second cost is the risk that waste created by the plant will have to remain in another type of repository-possibly on site[123]-and emit radiological effluents prior to permanent disposal, if such disposal ever comes about. Hence, the zero-release assumption prevents licensing boards from considering two environmental costs.
 
 
 70
 The Commission argues that its consideration and disclosure of these costs prior to promulgating the Rule was sufficient under NEPA, and that the licensing boards need not reconsider them. We disagree. Although the Commission did consider these uncertainties, it did not do so in a manner that would allow licensing decisions to be affected-either directly or indirectly-by the risk that nuclear waste will not be successfully isolated from the environment indefinitely. After recognizing that there are uncertainties concerning the permanent storage of nuclear wastes, the Commission simply ruled that licensing decisions should be made on the basis of cost-benefit analyses that omitted the costs represented by those uncertainties. It did not rule that the costs were insignificant,[124] nor did it rule that they were outweighed by generic benefits that would also be excluded from licensing boards' consideration. In effect, therefore, the Commission directly contravened NEPA's requirement that environmental costs be considered "at every stage where an overall balancing of environmental and nonenvironmental factors is appropriate."[125] The risks entailed by the possible failure to develop a successful waste-disposal system were never part of any "balancing." They were considered alone, in a vacuum, and then excluded from the licensing boards' balancing. The process that began with the proposal of the Table S-3 Rule does not allow the uncertainties concerning permanent storage to play a role in the ultimate licensing decision. That omission, and hence, the Rule, which causes it, constitutes a blatant violation of NEPA.
 
 
 71
 In arguing that it adequately considered the uncertainties surrounding long-term storage, the Commission emphasizes the fact that these uncertainties represent generic costs.[126] The Commission recognizes that cost-benefit balances differ among individual plants and that these uncertainties are relevant costs, particularly if a plant's cost-benefit balance is close.[127] Nonetheless, the Commission asserts that "(it remains) a generic question how to weigh these uncertainties (in individual cases)."[128] To the extent that the Commission is arguing that the uncertainties can be assessed generically, and that the attendant risks can be measured generically, we agree. As we have stated above, however, the Commission cannot find the environmental cost represented by the uncertainties to be zero unless their cost is, in fact, zero.[129] Similarly, although the Commission can assess generic costs in a generic rulemaking, it must, in some manner, factor its assessment into ultimate decisions to license plants.[130] One way in which the Commission could do so would be to follow the course that it has taken with respect to other environmental costs of licensing nuclear power plants: It could assess and evaluate the uncertainties and attendant risks, and instruct licensing boards to consider and disclose them in a uniform manner. To the extent that the Commission is arguing, however, that generic costs need not be considered at all within the context of balancing the costs and benefits of licensing decisions, we strongly disagree. The fact that certain environmental costs can be assessed generically does not imply that they can be excluded entirely from the balancing process that must precede an agency's decision to take a major action.[131]
 
 
 72
 The Commission also argues that its disclosure of uncertainties in its Statements of Consideration and in its staff reports, satisfies NEPA's requirement of a "detailed statement." We recognize that the NRC, particularly in promulgating the final Rule, has disclosed the nature of many of the uncertainties surrounding the storage of long-lived wastes.[132] NEPA, however, requires an agency to do more than to scatter its evaluation of environmental damage among various public documents. As stated above, an agency must disclose environmental costs-including uncertainties concerning such costs-in a manner that proves to the public that the agency has properly considered the environmental costs of its action.[133] In this case, because the Commission has not properly considered such costs, the issue whether it has disclosed enough raw information is beside the point.
 
 
 73
 In sum, when viewed as an administrative decisionmaking device, the zero-release assumption of Table S-3 constitutes a violation of NEPA. Under section 706(2)(A) of the APA, it is, therefore, "not in accordance with law."[134]
 
 
 74
 Alternatively, the same result can be reached under the arbitrary and capricious standard.[135] Under that standard, as stated above, our inquiry focuses upon whether the zero-release assumption is based on "consideration of the relevant factors."[136] Under NEPA, significant uncertainty surrounding the environmental effect of a proposed action is relevant to an agency's decision to rule generically that the effect will not occur. For an agency to go forward in the face of significant uncertainty and issue such a rule indicates either a failure to consider a relevant factor or a clear error in judgment. Because that is precisely what the Commission did in promulgating the Table S-3 Rule, we could also conclude that its action was arbitrary and capricious.[137]
 
 B. Consideration of Other Uncertainties
 
 75
 The NRDC seems to argue that Table S-3 masks uncertainties underlying waste-management activities other than permanent disposal.[138] It has not, however, indicated where those uncertainties lie or what values in the Table obscure them. Similarly, the Commission has responded to the NRDC by focusing primarily on the uncertainties surrounding the successful development of a permanent repository.[139] As a result, we face considerable difficulty reviewing this issue.
 
 
 76
 Table S-3 lists several gaseous and liquid radiological effluents along with low-level, high-level and transuranic solid wastes.[140] The gaseous and liquid effluent releases are expected to occur at the early stages of the waste-management process, before the wastes are solidified and prepared for permanent disposal. The staff reports supporting the Table S-3 Rules indicate that there is indeed uncertainty concerning the predictions of these releases. In contrast to its method of projecting releases from the solid waste stored in a permanent repository, however, it appears that the Commission used "worst case" estimates in determining Table S-3's values for gaseous and liquid releases. The Commission assumed, for example, that all of the tritium, krypton-85 and carbon-14 in spent fuel would be discharged into the environment during reprocessing.[141] The Commission also seems to have used equally conservative assumptions in determining Table S-3's values for releases of iodine-129, iodine-131 and other radioactive gases.[142] One issue before us, therefore, is whether the Commission violated NEPA in treating these uncertainties in this manner, rather than by representing uncertainty itself in the Table. We hold that it did not.
 
 
 77
 As we have emphasized above, NEPA requires an agency to consider the environmental risks of a proposed action in a manner that allows the existence of such risks to influence the agency's decision to take the action.[143] An agency can do this by having the appropriate decisionmakers consider all that is known and unknown about the risks before deciding whether to take an action. Or, it can organize its decisionmaking process in such a manner that the appropriate decisionmakers consider only the upper bound of reasonably foreseeable environmental costs. If, after considering that level of environmental damage, the decisionmakers conclude that the proposed action is worth its societal costs, full account will have been taken of the action's environmental impact. Similarly, if the upper bounds of environmental risks are disclosed in an EIS, Congress, the public, and any interested agency can effectively assess for themselves whether the agency has proposed an action that is not worth its environmental costs. Either method of considering and disclosing uncertainties surrounding an environmental effect is acceptable under NEPA.[144] Thus, to the extent that the Commission has listed the upper bound of reasonably foreseeable gaseous and liquid effluent releases in Table S-3, we hold that it has complied with NEPA.
 
 
 78
 It is impossible for this court to determine whether there are other numerical values in Table S-3 that mask uncertainties without using such conservative heuristic devices as a worst-case scenario. We expect, however, that the Commission's consideration of uncertainties underlying the zero-release assumption will encompass any significant uncertainties underlying other values in the Table.[145]
 
 
 79
 C. Consideration of Health, Socioeconomic and Cumulative Effects
 
 
 80
 Petitioner NRDC also challenges the original and interim Rules for failing to allow proper consideration or disclosure of the actual environmental impact of the fuelcycle.[146] In all versions of the Rule, Table S-3 lists the environmental effects of the fuel cycle in terms of the quantity of land, water, and energy used, and of heat, chemicals and radioactivity released. It does not reveal the meaning of those impacts in terms of human health or other environmental values. The Table does not, for instance, indicate the number of cancer deaths or genetic defects to be expected. Nor does it refer to potential social, psychological, and economic disruptions that might accompany the siting of waste repositories, the construction of reprocessing and disposal facilities, or the maintenance of safety and security over long periods of time. Furthermore, the Table, which is based on the incremental impact of one prototypical reactor operating for one year, assumes that there will be no cumulative effects of licensing scores of reactors each of which will remain in operation for thirty to forty years.
 
 
 81
 There can be no dispute that NEPA requires the health, socioeconomic and cumulative impacts of a proposed action to be disclosed in an EIS.[147] Otherwise, the statement could not fulfill its purpose of informing the public, Congress, and other decisionmakers of the environmental impact of the action.[148] Nor could the environmental cost-effectiveness of a proposed action be compared to that of alternative actions if the environmental effects of each are not disclosed in such commensurable terms. In this case, therefore, it is not releases of curies that Congress wanted disclosed; it is the effects, or environmental significance, of those releases. Those effects are defined by the CEQ regulations to include:
 
 
 82
 ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative.[149]
 
 
 83
 Hence, the issue before us is whether the provisions of the original and interim Rules that governed the use of Table S-3 allowed for proper consideration of these environmental values.
 
 
 84
 Our resolution of that issue is complicated by the fact that the relevant provisions of the Rule have undergone several transformations since their initial promulgation. The original and interim Rule provided that "the contribution of the environmental effects of ... fuel cycle activities shall be as set forth in the following Table S-3 ... (and) no further discussion of such environmental effects shall be required."[150] Prior to 1977, individual licensing boards interpreted this clause to preclude their consideration of the environmental significance of the numerical values listed.[151] In its January 1977 Hartsville decision, however, the Commission's Appeal Board ruled that a licensing board must consider the relative health effects of a proposed nuclear power plant and a coal-fired alternative.[152] Then, in April 1978, the Commission promulgated a "clarifying" amendment to the interim Table S-3 Rule which specifically provided that health effects could be considered by individual licensing boards.[153] In addition, the Commission broadened the scope of licensing boards' consideration by amending the restriction on such consideration to read: "No further discussion of the environmental effects addressed by the Table shall be required."[154] The amended interim Rule did not, however, explicitly address the consideration of any type of impact other than health effects. Ultimately-or perhaps penultimately-in the final Rule, which the NRDC does not challenge, the Commission resolved the issue by requiring licensing boards to consider the socioeconomic and cumulative effects in addition to the health effects of the releases projected in the Table.[155] At that point, the Commission also indicated that it would conduct further proceedings to determine such health, socioeconomic and cumulative effects on a generic basis, and thereby eliminate the need for case-by-case consideration.[156]
 
 
 85
 The NRDC argues that the original, the interim and the amended interim Rules violated NEPA by preventing licensing boards from considering the health, socioeconomic and cumulative effects of fuel-cycle activities.[157] The Commission responds by arguing that each version of the Rule complied with NEPA because none explicitly precluded such consideration. We find the Commission's argument unpersuasive.
 
 
 86
 The original Rule and the interim Rule, prior to its amendment, stated that "the contribution of the environmental effects of ... fuel cycle activities shall be as set forth in the following Table S-3 ... (and) no further discussion of such environmental effects shall be required."[158] The term "such" refers to the phrase "the contribution of the environmental effects of ... fuel cycle activities." Therefore, the Rules unambiguously stated that a licensing board's consideration and an EIS's disclosure of the environmental effects of fuel-cycle activities could be limited to the information contained within the four corners of Table S-3. Moreover, it appears that the impact of the Rules was to preclude further consideration or disclosure. The background of the Rules makes this conclusion even clearer. Recall that the proposal for the original Rule suggested two ways of dealing with the environmental effects of fuel-cycle activities.[159] One approach was to ignore those environmental effects in individual licensing proceedings as the Appeal Board had allowed in Vermont Yankee ; and the other, which was adopted, was to factor those effects into individual cost-benefit analyses by using Table S-3. Since the Table S-3 Rule was adopted as an alternative to a rule that would have permitted no consideration or disclosure of the environmental effects of the fuel cycle, it was reasonable for licensing boards and interested parties to conclude that the Rule limited consideration of such environmental effects to the introduction of the Table.[160] The Commission itself has recognized as much. For instance, in promulgating the final Rule, the Commission stated that the Table S-3 Rule "at least initially was apparently interpreted as cutting off further discussion of fuel cycle impacts"[161] and that
 
 
 87
 the rule in practice (was applied) as allowing fuel cycle impacts to be addressed in reactor licensing proceedings solely by the formal act of displaying Table S-3 in impact statements, with no further discussion. In particular, impact statements prepared by the staff did not analyze fuel cycle impacts in terms of health effects which might be caused by the radioactive releases tabulated in the rule and did not discuss socioeconomic or cumulative impacts.[162]
 
 
 88
 The original Rule and the interim Rule, prior to its amendment, thus effectively eliminated the consideration and disclosure of the health, socioeconomic and cumulative impacts of fuel-cycle activities. The NRC, therefore, in promulgating the original and interim Rules violated NEPA.[163]
 
 
 89
 The Commission argues that the Appeal Board's Hartsville[164] decision eliminated any preclusive effect that the Rules may have had on the consideration of health, socioeconomic and cumulative impacts.[165] We disagree. First, the decision in Hartsville was itself ambiguous. Although holding, in general, that a licensing board had to examine the comparative health effects of a nuclear plant and the alternative of a coal-fired plant, the Appeal Board specifically refrained from considering any environmental effect of waste-management and disposal activities, awaiting direction from the Commission in the then-pending interim Table S-3 Rule.[166] Second, the Hartsville decision only addressed health effects in the context of comparing a nuclear plant with a coal-fired alternative.[167] Finally, the Hartsville decision did not address cumulative or socioeconomic effects. Thus, even after Hartsville, it remained apparent that the consideration of health, and particularly, cumulative and socioeconomic impacts of the fuel cycle was precluded by the Table S-3 rules.[168]
 
 
 90
 Not until the Commission's amendment of the interim Rule did it become reasonably clear that health, cumulative, or socioeconomic impacts could be considered in individual licensing proceedings under the Table S-3 Rule.[169] Even with the amendment, in fact, there could be some doubt as to whether or not cumulative or socioeconomic impacts were still precluded from consideration. As stated above, the amended Rule and its Statement of Consideration referred explicitly to health effects, but not to socioeconomic or cumulative effects.[170] Nevertheless, it did replace the language that had effectively limited licensing boards' consideration and disclosure of the environmental effects of fuel-cycle activities to the values listed in Table S-3. The new language precluded consideration of the effects "addressed by the Table."[171] Because socioeconomic and cumulative effects were not addressed by the Table, the terms of the amended Rule did not prevent licensing boards from considering such effects and should not have prevented such effects from being disclosed in environmental impact statements. Thus, the amendment of the interim Rule eliminated the NEPA violation.
 
 
 91
 In view of the foregoing, we hold that the original Table S-3 Rule and the interim Table S-3 Rule, prior to amendment, were invalid. Although the amended interim Rule, and later the final Rule, allowed consideration of health, socioeconomic, and cumulative effects, a number of licenses issued under the original and unamended interim Rules have been challenged. Several of those cases are currently pending in this circuit awaiting this decision.[172]
 
 D. Economic Feasibility
 
 92
 Petitioner, the State of New York, and Intervenor, the State of Wisconsin, argue that the effluent-release values listed in Table S-3 assume the use of technology that is economically infeasible, even if it is technologically feasible. They argue, first, that the Commission applied an improper standard of economic feasibility in concluding that its projected releases are reasonably foreseeable; second, that the Commission's cost estimates are incorrect, and third, that the Commission failed to explain the basis of its finding of feasibility.[173] We conclude that, although the Commission could have been clearer in setting out its reasons for determining that Table S-3's predictions are economically feasible, the determination itself was not arbitrary or capricious.[174] Therefore, we affirm the Commission on this issue.
 
 
 93
 As Judge Tamm stated in our initial decision in this case, "(t)he Commission should be able to supply the court with a statement of the methods by which its staff arrived at the figures embodied in Table S-3 and by which (its staff) concluded that the waste storage problem is already technologically and economically soluble."[175] The values in Table S-3 are based on assumptions concerning the types of technology that will be used in waste-management and disposal activities.[176] For those values to represent reasonably foreseeable environmental effects, as required by NEPA, the use of that technology must be reasonably foreseeable. It must, therefore, be both technologically and economically feasible.[177]
 
 
 94
 In concluding that the facilities required to meet the effluent projections of Table S-3 are economically feasible, the Commission applied a standard of whether the facilities are "prohibitively" or "outrageously expensive."[178] Although the Commission's articulation of the standard is somewhat nebulous, we interpret it to mean that a facility would be economically feasible if its expected cost is no more than the nuclear power industry will pay, under the regulation of the NRC or with the aid of reasonably foreseeable public subsidization.[179]
 
 
 95
 New York and Wisconsin argue that "(e)conomic feasibility must be determined in the context of private enterprise, and the question is whether the costs are feasible for the profit-making sector."[180] The basis of their argument seems to be that if it is very expensive to limit effluent discharges to the levels predicted in the Table, the nuclear power industry may economize, at the expense of the public, by allowing higher discharges.[181] We find this approach untenable. The standard of economic feasibility may be based on realistic, conservative, and reasoned forecasts of who will have to pay the costs of waste management and disposal, and under what type of compulsion.[182] The history of the federal government's commitment to regulate and subsidize the nuclear power industry, and to operate certain nuclear facilities itself, is clear and long-standing. Moreover, at least the final repository envisioned by the Commission is expected to be developed and operated by the federal government.[183] The Commission, in making its prediction of economic feasibility, therefore, was justified in making the reasonable assumption that the regulatory structure of the nuclear power industry would remain basically unchanged.[184] Under that structure, the NRC will have the power to regulate the industry in such a manner that no private firm will be able to, let alone have an incentive to, cut its costs by allowing the release of more effluents than those projected in Table S-3. If it turns out that the industry cannot pay the full cost of managing and disposing of the waste it has created, it is reasonable to expect the federal government to help out, for society as a whole can be expected to prevent private industry from taking chances in handling nuclear waste. Because the possibility that a firm will have in a socially irresponsible manner is well within the control of the Commission, we hold that the Commission correctly determined that the standard of economic feasibility is that level of costs that the industry in combination with the federal government can reasonably be expected to pay. Of course, we can only hope that the Commission, in fact, exercises its control over the industry in a manner consistent with the public interest.[185]
 
 
 96
 New York and Wisconsin challenge, as arbitrary and capricious, both the cost estimates that the Commission accepted,[186] and the conclusion that such costs would be feasible.[187] The major elements of the Commission's cost estimates that New York and Wisconsin challenge are the discount rate used and the estimate of decommissioning costs.
 
 
 97
 In preparing the cost estimates in question, the Commission staff discounted future expenditures to present values at a ten percent rate. In the rulemaking proceeding and again before this court, New York objected to both the discounting procedure and the discount rate used, arguing that a discount rate from zero to two percent would be more appropriate.[188] We find, however, that although this argument may be meritorious, it does not undermine the Commission's finding of feasibility, because both the Hearing Board and the Commission used discount rates of zero and two percent in estimating the range of expected costs.[189]
 
 
 98
 New York and Wisconsin also argued before the Commission, and now before this court, that the Commission underestimated, by a factor of ten, the cost of decontaminating and decommissioning (D&D) a reactor.[190] Although the Hearing Board took evidence on D&D costs, the Commission ultimately decided that the consideration of such costs should be relegated to individual licensing proceedings.[191] D&D costs were consequently held to be irrelevant to the economic feasibility of the Table S-3 values. The effluent values in Table S-3 nevertheless continue to include effluents emitted from decommissioned plants.[192] We must assume, therefore, that licensing boards will use Table S-3's values attributable to decommissioning only if they are assured that the decommissioning method assumed by the Table is reasonably likely to be the method used for the individual reactor under consideration. If not, we assume that the licensing board will be free to consider the full environmental costs of whatever decontamination and decommissioning method is expected to be used.[193] Thus to this limited extent, we interpret the Table S-3 Rule to be nonpreemptive. Therefore, we reject New York's and Wisconsin's contention that Table S-3 is invalid because of inaccuracies in the D&D cost estimates.
 
 
 99
 Using a variety of discount rates and including the staff's estimated decommissioning costs,[194] the Commission found that the projected waste-management and disposal facilities would entail capital costs of between $71 million and $76 million,[195] and operating costs ranging from 0.4 mills/KWh to 1.4 mills/KWh for the once-through cycle and 1.9 mills/KWh to 3.9 mills/KWh for the uranium-only recycle option.[196] The Commission observed that such costs represented less than 10% of the capital costs and less than 5% of the operating costs of a typical reactor.[197] The Commission found these costs to be feasible simply because they represent only a small fraction of the total cost of building and operating a reactor.[198] New York and Wisconsin argue that the finding is arbitrary and capricious because the Commission did not explain why, even under the Commission's own standard, these costs are feasible. We conclude that, although the Commission's reasoning is far from transparent, its finding of economic feasibility is neither arbitrary nor capricious. We recognize that an agency must provide a rational connection between facts found and conclusions reached, and a court may not supply a reasoned basis for an agency's action.[199] Nonetheless, a court must uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned;[200] and in reviewing an agency's decision, a court can only ensure that the agency properly considered all relevant factors, and that its conclusion does not represent a clear error in judgment.[201] In this case, it is apparent that by comparing the projected costs of waste management and disposal to current reactor costs, the Commission was implicitly considering the level of private and, if necessary, public resources that could reasonably be expected to be available for these activities.[202] Because these waste-management and disposal expenses represent a comparatively small addition to the resources needed to build and operate a reactor, and because a plant need not be built if it appears that those expenses will render the plant unprofitable, we cannot say that the Commission clearly erred in determining that sufficient resources would be available. The Commission has thus addressed the relevant factor of the availability of private and public resources and reached a conclusion that is within the range of reasonability. We conclude that the Commission's finding of economic feasibility was not arbitrary or capricious, and dismiss the petition in No. 79-2110.
 
 CONCLUSION
 
 100
 For the foregoing reasons, we hold that the original, interim and final Table S-3 Rules are invalid due to their failure to allow for proper consideration of the uncertainties that underlie the assumption that solidified high-level and transuranic wastes will not affect the environment once they are sealed in a permanent repository. We also hold that the original Rule and the interim Rule, prior to its amendment, are invalid due to their failure to allow for proper consideration of the health, socioeconomic and cumulative effects of fuel-cycle activities. We conclude, however, that the Commission's finding of economic feasibility was not arbitrary or capricious. We, therefore, vacate all three Rules. Licenses already granted under the Rules are not at issue in this action, and we accordingly express no view as to their validity. The validity of those licenses will be determined in subsequent proceedings.[203]
 
 
 101
 Vacated and Remanded.
 
 
 102
 GEORGE CLIFTON EDWARDS, Jr.,* Circuit Judge, concurring in part and dissenting in part.
 
 
 103
 This case may prove to be one of the most important cases to be decided by the United States courts in this century. The United States Supreme Court, in reversing this court's previous remand of this case to respondent, the Nuclear Regulatory Commission (NRC or Commission), emphasized the magnitude of the problem it was sending back for our reconsideration:
 
 
 104
 The Commission itself, in a pamphlet published by its information office, clearly recognizes that these wastes "pose the most severe potential health hazard...." U.S. Atomic Energy Commission, Radioactive Wastes 12 (1965). Many of these substances must be isolated for anywhere from 600 to hundreds of thousands of years. It is hard to argue that these wastes do not constitute "adverse environmental effects which cannot be avoided should the proposal be implemented," or that by operating nuclear power plants we are not making "irreversible and irretrievable commitments of resources." 42 U.S.C. §§ 4332(2)(C)(ii), (v).
 
 
 105
 Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 538-39, 98 S.Ct. 1197, 1208-09, 55 L.Ed.2d 460 (1978), rev'g Natural Resources Defense Council v. Nuclear Regulatory Commission, 547 F.2d 633 (D.C.Cir.1976).
 
 
 106
 In this case we are required to review the continuing effort of the NRC to pit human intelligence against the most primordial force of nature. This force, when involved in its most awful manifestation, exceeds the power of flood, fire, pestilence, earthquake, hurricane and volcano. In this century, it has been demonstrated in this and other countries that this force can be employed for peace and war-for warming a baby's bottle and for nuclear holocaust.
 
 
 107
 It is not the function of the judicial branch either to initiate or to halt the development of a nuclear power industry. These national policy choices are constitutionally vested in the President and the Congress of the United States, and they have been made in favor of proceeding.
 
 
 108
 This court's limited function is to determine from the agency record before us whether or not the Commission's decision to adopt certain Tables S-3, 10 C.F.R. § 51.20(e) (1981), was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[1] The S-3 Tables instruct the licensing boards, which are delegated the task of licensing all new nuclear power plants, that there will be "zero" release of emissions or releases so small as to be insignificant,[2] from the nuclear waste accumulated or to be accumulated from plants now licensed or which may be licensed during the 2,500 centuries it will take for that waste to decay. Thus the Commission seeks to preclude further licensing hearings from considering the hazards from unanticipated, accidental or willful release of emissions beyond those specified in the Tables from the highly toxic and potentially explosive wastes generated by nuclear power plants during temporary storage, reprocessing, transportation and 250,000 years of burial. 46 Fed.Reg. 15154, 15156 (March 4, 1981).
 
 
 109
 I concur fully with Judge Bazelon's opinion for the court, except for the cost issue.
 
 
 110
 I write separately in concurrence to express deep concern for additional problems and uncertainties that I believe to be buried in the naked figures and enigmatic footnotes of the Tables S-3 that this appeal requires us to review. Further, in computing the cost of the proposed nuclear waste disposal system, the NRC has not included the costs of surveillance of and guarding the public from the toxic effects from nuclear waste at all disposal sites for somewhere between 10,000 to 250,000 years. As a consequence, I dissent from the opinion for the court on this issue and state my reasons at the end of this opinion.
 
 
 111
 My concurrence with Judge Bazelon is based on the reasoning he has ably set forth. But I find what appear to me to be even more substantial reasons to agree with his result. An integral part of the "back end" of the nuclear fuel cycle involves the NRC's plan for reprocessing spent fuel rods. Reprocessing involves extraction from the spent fuel rods of either the remaining uranium and plutonium (uranium and plutonium recycle) or just the remaining uranium (uranium-only recycle). Both elements can be prepared as fuel usable in light-water reactor power plants. The uranium can be enriched and again fashioned into uranium-based fuel rods; in the alternative, the plutonium can be combined with uranium to form mixed oxide fuel rods. There are many indications in this record that the Commission originally intended to use both uranium and plutonium extracted by reprocessing as supplementary fuel in all nuclear power plants, licensed or to be licensed.
 
 
 112
 On April 7, 1977, a presidential order indefinitely suspended reprocessing of spent fuel. 13 Weekly Comp. of Pres. Doc. 506. A new presidential statement on nuclear energy policy, however, dated October 8, 1981, "lift(ed) the indefinite ban which previous administrations placed on commercial reprocessing activities in the United States." 17 Weekly Comp. of Pres. Doc. 1102. There is now reason to believe that the Commission will proceed with plans to reprocess spent fuel rods thus extracting both uranium and plutonium.
 
 
 113
 Table S-3 in its final form purports to summarize all "releases" that may be expected in the entire nuclear fuel cycle, except for radon and technetium, which are irrelevant to our present considerations. Moreover, in a proposed "Narrative Explanation of Table S-3," the NRC states that "the environmental impacts from reprocessing and related waste management activities are nearly identical for the recycling of uranium and plutonium, and for the recycling of uranium only, as fuel in nuclear power reactors." 46 Fed.Reg. 15154, 15161 (March 4, 1981).
 
 
 114
 The proposed narrative avoids discussing the potential environmental impacts of plutonium. The Commission has not, however, disavowed its option to use both uranium and plutonium as reactor fuel-probably in the form of mixed oxide fuel. The NRC may well read any final approval of the S-3 Tables by the federal courts as foreclosing any further public hearings or litigation over the matter.
 
 
 115
 Absent any clear indication to the contrary from the Commission, I feel prudence requires this court to assume that approval of Tables S-3 would be read by the Commission as judicial sanction for its originally intended-and now presidentially permitted-employment of plutonium as reactor fuel.
 
 
 116
 Plutonium is the most dangerous substance yet known in the history of the world. Airborne, the tiniest speck of it breathed into a human being will produce lung cancer. Twenty pounds of this powder can be made into a nuclear bomb with the explosive force of the atomic bombs that destroyed Hiroshima and Nagasaki in the fall of 1945. The Commission's originally contemplated nuclear waste disposal scheme included reprocessing of all spent fuel rods from all nuclear power plants now licensed (71) or in contemplation (190). Such reprocessing, depending on the number of plants in operation, would extract each year 35,000 to 93,500 pounds of plutonium[3] in the form of plutonium oxide. The plutonium, in the form of mixed oxide fuel, would then be transported by truck or rail through many heavily populated areas to all nuclear power plants wherever located in the nation and stored until it is consumed as nuclear fuel.
 
 
 117
 If this scheme is executed according to what I perceive to be NRC's plan, many private corporations will continually have on hand substantial stocks of the most lethal weapons material ever produced.
 
 
 118
 Unlike spent fuel rods, plutonium oxide powder can be approached by human beings without fear of radiation. If sealed in an airtight container, it can be transported without harm to the bearer. Also, it is estimated that many thousand people in the United States have the knowledge necessary to fashion a nuclear bomb from this material.[4]
 
 
 119
 In the dangerous world in which we live, attempts by foreign or domestic terrorists to divert plutonium oxide to international or domestic blackmail or catastrophic destruction must be anticipated.
 
 
 120
 How NRC contemplates protecting this huge amount of hazardous material from forcible seizure on the highways and rail lines of the United States, and from theft or illegal diversion from storage at between 71 and 190 nuclear power plants is most inadequately dealt with in this record.
 
 
 121
 Finally, the ancient question, "But who is to guard the guards themselves?" is pertinent. The nuclear weapons of the United States are closely guarded by its armed forces. Their employment is subject to command controls so carefully devised that they terminate in the hands of the President of the United States. Yet it appears that the NRC plans to ship bomb-grade materials freely by road or rail, guarded by civilian employees of the private corporation that secures the reprocessing contract. 10 C.F.R. § 70 (1981). And it appears that the NRC may place supplies of plutonium oxide in the form of mixed oxide fuel with its awesome power on the premises of a total of 71 to 190 nuclear power plants under the control of private corporate officers chosen by and responsible to as many private corporate boards of directors. 10 C.F.R. § 72 (1981).
 
 
 122
 In the long history contemplated for the nuclear power adventure, we cannot be certain that the raw power placed in so many private hands will never be used against the security of our people or of our form of government.
 
 
 123
 Any failure to deal with the hazards of this plan may be read by the NRC as validation sub silentio of a plan involving incredible dangers. In its original consideration of using atomic energy for production of electric power, Congress repeatedly required "the protection of the health and safety of the public." For the reasons which follow, I would not risk the dangers and uncertainties contained in the S-3 Tables without a prior remand of the NRC reprocessing, transportation and storage plans for thorough briefing and argument as to the legality of said plans for the use of plutonium as fuel under the public health and safety requirements of the Atomic Energy Act of 1954. 42 U.S.C. §§ 2012(d), (e), 2133(b), (d), 2232(a) (1976).
 
 THE THREE S-3 TABLES
 
 124
 In this case we are now reviewing three variations of Table S-3: an original version, an interim version and a final version. For purposes of this appeal, the differences between the three versions are inconsequential. To illustrate something about the nature of the problem with which this court has been faced, I print the final version of Table S-3 in full:
 
 
 125
 Table S-3.--Table of Uranium Fuel Cycle Environment Data1
 
 
 126
 (Normalized to model LWR annual fuel requirement (WASH-1248)
 or reference reactor year (NUREG-0116))
-------------------------------------------------------------------------------
 Maximum effect per annual fuel
Environmental Total requirement or reference reactor
Considerations year of model 1,000 MWe LWR
-------------------------------------------------------------------------------
 NATURAL RESOURCES USE
Land (acres):
 Temporarily committed 2 ........... 100
 Undisturbed area ................. 79
 Disturbed area ................... 22 Equivalent to a 110 MWe coal-fired
 power plant.
 Permanent committed ................ 13
 Overburden moved
 (millions of MT) ................ 2.8 Equivalent to 95 MWe coal-fired
 ------ power plant.
Water (millions of
 gallons):
 Discharged to air ................. 160 =2 percent of model 1,000 MWe LWR
 with cooling tower.
 Discharged to water
 bodies ......................... 11,090
 Discharged to ground .............. 127
 ------
 Total ........................ 11,377 4 percent of model 1,000 MWe LWR
 ------ with once-through cooling.
Fossil fuel:
 Electrical energy
 (thousands of MW-hour) .......... 323 5 percent of model 1,000 MWe LWR
 output.
 Equivalent coal
 (thousands of MT) ............... 118 Equivalent to the consumption of a
 45 MWe energy output.
 Natural gas
 (millions of scf) ............... 135 0.4 percent of model 1,000 MWe
 energy
 output.
 EFFLUENTS--CHEMICAL (MT)
Gases (including
 entrainment): 3
 SO subx ......................... 4,400
 NO subx 4 ....................... 1,190 Equivalent to emissions from 45 MWe
 coal-fired plant for a year.
 Hydrocarbons ....................... 14
 CO ............................... 29.6
 Particulates .................... 1,154
Other gases:
 F ................................. .67 Principally from UF sub6 production,
 enrichment, and reprocessing.
 Concentration within range of
 state standards--below level
 that has effects on human health.
 HCl .............................. .014
Liquids:
 SO- sub4 .......................... 9.9 From enrichment, fuel fabrication,
 NO- sub3 ......................... 25.8 and reprocessing steps.
 Fluoride ......................... 12.9 Components that constitute
 Cakk .............................. 5.4 a potential for adverse
 Cl- ............................... 8.5 environmental effect are present
 Nak .............................. 12.1 in dilute concentrations and
 NH sub3 .......................... 10.0 receive additional dilution by
 Fe ................................. .4 receiving bodies of water to
 levels below permissible
 standards. The constituents that
 require dilution and the flow of
 dilution water are:
 NH sub3 --600 cfs.
 NO sub3 --20 cfs.
 Fluoride--70 cfs.
Tailings solutions
 (thousands of MT) ................. 240 From mills only--no significant
 effluents to environment.
Solids ........................... 91,000 Principally from mills--no
 significant effluents
 to environment.
 EFFLUENTS--RADIOLOGICAL
 (CURIES)
Gases (including
 entrainment):
 Rn-222 ................................. Presently under reconsideration by
 the Commission.
 Ra-226 ............................ .02
 Th-230 ............................ .02
 Uranium .......................... .034
 Tritium (thousands) .............. 18.1
 C-14 ............................... 24
 Kr-85 (thousands) ................. 400
 Ru-106 ............................ .14 Principally from fuel reprocessing
 plants.
 I-129 ............................. 1.3
 I-131 ............................. .83
 Tc-99 .................................. Presently under consideration by the
 Commission.
 Fission products
 and transuranics ............... .203
Liquids:
 Uranium and daughters ............. 2.1 Principally form milling--including
 tailings liquor and returned to
 ground--no effluents, therefore,
 no effect on environment.
 Ra-226 .......................... .0034 From UF sub6 production.
 Th-230 .......................... .0015
 Th-234 ............................ .01 From fuel fabrication plants--
 concentration 10 percent of 10
 CFR 20 for total processing 26
 annual fuel requirements for model
 LWR.
Fission and
 activation products ....... 5.9 X 10- 6
Solids (burned on site):
 Other than high level
 (shallow) ...................... 11,300 9,110 Ci comes from low level
 reactor wastes and 1,500 Ci comes
 from reactor decontamination
 and decommissioning--buried at
 land burial facilities. 600 Ci
 comes from mills--included in
 tailings returned to ground.
 Approximately 60 Ci comes from
 conversion and spent fuel storage.
 No significant effluent to the
 environment.
 TRU and HLW (deep) ......... 1.1 X 10 7 Buried at Federal Repository.
Effluents--Thermal
 (billions of
 British thermal units) .......... 4,063 5 percent of model 1,000 MWe LWR.
Transportation
 (person-rem):
 Exposure of workers and
 general public .................. 2.5
 Occupational exposure
 (person-rem) ................... 22.6 From reprocessing and waste
 management.
-------------------------------------------------------------------------------
1. In some cases where no entry appears it is clear from the background
 documents that the matter was addressed and that, in effect, the Table should
 be read as if a specific zero entry had been made. However, there are other
 areas that are not addressed at all in the Table. Table S-3 does not include
 health effects from the effluents described in the Table, or estimates of
 releases of Radon-222 from the uranium fuel cycle or estimates of
 Technetium-99 released from waste management or reprocessing activities.
 These issues may be the subject of litigation in the individual licensing
 proceedings.
 Data supporting this table are given in the "Environmental Survey of the
 Uranium Fuel Cycle," WASH-1248, April 1974; the "EnvironmentalSurvey of the
 Reprocessing and Waste Management Portion of the LWR FuelCycle," NUREG-0116
 (Supp. 1 to WASH-1248); the "Public Comments and Task Force Responses
 Regarding the Environmental Survey of the Reprocessing and Waste Management
 Portions of the LWR Fuel Cycle," NUREG-0216 (Supp. 2 to WASH-1248); and in
 the record of the final rulemaking pertaining to Uranium Fuel Cycle Impacts
 from Spent Fuel Reprocessing and Radioactve Waste Management, Docket RM-50-3.
 The contributions from reprocessing, waste management and transportation of
 wastes are maximized for either of the two fuel cycles (uranium only and no
 recycle). The contribution from transportation excludes transportation of
 cold fuel to a reactor and of irradiated fuel and radioactive wastes from a
 reactor which are considered in Table S-4 of Sec. 51.20(g). The contributions
 from the other steps of the fuel cycle are given in columns A-E of Table S-3A
 of WASH-1248.
2. The contributions to temporarily committed land from reprocessing are
 not prorated over 30 years, the complete temporary impact accrues regardless
 of whether the plant services one reactor for one year or 57 reactors for 30
 years.
3. Estimated effluents based upon combustion of equivalent coal for power
 generation.
4. 1.2 percent from natural gas use and process.
 
 
 127
 10 C.F.R. § 51.20(e) (1981).
 
 
 128
 As of this date the Commission has not finally[5] adopted any explanation of Table S-3, except to the degree that such may be found in the footnotes to the Table and in the briefs filed by the Commission.
 
 
 129
 Turning to the Table itself, the critical language may be found on the fifth from the last line of the Table, which reads:
 
 
 130
 "TRU and HLW (deep) .... 1.1 X 10[7]
 
 
 131
 Buried at Federal Repository."
 
 
 132
 Translated into possibly more understandable English, "TRU and HLW" mean transuranic and high level waste. "((D)eep)" is the sole stated explanation of the contemplated storage or disposal of such waste under the Commission's present thinking. The figure 1.1 X 10 to the 7th power refers to a total of 11 million curies per nuclear reactor per year. In a footnote keyed to the Table Heading, the Commission does elucidate further, as follows:
 
 
 133
 In some cases where no entry appears it is clear from the background documents that the matter was addressed and that, in effect, the Table should be read as if a specific zero entry had been made.
 
 
 134
 Table S-3 n.1.
 
 
 135
 This innocent sounding language actually stands for the Commission's holding that 11 million curies of high level radioactive waste per year for each of the presently licensed reactors will be temporarily stored, reprocessed, transported, and then buried and contained deep underground at some unascertained place in some undetermined stratum[6] at some undetermined time without any release at all of toxic effluents. The life of presently constructed reactors is estimated to be 30 to 40 years. See Proposed Appendix A, Narrative Explanation of Table S-3, 46 Fed.Reg. 15154, 15162 n.2 (Mar. 4, 1981). This means that within the lifetime of the 70[7] presently licensed nuclear power plants, there will be accumulated for disposal at least 2,100 plant-years of radioactive waste, each plant-year representing by Commission estimate 11 million curies.
 
 
 136
 If the mathematics involved is not sufficiently impressive, it may be appropriate to point out that a "curie" is defined as "a measure of the number of atoms undergoing radioactive disintegration per unit time and is 37 billion disintegrations per second, or about the rate of decay in 1 gram of natural radium." C. Fox, Radioactive Wastes 11 n.* (rev. ed. 1969).
 
 
 137
 If no other nuclear power plant is licensed or brought on line, the task of the Commission will involve containment in one or more federal repositories of radioactive waste sufficient to generate 854,700,000,000,000,000,000 (854.7 quintillion) disintegrations per second. Since the decay of radioactive waste spontaneously gives off substantial heat, the problem of preventing accidental or deliberate emission is central to any design that may be proposed for the federal repository. The gradual decay of radioactivity will extend, as the Supreme Court pointed out, from 600 to hundreds of thousands of years. Vermont Yankee, 435 U.S. at 538, 98 S.Ct. at 1209. Yet the Commission contends that this mass of energy and toxic waste (plus possibly two and one-half times more, which may be added by additional nuclear power reactor licensing) can and will be contained with "zero" release. This must be read as meaning no impact at all on the human race in its turbulent occupancy of this biosphere for a minimum period of 250,000 years.
 
 THE COMMISSION'S WASTE DISPOSAL PLAN
 
 138
 Licensing of nuclear power reactors began in 1958. Although some 82 licenses have been issued since 1958, several of those plants are no longer operating. At present, 71 reactors are "licensed for operation," although not all are currently on line.[8] The record before us contains published studies of various proposals for handling high-level nuclear waste for over 250,000 years. Many are in conflict. And one important aspect of the Commission's original plan, the reprocessing of spent fuel rods, had been in suspension from 1977 until October 8, 1981.
 
 
 139
 Originally, the Commission's thinking appears to have encompassed consideration of at least the following elements:
 
 
 140
 1) Containment buildings for spent fuel rods constructed at each nuclear power plant. These buildings are operated as an integral part of the plant and are guarded within the private power company's perimeter fences. No other temporary, interim, or permanent storage facility for commercial high-level nuclear waste has yet been built.
 
 
 141
 As a consequence, spent nuclear fuel is currently accumulating in all nuclear power reactor on-site waste storage facilities-in many instances in quantities far in excess of the originally contemplated storage capability. For example, the Vermont Yankee Nuclear Power Station in Vernon, Vermont, a relatively recent entry on the nuclear scene, was designed to store a maximum of 1,000 spent fuel rods. The Vermont Yankee Nuclear Power Corporation has now been given permission by the NRC to store 2,400 such spent fuel assemblies there. It is estimated that the plant can operate only until 1987 under this grant of authority, unless, presumably, some now nonexistent interim or permanent storage facility is provided or authority is granted for the spent fuel rods to be stacked even closer.
 
 
 142
 2) The NRC's original assumption was that all spent fuel produced by nuclear power reactors would be reprocessed before it was stored. It was also contemplated that the residue of high level waste, particularly plutonium, would be greatly diminished in volume in the process. Only this residue after such extraction was scheduled for storage in the permanent repository. As will be indicated below, this plan is now at least partially back in place.
 
 
 143
 In fact, a plant for reprocessing spent fuel was built by private industry at West Valley in New York State. It was small; it produced high levels of radioactive effluent releases. See 44 Fed.Reg. 45362, 45370 (Aug. 2, 1979). The operation proved to be uneconomical and was abandoned. Three other more sophisticated reprocessing plants-one actually constructed in Barnwell, South Carolina, and the others planned for Oak Ridge, Tennessee, and Marion, Illinois-were contemplated as a basic part of the NRC's nuclear waste disposal plan. This record indicates that thus far no reprocessing of spent nuclear fuel, except in small experimental amounts, has occurred.[9]
 
 
 144
 3) The NRC also contemplates an interim storage facility. This was described as a retrievable surface storage facility (RSSF). Scheduled to be built about 1980, the RSSF was thought to be capable of storing high-level waste for up to 100 years. The facility would have been built at ground level or slightly below. The high-level waste was to be placed in canisters capable of containing toxic emissions. The dissemination of heat from the decay processes would be accomplished by bringing containment canisters into contact with a coolant, either water or air. Each canister was then to be stored and subjected to cooling for 100 years in the RSSF before being moved to permanent storage.
 
 
 145
 No such facility has ever been built.
 
 
 146
 4) Most Commission documents indicate that all high-level waste ultimately will be placed in a federal repository for permanent disposal. The most frequently cited plan, as indicated earlier, is for deep burial in geologic salt deposits.[10] Studies of salt bed deposits have been made, the results of which the Commission staff regards as favorable to permanent containment.
 
 THE REVIEW STANDARD
 
 147
 The statute under which the Supreme Court has directed us to review this case is the Administrative Procedure Act, 5 U.S.C. §§ 551-59, 701-06 (1976). In applicable part the Act says:
 
 
 148
 To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall -
 
 
 149
 (1) compel agency action unlawfully withheld or unreasonably delayed; and
 
 
 150
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be -
 
 
 151
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 
 
 152
 (B) contrary to constitutional right, power, privilege, or immunity;
 
 
 153
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
 
 
 154
 (D) without observance of procedure required by law;(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
 
 
 155
 (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
 
 
 156
 Id. § 706 (emphasis added).
 
 
 157
 The critical language to which the Supreme Court directed our attention, Vermont Yankee, 435 U.S. at 535 n.14, 98 S.Ct. at 1207 n.14, is found italicized above. The Supreme Court has unanimously interpreted this language as follows:
 
 
 158
 Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, supra, (401 U.S.), at 416 (91 S.Ct. at 823). The agency must articulate a "rational connection between the facts found and the choice made." Burlington Truck Lines v. United States, 371 U.S. 156, 168 (83 S.Ct. 239, 246, 9 L.Ed.2d 207) (1962). While we may not supply a reasoned basis for the agency's action that the agency itself has not given, SEC v. Chenery Corp., 332 U.S. 194, 196 (67 S.Ct. 1575, 1577, 91 L.Ed. 1995) (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595 (65 S.Ct. 829, 836, 89 L.Ed. 1206) (1945).
 
 
 159
 Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86, 95 S.Ct. 438, 441-42, 42 L.Ed.2d 447 (1974).
 
 
 160
 This court has repeatedly cited and followed Bowman and other Supreme Court authority on the arbitrary and capricious standard:
 
 
 161
 It is axiomatic that we may not substitute our judgment for that of the agency. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814 (823), 28 L.Ed.2d 136 (1971). Yet our review must be "searching and careful," id., and we must ensure both that the Commission has adequately considered all relevant factors, see id., and that it has demonstrated a "rational connection between the facts found and the choice made," Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962).
 
 
 162
 Home Box Office, Inc. v. FCC, 567 F.2d 9, 35 (D.C.Cir.) (per curiam), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). Accord, United States Lines, Inc. v. Federal Maritime Commission, 584 F.2d 519, 526 (D.C.Cir.1978); Ethyl Corp. v. EPA, 541 F.2d 1, 34-36 & n.74 (D.C.Cir.) (en banc), cert. denied sub nom. E. I. duPont de Nemours & Co. v. EPA, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).
 
 
 163
 "ZERO" RELEASE AT THE FINAL REPOSITORY
 
 
 164
 On this issue I am in full agreement with Judge Bazelon's opinion and will add only a few paragraphs in support thereof. I agree that it is arbitrary and capricious for the NRC to close off discussion of the grave problems involved in building a permanent repository for all nuclear waste by categorical determination in Table S-3 that there will be zero releases. As I read this record, neither the Commission nor the Commission staff really defend the zero-release conclusion for any purpose other than to prevent discussion of the issue at licensing hearings. This despite the fact that both Commission and staff recognize that present scientific information strongly suggests that there will be releases of gaseous nuclides during the substantial period of time before the repository is closed. Their studies have shown a probability that transportation and storage canisters designed to contain radiological emissions will corrode and disintegrate in time, releasing their contents. The Commission staff contemplates some escape of radionuclides either by gaseous emission or ground water migration. In the proposed Narrative, the Commission staff, at least tentatively, holds that these emissions and migrations will occur "early" in the 250,000-year life of the federal repository and that risks therefrom will be "acceptable." It is not clear whether the risks become acceptable before or sometime during the first 10,000 years of decay.
 
 
 165
 The following Table depicts the periods of toxicity of just a few of the various isotopes found in the high-level wastes that may be stored in the federal repository:
 
 
 166
 Half-Life Period of Toxicity
Element (In years) (In years)
----------------------------------------------
Plutonium-239 24,000 250,000 (approx.)
Strontium-90 28 600-1,000
Cesium-137 30 600-1,000
Technetium-99 210,000 2,000,000 (approx.)
 
 
 167
 The hope and expectation is really that the impact of the releases will be insignificant on human beings.
 
 
 168
 Even this last conclusion is subject to very significant uncertainty. As yet undetermined amounts of fissionable materials (markedly reduced, however, if reprocessing is employed) will be emplaced in the repository. In 250,000 years there may be one or more ice ages. See 46 Fed.Reg. 15154, 15172 (Mar. 4, 1981). The probability of container corrosion, the certainty of heat from the quintillions of disintegrations of radioactive wastes, the probable contact with ground water, added to the possibility of geologic disturbance by such forces as glacier, earthquake, or volcanic eruption, all tend to create significant uncertainties. The NRC relies on two studies for its conclusion that the uncertainties involved in waste disposal do not mandate that it alter the zero-release value. 44 Fed.Reg. 45362, 45367 n.19, 45368 & n.24 (Aug. 2, 1979). One study is that of the Interagency Review Group, Report to the President by the Interagency Review Group on Nuclear Waste Management (March 1979) (hereafter IRG Report). The IRG admits, however, that there is a large gap between actual and theoretical capabilities in the technology of nuclear waste disposal. Thus, while the IRG Report may correctly conclude geologic disposal is feasible, it cannot be relied upon to prove that radiological emissions will be zero. The IRG Report concedes as much when it states, "(I)n addition to technical evaluation, a societal judgment that considers the level of risk and the associated uncertainty will be necessary." Id. at 42.
 
 
 169
 In the opening pages of the revised Report, the Group states that safe disposal requires a program "whose resolution will clearly require an unprecedented extension of capabilities in rock mechanics, geochemistry, hydrogeology and long-term predictions of seismicity, volcanism, and climate." Id. at 3. It later summarizes, "The risk assessments performed to date ... have ... been based on idealized repository characteristics and are subject to significant uncertainties." Id. at 45. It then specifically described some of the remaining problems:
 
 
 170
 The IRG would like to emphasize, however, that risk assessment computations are needed which are site specific in the origin of their data and in their application and only such assessments can truly apply to a specific site. Some uncertainties about the level of risk will always remain both because of the current state of the methodology of risk assessment and because of its inherent limitations.
 
 
 171
 Uncertainties associated with risk assessment derive from lack of data, lack of experience, inability to identify all release mechanisms for radionuclides, the natural variability in physical properties of geologic media, and inability to predict long-term geologic and climatic processes and social evolution. All of these uncertainties are neither additive nor of equal significance. An important aspect of the research remaining to be done is to understand how each enters into the overall uncertainty of the calculation of risk.
 
 
 172
 Id. at 46.
 
 
 173
 It concludes that further study of the problem is necessary to reduce uncertainties:Significant institutional difficulties are involved in: marshalling the resources and programs capable of accurately detailing site suitability criteria and establishment of standards; thoroughly investigating possible sites; accurately assessing site characteristics in light of the technical criteria; carrying out credible analyses of the risks; obtaining agreement on site selection; getting the facility approved and licensed; providing for careful construction and operation of the repository (including safe transportation and handling of the wastes); mitigating accidents and responding to repository failure if that occurs; and providing adequate, long-term monitoring. The level of difficulty of all these problems could increase with the size of the nuclear waste inventory and its rate of growth. Institutions that can cope on a small scale may fail as the demands placed on them multiply. The IRG believes that a more detailed analysis of logistical and other institutional problems which would arise out of attempting to manage wastes on the scale require(d) should be undertaken.
 
 
 174
 Id. at 88 (emphasis added).
 
 
 175
 The Commission's leap from its hopes for safe containment to its conclusion of zero release is, as Judge Bazelon concludes, arbitrary and capricious.
 
 THE PLUTONIUM ISSUE
 
 176
 The Commission's brief argues that all three of the fuel-cycle rules should be upheld by this court. As previously indicated in this opinion, the Commission has stated that Table S-3 was designed to cover the entire back-end of the fuel cycle. As a consequence, this panel's affirmance of the validity of Table S-3, if certiorari were denied or the case affirmed by the Supreme Court, could be taken by the Commission as final approval of its original and present plans for reprocessing spent fuel, fabricating uranium and plutonium into mixed oxide fuel therefrom, and shipping this fuel to nuclear reactors all over the nation.
 
 A. Presidential Concern About Reprocessing
 
 177
 The lethal character of plutonium and its potential for use in nuclear bombs evoked expressions of concern from two successive Presidents, Gerald Ford and Jimmy Carter, about the reprocessing of nuclear waste and the separation of bomb-grade plutonium. This concern resulted in April 1977 in a Presidential statement, issued by President Carter, suspending all NRC plans for reprocessing spent nuclear fuel. This statement reads:
 
 
 178
 There is no dilemma today more difficult to resolve than that connected with the use of nuclear power. Many countries see nuclear power as the only real opportunity, at least in this century, to reduce the dependence of their economic well-being on foreign oil-an energy source of uncertain availability, growing price, and ultimate exhaustion. The U.S., by contrast, has a major domestic energy source-coal-but its use is not without penalties, and our plans also call for the use of nuclear power as a share in our energy production.
 
 
 179
 The benefits of nuclear power are thus very real and practical. But a serious risk accompanies worldwide use of nuclear power-the risk that components of the nuclear power process will be turned to providing atomic weapons.
 
 
 180
 We took an important step in reducing the risk of expanding possession of atomic weapons through the Non-Proliferation Treaty, whereby more than 100 nations have agreed not to develop such explosives. But we must go further. The U.S. is deeply concerned about the consequences for all nations of a further spread of nuclear weapons or explosive capabilities. We believe that these risks would be vastly increased by the further spread of sensitive technologies which entail direct access to plutonium, highly enriched uranium, or other weapons usable material. The question I have had under review from my first day in office is how can that be accomplished without forgoing the tangible benefits of nuclear power.
 
 
 181
 We are now completing an extremely thorough review of all the issues that bear on the use of nuclear power. We have concluded that the serious consequences of proliferation and direct implications for peace and security-as well as strong scientific and economic evidence-require
 
 
 182
 -a major change in U.S. domestic nuclear energy policies and programs; and
 
 
 183
 -a concerted effort among all nations to find better answers to the problems and risks accompanying the increased use of nuclear power.
 
 
 184
 I am announcing today some of my decisions resulting from that review.
 
 
 185
 First, we will defer indefinitely the commercial reprocessing and recycling of the plutonium produced in the U.S. nuclear power programs. From our own experience, we have concluded that a viable and economic nuclear power program can be sustained without such reprocessing and recycling. The plant at Barnwell, South Carolina, will receive neither Federal encouragement nor funding for its completion as a reprocessing facility.
 
 
 186
 Second, we will restructure the U.S. breeder reactor program to give greater priority to alternative designs of the breeder and to defer the date when breeder reactors would be put into commercial use.
 
 
 187
 Third, we will redirect funding of U.S. nuclear research and development programs to accelerate our research into alternative nuclear fuel cycles which do not involve direct access to materials usable in nuclear weapons.
 
 
 188
 Fourth, we will increase U.S. production capacity for enriched uranium to provide adequate and timely supply of nuclear fuels for domestic and foreign needs. * * *
 
 
 189
 13 Weekly Comp. of Pres. Doc. 506 (1977) (emphasis added).
 
 
 190
 The Commission recognized the impact of the Presidential order in a "Memorandum of Decision" issued December 23, 1977. In that memorandum, the Commission announced its decision:
 
 
 191
 (1) to terminate the GESMO proceeding;
 
 
 192
 (2) to terminate the proceedings on pending or future plutonium recycle-related license applications, except for-
 
 
 193
 (a) proceedings on licenses for the fabrication or use of small quantities of mixed oxide fuel for experimental purposes, and
 
 
 194
 (b) those portions of proceedings which involve only spent fuel storage, disposal of existing waste, or decontamination or decommissioning of existing plants;
 
 
 195
 (3) to reexamine the above matters after the completion of the ongoing domestic and international studies of alternative fuel cycles, now expected to take about 2 years;
 
 
 196
 (4) to publish the draft safeguards supplement to the GESMO documents as a staff technical report;
 
 
 197
 (5) as a consequence of the above decisions, to withdraw the November 1975 policy statement on mixed oxide fuel, 40 Fed.Reg. 53056; and
 
 
 198
 (6) to reserve for decision, if it arises, the question whether a facility such as the Allied-General Nuclear Services (AGNS) Nuclear Fuels Plant at Barnwell, South Carolina, may be licensed for experimental and feasibility purposes on a non-commercial basis to investigate processes which support the nation's non-proliferation objectives.
 
 
 199
 This memorandum provides the reasons for the December 23 decision.
 
 BACKGROUND
 
 200
 The use of mixed oxide fuel has been before the Commission and its predecessor, the AEC, for more than a decade. In 1960, Nuclear Fuel Services (NFS) began a small reprocessing plant at West Valley, New York, which operated from 1966 through 1971. Construction of the AGNS Plant at Barnwell began in 1970 and parts of the plant are now essentially complete. AGNS' application for an operating license is currently before the Commission. In 1973, Westinghouse Electric Corporation (Westinghouse) requested a construction authorization letter for a mixed oxide fuel fabrication plant near Anderson, South Carolina. Finally, Exxon Nuclear Company, Inc., (Exxon) is currently seeking permission to construct a reprocessing plant at Oak Ridge, Tennessee.
 
 
 201
 The health, safety, and environmental impacts of the wide-scale use of mixed oxide fuel were evaluated in the draft Generic Environmental Statement on Mixed Oxide Fuel, published in August 1974. The draft GESMO prompted many public comments, including a January 1975 letter from the President's Council on Environmental Quality which stressed the need to consider the safeguards aspects of wide-scale plutonium recycle. In May 1975, the Commission announced its provisional intention to supplement GESMO with an analysis of safeguards and to limit interim licensing of recycle-related activities to experimental purposes. 40 Fed.Reg. 20142 (May 8, 1975). Over 200 public comments were received in response. In November 1975, the Commission published a policy statement which announced that safeguards alternatives would be a part of the GESMO decision, provided for hearings on the GESMO documents, and stated criteria under which interim licensing of nonexperimental recycle-related activities would be considered. 40 Fed.Reg. 53056 (November 14, 1975), corrected 40 Fed.Reg. 59497 (December 24, 1975). The United States Court of Appeals for the Second Circuit affirmed the Commission's hearing procedures but held that interim licensing of recycle-related activities on a commercial scale violated the National Environmental Policy Act (NEPA). Natural Resources Defense Council, Inc. v. Nuclear Regulatory Commission, 539 F.2d 824 (1976), vacated and remanded to determine mootness, 434 U.S. 1030 (98 S.Ct. 759, 54 L.Ed.2d 777) (January 16, 1978).
 
 
 202
 The final impact statement on health, safety, and the environment was published in August 1976 and associated public hearings began that November. The hearings progressed through questioning of the NRC staff on its testimony and the filing of written testimony by all participants and proposed questions on that testimony.
 
 
 203
 Congress and other parts of the Federal Government, members of the public, and experts in the national security field have continued to express concerns related to the nuclear weapons proliferation risks of plutonium recycle technology as it is presently conceived. That technology produces separated plutonium, which can be used in the production of nuclear explosives. The concern is basically that the international spread of plutonium recycle technology for commercial nuclear power production creates a risk that nonnuclear weapons states might turn plutonium from the commercial fuel cycle to the production of nuclear explosives. See generally Senate Committee on Government Operations, 94th Cong., 1st. Sess., Peaceful Nuclear Exports and Weapons Proliferation-A Compendium (Comm. Print 1975). Moreover, a decision by the United States to proceed with commercial plutonium recycle domestically would undermine U.S. efforts to restrain premature international resort to plutonium. The risk led the Commission in late summer 1976 to direct its staff to begin an analysis for GESMO for international proliferation risks and safeguards.
 
 
 204
 On October 28, 1976, President Ford discussed these risks in his Statement on Nuclear Policy, and stated that the nation "should pursue reprocessing and recycling in the future only if they are found to be consistent with our international (non-proliferation) objectives" (p. 4).
 
 
 205
 President Carter expressed his concern over the proliferation risks of plutonium recycle and the potential availability of other weapons-grade materials in the nuclear fuel cycle in his April 7, 1977, Statement on Nuclear Power Policy. As part of his response to these risks, the President stated that the Administration's policy would be to defer indefinitely domestic plutonium recycle and to initiate a multinational evaluation of alternative fuel cycles in order to promote the government's international nonproliferation goals. The GESMO hearings were indefinitely postponed by the GESMO Hearing Board, and on May 3 the Commission announced that it intended to reassess "the future course and scope of GESMO, the review of recycle-related license applications, and the matter of interim licensing." 42 Fed.Reg. 22964 (May 5, 1977). Public comments were received in June.
 
 
 206
 On May 5, Marcus Rowden, then Chairman of the Commission, wrote the President requesting his views on these matters. Stuart Eizenstat, Assistant to the President for Domestic Affairs and Policy, responded for President Carter on October 4. The letter (reprinted at 42 Fed.Reg. 57186 (November 1, 1977)) states that "the President believes that his non-proliferation initiatives would be assisted both domestically and internationally if the Commission were to terminate the GESMO proceedings," "terminat(e) ... staff reviews and hearings relating to recycle activities ... den(y) ... interim licensing of fuel cycle facilities, den(y) ... interim licensing for use of mixed oxide fuel in reactors, except in small quantities for experimental purposes," and publish the staff's safeguards supplement.
 
 
 207
 In re Mixed Oxide Fuel, 7 N.R.C. 711, 713-15 (1978) (emphasis added).
 
 
 208
 The Commission also recognized that the President's request was due substantial deference and added that there were strong indications of Congressional agreement:
 
 
 209
 In addition, it is significant that Congress as a body has not taken any action disagreeing with the President's position on plutonium recycle in light water reactors.[6] Over a year has passed since the President made the deferral of plutonium recycle a matter of national policy and no substantial Congressional opposition has appeared. Indeed, the Congress has in several instances supported the actions the President has taken to implement the Administration's policy. The Department of Energy Act of 1978-Civilian Applications, Pub.L.No. 95-238, 92 Stat. 47,[7] provides $13 million for various activities at the Barnwell Nuclear Fuels Plants related to alternative fuel cycle technologies and the nation's non-proliferation objectives, but "none of the authorized funds may be used for operations of the plant to process spent fuel from reactors."[8] Sections 101(20), 106.[9] Congress has also explicitly supported the President's alternative fuel cycle studies in Section 105 of the Nuclear Non-Proliferation Act of 1978:
 
 
 210
 The President shall take immediate initiatives to invite all nuclear supplier and recipient nations to reevaluate all aspects of the nuclear fuel cycle, with emphasis on alternatives to an economy based on the separation of pure plutonium or the presence of high enriched uranium, methods to deal with spent fuel storage, and methods to improve the safeguards for existing nuclear technology ....[10]
 
 
 211
 In addition, Congress has strongly supported the non-proliferation goals of the Administration's policy. Section 2 of the Nuclear Non-Proliferation Act of 1978 states the following policy:
 
 
 212
 The Congress finds and declares that the proliferation of nuclear explosive devices or of the direct capability to manufacture or otherwise acquire such devices poses a grave threat to the security interests of the United States and to continued international progress toward world peace and development. Recent events emphasize the urgency of this threat and the imperative need to increase the effectiveness of international safeguards and controls on peaceful nuclear activities to prevent proliferation. Accordingly, it is the policy of the United States to-
 
 
 213
 (a) actively pursue through international initiatives ... the establishment of more effective international controls over the transfer and use of nuclear materials and equipment and nuclear technology for peaceful purposes in order to prevent proliferation....Moreover, Section 3 states that
 
 
 214
 It is the purpose of this Act to promote the policies set forth above by-
 
 
 215
 (a) establishing a more effective framework for international cooperation ... to ensure that the worldwide development of peaceful nuclear activities and the export by any nation of nuclear materials and equipment and nuclear technology intended for use in peaceful nuclear activities do not contribute to proliferation ...
 
 
 216
 Finally, Section 2(c) strongly endorses the Treaty on the Non-Proliferation of Nuclear Weapons, July 1, 1968, T.I.A.S. No. 6839, the sole function of which is to halt the proliferation of nuclear weapons.[11]
 
 
 217
 7 N.R.C. at 719-20 (emphasis added).
 
 
 218
 It is appropriate at this point to take judicial notice of a diametrically opposing point of view expressed by President Reagan:
 
 Nuclear Energy Policy
 Statement Announcing a Series of Policy
 Initiatives. October 8, 1981
 
 219
 A more abundant, affordable, and secure energy future for all Americans is a critical element of this administration's economic recovery program. While homeowners and business firms have shown remarkable ingenuity and resourcefulness in meeting their energy needs at lower cost through conservation, it is evident that sustained economic growth over the decades ahead will require additional energy supplies. This is particularly true of electricity, which will supply an increasing share of our energy.
 
 
 220
 If we are to meet this need for new energy supplies, we must move rapidly to eliminate unnecessary government barriers to efficient utilization of our abundant, economical resources of coal and uranium. It is equally vital that the utilities-investor-owned, public, and co-ops-be able to develop new generating capacity that will permit them to supply their customers at the lowest cost, be it coal, nuclear, hydro, or new technologies such as fuel cells.
 
 
 221
 One of the best potential sources of new electrical energy supplies in the coming decades is nuclear power. The U.S. has developed a strong technological base in the production of electricity from nuclear energy. Unfortunately, the Federal Government has created a regulatory environment that is forcing many utilities to rule out nuclear power as a source of new generating capacity, even when their consumers may face unnecessarily high electric rates as a result. Nuclear power has become entangled in a morass of regulations that do not enhance safety but that do cause extensive licensing delays and economic uncertainty. Government has also failed in meeting its responsibility to work with industry to develop an acceptable system for commercial waste disposal, which has further hampered nuclear power development.
 
 
 222
 To correct present government deficiencies and to enable nuclear power to make its essential contribution to our future energy needs, I am announcing today a series of policy initiatives:
 
 
 223
 (1) I am directing the Secretary of Energy to give immediate priority attention to recommending improvements in the nuclear regulatory and licensing process. I anticipate that the Chairman of the Nuclear Regulatory Commission will take steps to facilitate the licensing of plants under construction and those awaiting licenses. Consistent with public health and safety, we must remove unnecessary obstacles to deployment of the current generation of nuclear power reactors. The time involved to proceed from the planning stage to an operating license for new nuclear powerplants has more than doubled since the mid-1970's and is presently some 10-14 years. This process must be streamlined, with the objective of shortening the time involved to 6-8 years, as is typical in some other countries.
 
 
 224
 (2) I am directing that government agencies proceed with the demonstration of breeder reactor technology, including completion of the Clinch River Breeder Reactor. This is essential to ensure our preparedness for longer-term nuclear power needs.
 
 
 225
 (3) I am lifting the indefinite ban which previous administrations placed on commercial reprocessing activities in the United States. In addition, we will pursue consistent, long-term policies concerning reprocessing of spent fuel from nuclear power reactors and eliminate regulatory impediments to commercial interest in this technology, while ensuring adequate safeguards.
 
 
 226
 It is important that the private sector take the lead in developing commercial reprocessing services. Thus I am also requesting the Director of the Office of Science and Technology Policy, working with the Secretary of Energy, to undertake a study of the feasibility of obtaining economical plutonium supplies for the Department of Energy by means of a competitive procurement. By encouraging private firms to supply fuel for the breeder program at a cost that does not exceed that of government-produced plutonium, we may be able to provide a stable market for private sector reprocessing and simultaneously reduce the funding needs of the U. S. breeder demonstration program.
 
 
 227
 (4) I am instructing the Secretary of Energy, working closely with industry and State governments, to proceed swiftly toward deployment of means of storing and disposing of commercial, high-level radioactive waste. We must take steps now to accomplish this objective and demonstrate to the public that problems associated with management of nuclear waste can be resolved.
 
 
 228
 (5) I recognize that some of the problems besetting the nuclear option are of a deep-seated nature and may not be quickly resolved. Therefore, I am directing the Secretary of Energy and the Director of the Office of Science and Technology Policy to meet with representatives from the universities, private industry, and the utilities, and requesting them to report to me on the obstacles which stand in the way of increased use of nuclear energy and the steps needed to overcome them in order to assure the continued availability of nuclear power to meet America's future energy needs, not later than September 30, 1982.
 
 
 229
 Eliminating the regulatory problems that have burdened nuclear power will be of little use if the utility sector cannot raise the capital necessary to fund construction of new generating facilities. We have already taken significant steps to improve the climate for capital formation with the passage of my program for economic recovery. The tax bill contains substantial incentives designed to attract new capital into industry.
 
 
 230
 Safe commercial nuclear power can help meet America's future energy needs. The policies and actions that I am announcing today will permit a revitalization of the U. S. industry's efforts to develop nuclear power. In this way, native American genius, not arbitrary Federal policy, will be free to provide for our energy future.
 
 
 231
 17 Weekly Comp. of Pres. Doc. 1101-02 (Oct. 12, 1981).
 
 
 232
 With this recent Presidential debate in mind, I turn to the possible consequences for this case of President Reagan's announcement on October 8, 1981, which removed all restrictions on nuclear fuel reprocessing.
 
 B. The NRC Options
 
 233
 It is, of course, obvious that the NRC has many decisions yet to make in relation to the back-end of the nuclear fuel cycle. It has yet to license a private corporation to build a retrievable surface storage facility, if, indeed, such will ever be built. It has yet to choose a site for its proposed long-term repository. And it has yet to license a commercial reprocessing facility, although it now appears that such will be licensed. Finally, the NRC has not decided whether the reactor fuel to be produced from the reprocessing of spent fuel will be fabricated from 1) uranium only into enriched uranium fuel, 2) uranium and plutonium into mixed oxide fuel, or 3) some other combination of elements not presently described.
 
 
 234
 The NRC is seeking judicial sanction for the conclusion in the S-3 Tables that any releases that may be produced as a result of the exercise of any of these options can lawfully be termed "zero" or can lawfully be described as "umbrellaed" by the insignificant release figures set forth in the S-3 and S-3A Tables. I see no way by which we can in advance give such sanction consistent with the Administrative Procedure Act and the health and safety requirements of the Atomic Energy Act.
 
 
 235
 1. The Uranium-only Recycle Option. The NRC may decide to adopt a uranium-only recycle plan. This plan contemplates the reprocessing of spent fuel rods and the production of highly enriched uranium. Nonetheless, the extraction and storage of the plutonium remains a problem. The NRC described the option when it promulgated the final version of Table S-3 in August 1979:
 
 
 236
 The fuel cycle was to be taken to include ... reprocessing of spent fuel for purposes other than recycle of plutonium, with follow-on interim and/or long-term storage or disposal of plutonium and wastes from reprocessing, with plutonium either separated from or included with the wastes.
 
 
 237
 44 Fed.Reg. 45362, 45366 (Aug. 2, 1979) (footnote omitted).
 
 The NRC also envisions that
 
 238
 (t)he uranium would be converted to uranium hexafluoride for recycling at an enrichment plant. The plutonium, still containing about five percent of the fission products to deter diversion, would be converted to plutonium oxide and packaged for disposal in a Federal waste repository. The high-level liquid waste (HLLW) containing the bulk of the fission products, would be stored up to five years in tanks and then calcined and formed into glass for repository disposal.
 
 
 239
 Id. at 45369.
 
 
 240
 This option would, of course, reduce the hazards involved in extracting, storing and transporting plutonium dioxide. This option, however, raises by many degrees the uncertainties involved in the ultimate disposal of the wastes from the spent fuel rods. The remaining plutonium must be handled and guarded at the retrievable surface storage facility. Also, it must be shipped to the long-term waste disposal site and handled and guarded there until the repository is sealed.
 
 
 241
 Once in the repository, the heat and bulk of the decaying plutonium would increase the thermal stresses on the geologic medium that constitutes the repository. U. S. Nuclear Regulatory Commission, Environmental Survey of the Reprocessing and Waste Management Portions of the LWR Fuel Cycle, (NUREG-0116) 4-103 (Oct. 1976). Finally, the existence of large amounts of plutonium buried underground would add to the chance that shifting geologic conditions would cause the inadvertent formation of a critical mass and consequent nuclear explosion. Id. at 4-103, 4-104.
 
 
 242
 Continuation of the no-recycle option would, of course, raise somewhat similar problems.
 
 
 243
 2. The Uranium-Plutonium Recycle Option. The possibility that the NRC might read an affirmance of Table S-3 as justification to proceed with the recycling of plutonium and the fabrication of mixed oxide fuel is particularly troubling. Initially, it is important to note that the NRC has deliberately excluded the risks of nuclear fuel diversion from Table S-3 because it believes those risks are negligible, not because it believes these risks are beyond the scope of this rulemaking. This has been evident throughout the course of the proceeding. For example, when the NRC published its assessment of the risks of the back-end of the light water reactor fuel cycle, NUREG-0116, supra, public commentators questioned the exclusion of the risks of accident and sabotage from the interim version of Table S-3. The NRC answered that it excluded those risks because it thought they were negligible:
 
 
 244
 Comment (CEC B-139): It is unclear whether sabotage impacts have been included in the revised Table S-3.
 
 
 245
 Response: The risks of sabotage are judged to be negligible and therefore no entry is given in Table 2.10 in NUREG-0116. This judgment is based on the required protective measures of physical security, intrinsic protective features of containment systems required by regulations, and assessment of radiological consequences of given successful acts of sabotage. The NRC is conducting consequence studies of postulated sabotage events in all fuel-cycle facilities to assess current regulations and possible regulatory improvements as part of its continuing review of the adequacy of present safeguard measures.
 
 
 246
 U. S. Nuclear Regulatory Commission, Public Comments and Task Force Responses Regarding the Environmental Survey of the Reprocessing and Waste Management Portions of the LWR Fuel Cycle 3-96 (March 1977) (NUREG-0216).[11] After additional hearings on the proposed rule, the NRC Hearing Board expressed the same conclusion:
 
 
 247
 As a result of its analyses, the staff concluded that the impacts from accidents would be only a few per cent of the impacts from normal operation and did not include them in the values in Table S-3....
 
 
 248
 After considering the impacts of sabotage, the staff concluded that, overall, those impacts would be small in comparison with the impacts of normal operation and need not be explicitly included in Table S-3. This conclusion was based on the fact that acts of sabotage tend to resemble accidents. Measures provided to mitigate the effects of accidents should also mitigate the effects of sabotage. Moreover, the Commission now requires that substantial measures be taken to protect nuclear facilities from sabotage, including measures to protect against groups of highly motivated, well-trained saboteurs. We find the staff's conclusion reasonable.
 
 
 249
 Conclusions and Recommendations of the Hearing Board Regarding the Environmental Effects of the Uranium Fuel Cycle, Docket No. RM 50-3 44-45 (October 26, 1978); 4 J.A.S. 1466. The NRC adopted the recommendations of the Hearing Board when it promulgated the final version of Table S-3. See 44 Fed.Reg. 45362, 45367 (Aug. 2, 1979).[12]
 
 
 250
 Second, the nuclear regulatory agencies of this country have always contemplated that plutonium recycling would be a part of any fuel reprocessing regime. At 10 C.F.R. § 70.4(m) (1981), which deals with the licensing of reprocessing facilities, we find this definition:
 
 
 251
 "Special nuclear material" means (1) plutonium, uranium 233, uranium enriched in the isotope 233 or in the isotope 235, and any other material which the Commission, pursuant to the provisions of section 51 of the act, determines to be special nuclear material ....
 
 
 252
 And, the NRC's new regulations dealing with the transportation of nuclear materials also envision the transportation of plutonium.[13] 3] Section 73.2(aa) defines "(s)trategic special nuclear material" thusly:
 
 
 253
 "Strategic special nuclear material" means uranium-235 (contained in uranium enriched to 20 percent or more in the U-235 isotope), uranium-233, or plutonium.
 
 
 254
 10 C.F.R. § 73.2(aa) (1981).
 
 
 255
 Accordingly, the NRC could read our affirmance of Table S-3 to support the conclusion that plutonium recycling can be accomplished with zero release and without endangering the public. The NRC believes that "the environmental impacts from reprocessing and related management activities are nearly identical for the recycling of uranium and plutonium and for the recycling of uranium only, as fuel in nuclear power reactors." 46 Fed.Reg. 15154, 15161 (Mar. 4, 1981).[14]
 
 
 256
 The section of this opinion which follows concerns possible employment of the plutonium option. The NRC may avoid this option because it is clearly the "worst case" in terms of hazards. Or it may adopt it because it appears to be the best option in terms of the economics of the nuclear power industry.
 
 C. The Plutonium Hazards
 
 257
 I fear that when the history of this century is written that the greatest debacle of our nation will be seen ... to be ... our creation of vast armadas of plutonium, whose safe containment will represent a major precondition for human survival, not for a few decades or hundreds of years, but for thousands of years more than human civilization has so far existed.
 
 
 258
 James D. Watson,
 
 Nobel Laureate, Medicine
 
 259
 On March 13, 1975, Senator Stewart Symington addressed the United States Senate on "Controlling the Cancer of Nuclear Proliferation." His concerns extended well beyond the boundaries of this country and the scope of this case. The following paragraphs, however, serve to illustrate the nature of the problems generated by the recent Presidential decision to lift the prohibition against the NRC's plan to reprocess nuclear waste so as to produce plutonium:
 
 
 260
 Only 10 to 20 pounds of plutonium is necessary for making an atomic bomb with the same destructive power as the one dropped on Hiroshima. Yet today, close to 90,000 pounds of plutonium have been produced by commercial nuclear power plants-not including amounts used for the nuclear weapons programs of the Big Powers.
 
 
 261
 Five years from now some half-million pounds of plutonium may be commercially available throughout the world. As the amount of plutonium grows internationally so does the risk of its diversion from peaceful uses to weapons-development programs.
 
 
 262
 121 Cong.Rec. 6437 (1975).
 
 
 263
 In present posture, this case requires us to compare the NRC's flat assurance of zero or insignificant release of effluents as stated in Table S-3 with the incredible risks involved in transporting large quantities of plutonium all over the United States.
 
 
 264
 Plutonium is one of the most deadly substances known to humankind. It is toxic to human beings if a microscopic particle is breathed into the lungs.
 
 
 265
 A small quantity of Plutonium-239 smoke deposited in the lung-about one ten-thousandths of an ounce, would kill a person through radiological destruction of lung tissue. A quantity smaller than one one-millionth of an ounce would give rise to a substantial risk of lung cancer ... Plutonium-239 ... is at least 20,000 times more toxic than cobra venom or potassium cyanide and ten times more toxic than heroin or modern nerve gas.
 
 
 266
 Ford Foundation Energy Policy Project, A Time to Choose 210 (1974).
 
 
 267
 After reprocessing, plutonium is reduced to oxide powders for shipment to fuel fabrication plants:
 
 
 268
 NRC regulations prohibit the shipment of plutonium compounds, apart from small quantities, in liquid form. Consequently, the plutonium is converted into the solid dioxide (PuO 2) prior to shipment. Plutonium Oxalate is generally precipitated from the nitrate solution; the oxalate is separated, dried and calcined to form the dioxide. The product is ground and screened to yield a powder of the desired size.
 
 
 269
 S. Glasstone & W. Jordan, Nuclear Power and Its Environmental Effects 234 (1980).
 
 
 270
 This powder would be extremely dangerous if dispersed into the air as it could be by accident, theft or sabotage:
 
 
 271
 Both in storage and in transit, separated plutonium requires the most careful ... measures ... against theft by non-state actors. Owing to the serious inhalation hazard of powdered PuO 2, currently the form in which most nonmilitary stocks are held, equally strict measures for protection of public health and safety are ... required. These precautions ... are to be applied from the time the material emerges from the reprocessing plant-at least until ... it is fabricated into reload fuel assemblies, thereby rendering accounting easier and theft more difficult.
 
 
 272
 G. I. Rochlin, Plutonium, Power and Politics 90 (1979).
 
 
 273
 Indeed, even the fabricated mixed oxide fuel would be an attractive target for terrorists. The Nuclear Energy Policy Study Group explained why:
 
 
 274
 Shipments of fresh mixed oxide fuel for the yearly reloading of a single reactor would contain enough plutonium for fifty nuclear weapons. Separation of plutonium ... would be much easier than from irradiated fuel, involving only simple chemical operations and little radiation hazard.
 
 
 275
 Nuclear Energy Policy Study Group, Nuclear Power: Issues & Choices 331 (1977) (hereafter NEPSG).
 
 
 276
 The Study Group pointed out the general, worldwide increase in terrorism over the last decade:
 
 
 277
 The past few years have seen an upsurge in the size, sophistication and capabilities of terrorist groups around the world. Terrorist activities offer strongly motivated political or dissident groups a way to dramatize their causes and influence their adversaries ... the worldwide development of civilian nuclear power provides additional opportunities for terrorists-whether revolutionaries, nationalists, dissidents or criminally motivated-to employ nuclear energy as a weapon....
 
 
 278
 Terrorists might choose the nuclear industry as a target to exploit the mystique that surrounds nuclear weapons. The threat of nuclear terrorism may be used to extort money, secure the release of prisoners or publicize a particular cause.
 
 
 279
 Id. at 301.
 
 
 280
 The simplest form of sabotage would probably consist of blowing up a truck that was transporting plutonium from the reprocessing plant to a fuel fabrication plant or nuclear reactor. A high explosive charge fracturing the shipping container and discharging the oxide powder into the air could occasion disaster to any area downwind.
 
 
 281
 In addition, plutonium is highly explosive and extremely powerful. It has been estimated that 10 pounds of plutonium fashioned into a bomb could kill 100,000 people in a densely populated city. It has also been estimated by one knowledgeable expert that many thousands of persons in the United States have the knowledge required to design a workable bomb.
 
 
 282
 With only presently-licensed nuclear reactors taken into account, the NRC's plan for reprocessing nuclear waste would produce 200-300 kilograms (440-660 lbs.) of plutonium from each of 71 reactors, or over 35,000 pounds of this hazardous substance.
 
 
 283
 On this score the Nuclear Energy Policy Group Study said:
 
 
 284
 (T)he weakest link in security would be transportation .... The (1973) regulatory changes (to reduce the possibility of employee diversion) did not eliminate the possibility that a small armed group could successfully hold up a truck and hijack its load of nuclear materials .... Transport procedures are not vastly different than those employed by armored car companies and other carriers that ship high-value cargo. Some criminal and terrorist groups have already demonstrated capabilities to defeat such precautions.
 
 
 285
 Id. at 304.
 
 
 286
 Lovins, Lovins & Ross summarized the present problems of preventing plutonium diversion:
 
 
 287
 Political arrangements for safeguards must rest on technical measures for materials accounting and for physical security. The former measures are so imprecise and post hoc that they cannot, even in principle, provide reasonable assurance that many bombs' worth of plutonium per year are not being removed from a good-sized reprocessing plant. Primary reliance must therefore be placed on physical security measures to limit access ... These measures must forestall well equipped groups perhaps including senior insiders acting in concert with the host government or a faction of it. Even modestly effective measures would be costly, fallible and intrusive.
 
 
 288
 Lovins, Lovins & Ross, Nuclear Power and Nuclear Bombs 58 Foreign Affairs 1137, 1145 (Summer 1980).
 
 
 289
 The Nuclear Energy Policy Study Group summed up, "If plutonium and highly enriched uranium become increasingly available, the route to national or subnational explosives capabilities will become easier and quicker and safeguards will lose much of their ability to provide reassurance." NEPSG, supra at 294.
 
 
 290
 Commentary on these hazards could be extended indefinitely, since the literature concerning the hazards of plutonium is almost endless.
 
 
 291
 If this were a wholly peaceful world, or if ours were a wholly peaceful country, the NRC's plan to recycle plutonium and fabricate and burn it as a fuel would be subject to much less objection. In fact, however, the United States confronts many hostile powers, some with vast wealth and the consequent ability to train and arm desperadoes or to bribe and corrupt personnel connected with either private or government aspects of the nuclear cycle. In addition, past history (and in particular the last two decades) teaches that domestic tranquility is a constitutional goal rather than a reality in our land. Organized crime as we know it in our country is capable of hijacking a truck with armed guards, and terrorist groups capable of stopping and robbing Brinks trucks of millions of dollars have demonstrated a somewhat like capability. See NEPSG, supra at 304.
 
 
 292
 The routine use of plutonium for nuclear power under the Commission's present plans will call for a private corporation to reprocess the spent fuel rods from all nuclear reactors, thus producing plutonium. By Commission regulation, that corporation is required to organize a private army larger than has ever existed in this country and to deploy it at the reprocessing plant and on U. S. highways all over the land. See 10 C.F.R. § 73.25 (1981). Nevertheless, under the Commission's present plans, it will be impossible to guarantee the security of plutonium shipments from an intelligently organized surprise attack by substantial forces on a lonely stretch of highway in a remote area. Under the Commission's present plans, the ultimate reliance is upon a call to local law enforcement. See 10 C.F.R. § 73.26(c)(2)(iii)(A), (i)(6) (1981). In the event of attack at a lonely milepost, the call might produce one deputy sheriff. Protecting plutonium shipments is a task appropriate for the military forces of the United States. No such authorization has been sought from or considered by Congress.
 
 
 293
 I assume that the theft by stealth or force of sufficient plutonium to fabricate a bomb and its subsequent employment by threats or fact of explosion would constitute a "release." In my view, the threat of such a "release" of plutonium if it is fabricated, stored and shipped all over the nation, is anything but "insignificant." The NCR's finding to the contrary constitutes "a clear error of judgment." See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). As indicated earlier, I therefore join in holding the affected portions of Table S-3 to be arbitrary and capricious.
 
 
 294
 The fundamental law that launched this nation on the road to peaceful use of nuclear power was the Atomic Energy Act of 1946, ch. 724, 60 Stat. 755 (1946). That Act was superseded by the Atomic Energy Act of 1954, ch. 1073, 68 Stat. 921 (1954) (codified in 42 U.S.C. § 2011 et seq.). The 1954 Act repeatedly requires the "protect(ion) of the health and safety of the public." 42 U.S.C. §§ 2012(d), (e), 2133(b), 2232(a) (1976); see id. § 2133(d).
 
 
 295
 After much acquaintance with this case, I have come to believe that Table S-3, inasmuch as it requires licensing boards to accept that only insignificant releases will result from transporting plutonium all over the nation to 71 (potentially 190) reactors is "otherwise not in accordance with law."
 
 COST
 
 296
 Appellants New York and Wisconsin contend that the figure of 10% of construction costs per nuclear reactor determined by the NRC as the cost of nuclear waste disposal is arbitrary and capricious. I agree.
 
 
 297
 As I understand this record, the 10% of cost (building and operating) per nuclear reactor represents the Commission's determination of the economic cost of all nuclear waste disposal. Thus, it underpins the Commission's adoption of the S-3 Tables and is properly before this panel for decision at this time.
 
 
 298
 This record indicates that the NRC now assumes that all nuclear waste is to be under the guardianship of the federal government practically in perpetuity and that all nuclear waste costs above the 10% referred to above for each reactor will be borne by the United States. Under ordinary standards of accountability (absent subsidy determined by law), appropriate charges for maintaining facilities owned and operated by government for private industry would be determined and charged back to the private industry making use of them. The cost of maintenance, surveillance and guarding the public from toxic waste at all such facilities will continue from somewhere between 10,000 and 250,000 years. The currently estimated life of each reactor is 30 years. The nuclear power industry may not survive its problems. Its waste will, for all practical purposes, survive forever. This policy decision potentially involves an open-ended subsidy of great dimension. Constitutionally, it can only be made as a matter of legislation by Congress and the President. It certainly should not be made sub silentio by an administrative agency and routinely endorsed by the federal courts.
 
 
 299
 I dissent from my colleagues' treatment of the economic issue. I would remand the issue concerning the economic feasibility of the S-3 Tables to the Commission for further consideration. Public discussion of these costs at licensing hearings should not be terminated until much more knowledge about them has been developed.
 
 OUTLINE
 
 300
 I. ANALYSIS ................................... 517
 II. BACKGROUND ................................. 518
 A. The Challenged Rules .................... 518
 B. Vermont Yankee I ........................ 519
 C. Vermont Yankee II ....................... 520
III. OUR TASK ON REMAND ......................... 524
 A. The Agency's Decision ................... 524
 B. Contemporaneous Explanation ............. 525
 1. The Commission's Purpose ............. 525
 2. The Commission's Methodology ......... 528
 3. The Commission's Conclusions ......... 529
 C. The Appropriate Standard of Review ...... 530
 D. The Standard of Review Applied to the
 Agency's Decision ....................... 533
 1. "Scope of Authority" ................. 533
 2. "Observance of Procedure" ............ 535
 3. "Reasoned Decisionmaking" ............ 537
 IV. LIVING WITH UNCERTAINTY .................... 540
 V. CONCLUSION ................................. 545
 
 WILKEY, Circuit Judge, dissenting:
 
 301
 In Greater Boston Television Corp. v. FCC[1] the late Judge Leventhal first enunciated what has come to be known as the "hard look" doctrine for judicial review of agency action.[2] When today's case first came to this court (Vermont Yankee I ), Judge Bazelon upped the ante by endorsing the notion of a "good, hard look."[3] Now, notwithstanding clear directions to the contrary from the Supreme Court (in Vermont Yankee II ),[4] Judge Bazelon has applied a standard which is best described as requiring "too hard a look." If there was ever a doubt prior to today, it is now clear that this court is committed to an assumed role as high public protector of all that is good from perceived evils of the nuclear age.
 
 
 302
 In his lengthy opinion today (Vermont Yankee III ) Judge Bazelon adapts to a new heading an approach unanimously rejected by the Supreme Court in Vermont Yankee II and steps boldly into the arena of nuclear regulation to vacate all of the NRC's original, interim, and final fuel cycle rules-the product of nearly a decade of agency and judicial proceedings and an administrative record of thousands of pages in length. He justifies this action on a conclusion that the Commission somehow violated NEPA and the APA by adopting a generic table embodying a prediction that nuclear power plant wastes can someday be safely stored.
 
 
 303
 Judge Bazelon's majority opinion has braided from NEPA, the APA, and his own perceptions of public good a novel standard of substantive and procedural scrutiny of NRC activity which we as a court are unauthorized to create and ill-equipped to manage. It has ignored the Supreme Court's unequivocal mandate that we limit our examination in this matter to the administrative record to determine only whether the NRC's rule was "arbitrary and capricious within the meaning of § 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706."[5] On the record before us, which has been supplemented extensively since Vermont Yankee II, I cannot say that under the appropriate standard the rule fails. Accordingly, I would affirm.[6]
 
 I. ANALYSIS
 
 304
 The cases before us today represent the latest chapter in perhaps the most celebrated administrative litigation of our time. Although the procedural backdrop of the litigation, adequately rehearsed in Judge Bazelon's opinion,[7] is extraordinarily complex, I believe the analysis and resolution of the central issues are comparatively simple.
 
 
 305
 That analysis must begin with a review of the case history, culminating in the unanimous directive given us by the Supreme Court in Vermont Yankee II. Both the holdings and the language of that opinion, essentially endorsing Judge Tamm's original concurrence in Vermont Yankee I,[8] clarify the appropriate standard for our review of the informal rulemaking challenged here. When we examine the agency's rulemaking under that standard, two further points become clear. First, the agency acted well within the scope of its broad authority by choosing to consider the issue of long-term risks and uncertainties from radioactive waste disposal generically, rather than in a series of repetitive individual power plant licensings. Second, contrary to the majority's joint assertions, the agency did not act arbitrarily and capriciously or "not in accordance with law" by concluding that licensing boards need not factor uncertainties into their environmental analyses, but, that "for the limited purposes of the fuel cycle rule it is reasonable to base impacts on the assumption which the Commission believes the probabilities favor": namely, that sites can be found and the technology developed effectively to isolate radioactive waste from the biosphere.[9]
 
 
 306
 These conclusions are not only compelled by a careful review of the extensively supplemented record on appeal; they are totally consistent with all of the evidence reviewed in Judge Bazelon's opinion. That record clearly reveals that the Commission has fulfilled its procedural obligations under § 102(2)(C) of NEPA[10] and the Administrative Procedure Act,[11] has taken the requisite "hard look" at the waste storage question, and has supported its final rule by "reasoned decisionmaking." This court may require no more.
 
 
 307
 We easily resolve this appeal if we recognize the obvious-we live in a world of risk, uncertainty, and rapid technological change. We not only expect, we demand, expert agencies charged with broad statutory discretion to make predictions en route to factual, technical, and policy judgments. "Where existing methodology or research in a new area of regulation is deficient, the agency necessarily enjoys broad discretion to attempt to formulate a solution to the best of its ability on the basis of available information."[12] So long as the agency adequately observes statutory procedures, gives close scrutiny to all relevant considerations, and engages in reasoned decisionmaking, it is not our job to substitute our judgment for the agency's to reach what we perceive to be the best or correct result. Yet this is precisely what the majority has accomplished in this case.
 
 II. BACKGROUND
 A. The Challenged Rules
 
 308
 The rules at issue here[13] resulted from an informal, "generic" rulemaking instituted by the NRC in November 1972 under 5 U.S.C. § 553 of the Administrative Procedure Act.[14] This proceeding, like a number of generic rulemakings noticed by the Commission since 1972,[15] was intended primarily to provide information for future adjudications in licensing proceedings. The product of the rulemaking was a table of numerical values (Table S-3), representing the incremental environmental effects associated with the uranium fuel cycle of one additional light water power reactor.[16] Individual licensing boards, in turn, were allowed to factor those representative values into the cost-benefit analysis for each proposed facility as part of the detailed Environmental Impact Statement (EIS) required by § 102(2)(C) of NEPA.[17]
 
 
 309
 Like all generic rulemakings, the proceeding here was instituted to further the goals of administrative efficiency, public participation, and uniformity in agency adjudications.[18] The rulemaking permitted the agency to consider and settle in one proceeding a number of issues of fact or policy common to a large number of licensing hearings. Without the informal rulemaking, "generic" issues would have been reopened at each proceeding before individual licensing boards. This not only would have required, in proceeding after proceeding, an inefficient presentation of identical and repetitive evidence bearing on matters not truly "local" to the plant proposed for license,[19] but likely would have resulted in inconsistent adjudications.
 
 B. Vermont Yankee I
 
 310
 When this case first came to our court, environmentalist petitioners challenged Table S-3 on the grounds that its values "expresse(d) in numerical terms the conclusion that the environmental effects of the fuel cycle, including (nuclear power) waste disposal, are insubstantial."[20] Judge Bazelon's opinion for the court set aside those portions of the rule pertaining to the issues of high-level waste disposal and waste reprocessing.[21] At the outset the panel majority held, under § 102(2)(C) of NEPA, that "absent effective generic proceedings to consider (long-term waste disposal) issues, they must be dealt with in individual licensing proceedings."[22] Judge Bazelon's opinion for the panel then went on to find the agency's generic proceedings "ineffective" for two interrelated reasons: because the agency's procedures were inadequate to "ventilate" thoroughly the waste fuel disposal issues, and because the agency's record was inadequate to support its rule.[23] Thus, the issues were relegated to individual adjudication.
 
 
 311
 Judge Tamm, concurring in the result, joined only the second of the court's two grounds, finding that "the inadequacy of the record demands that we remand this case to the Commission in order to ensure that it has taken a hard look at the waste storage issue."[24] Challenging Judge Bazelon's first ground of decision, Judge Tamm noted that "the deficiency is not with the type of proceeding below, but with the completeness of the record generated."[25] He concluded,
 
 
 312
 The appropriate remedy at this point is not to impose ad hoc procedural requirements in an attempt to raise the level of petitioners' participation, already adequate under (5 U.S.C.) section 553, but to remand for ... the documentation which the majority finds so conspicuously lacking. The Commission should be able to supply the court with a statement of the methods by which its staff arrived at the figures embodied in Table S-3 and by which (the NRC Waste Management Division Director) concluded that the waste storage problem is already technologically and economically soluble. If it cannot, we will have no choice but to invalidate the Commission's rule under the "arbitrary, capricious" standard ; if it can, we should defer to the administrative weighing of risks and benefits of additional reactors.[26]
 
 C. Vermont Yankee II
 
 313
 The Supreme Court unanimously reversed the panel opinion.[27] The united Court, speaking through Justice Rehnquist, resoundingly rejected the first of the panel's decisional grounds:
 
 
 314
 (N)othing in the APA, NEPA, the circumstances of this case, the nature of the issues being considered, past agency practice, or the statutory mandate under which the Commission operates permitted the (circuit) court to review and overturn the rulemaking proceeding on the basis of the procedural devices employed (or not employed) by the Commission so long as the Commission employed at least the statutory minima, a matter about which there is no doubt in this case.[28]
 
 
 315
 The Court did not, however, reverse this court's second finding, concu red in by Judge Tamm. Instead, it remanded that question to us with the following directive:
 
 
 316
 There remains, of course, the question of whether the challenged rule finds sufficient justification in the administrative proceedings that it should be upheld by the reviewing court. Judge Tamm, concurring in the result reached by the majority of the Court of Appeals, thought that it did not. There are also intimations in the majority opinion which suggest that the judges who joined it likewise may have thought the administrative proceedings an insufficient basis upon which to predicate the rule in question. We accordingly remand so that the Court of Appeals may review the rule as the Administrative Procedure Act provides. We have made it abundantly clear before that when there is a contemporaneous explanation of the agency decision, the validity of that action must "stand or fall on the propriety of that finding, judged, of course, by the appropriate standard of review. If that finding is not sustainable on the administrative record made, then the Comptroller's decision must be vacated and the matter remanded to him for further consideration." Camp v. Pitts, 411 U.S. 138, 143 (93 S.Ct. 1241, 1244, 36 L.Ed.2d 106) (1973). See also SEC v. Chenery Corp., 318 U.S. 80 (63 S.Ct. 454, 87 L.Ed. 626) (1943). The court should engage in this kind of review and not stray beyond the judicial province to explore the procedural format or to impose upon the agency its own notion of which procedures are "best" or most likely to further some vague, undefined public good.[29]
 
 
 317
 The Vermont Yankee II Court buttressed its explicit mandate with four observations of major significance to our review on remand. First, the Court reiterated the broad scope of NRC authority to deal with fuel cycle issues by rulemaking.[30] Second, the Court declared that this court had "fundamentally misconceive(d) the nature of the standard for judicial review of an agency rule."[31]
 
 
 318
 (Because) informal rulemaking need not be based solely on the transcript of a hearing held before an agency ... the adequacy of the "record" in this type of proceeding is not correlated directly to the type of procedural devices employed, but rather turns on whether the agency has followed the statutory mandate of the Administrative Procedure Act or other relevant statutes.[32]
 
 
 319
 The Court's third observation, particularly important for our purposes today, emphasized the limited scope of our power to review NRC rulemaking under NEPA. Justice Rehnquist stated in no uncertain terms that a reviewing court's already-limited power to review the substance of agency decisions is not significantly supplemented by the broadly stated environmental mandate found in § 101 of NEPA.[33] In Calvert Cliffs' Coordinating Comm. v. AEC,[34] this court had held that § 101 imposes substantive restraints on agency actions, thus obliging courts to review agency decisions on the merits to ensure their consistency with the goals of NEPA.[35] In Vermont Yankee II the Court acknowledged that while "NEPA does set forth significant substantive goals for the Nation, ... its mandate to the agencies is essentially procedural."[36] In Stryckers' Bay Neighborhood Council v. Karlen,[37] the Court elaborated on that statement:
 
 
 320
 Vermont Yankee cuts sharply against the Court of Appeals' conclusion that an agency, in selecting a course of action, must elevate environmental concerns over other appropriate considerations. On the contrary, once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences ; it cannot " 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' "[38]
 
 
 321
 Furthermore, the Vermont Yankee II Court explicitly rejected Judge Bazelon's view that NEPA authorizes courts to require agencies to "develop new procedures to accomplish the innovative task of implementing NEPA through rulemaking:"[39]
 
 
 322
 We have before observed that "NEPA does not repeal by implication any other statute." ... In fact, just two Terms ago, we emphasized that the only procedural requirements imposed by NEPA are those stated in the plain language of the Act.... Thus, it is clear NEPA cannot serve as a basis for a substantial revision of the carefully constructed procedural specifications of the APA.[40]
 
 
 323
 Thus, after Vermont Yankee II, reviewing courts must not only limit their substantive review of agency action to the appropriate standards under the APA, they must take pains in their procedural review to avoid imposing requirements in excess of the "statutory minima" or extending their scrutiny beyond the "plain language" of § 102.
 
 
 324
 Vermont Yankee II 's fourth major pronouncement arose from its discussion of a consolidated case. Addressing Consumers Power Co. v. Aeschliman,[41] which presented identical fuel cycle issues in the licensing context, the Vermont Yankee II Court reiterated both the breadth of NRC statutory authority and the limited "role of a court in reviewing the sufficiency of an agency's consideration of environmental factors" under NEPA.[42] The Court expressly recognized that § 102(2)(C) requires responsible agency officials to include in each EIS "a detailed statement ... on ... alternatives" to the proposed federal action[43] and that NEPA obliges agencies to consider "every significant aspect of the environmental impact" of the action.[44] Nevertheless, it refused to read those NEPA requirements as placing on the agency the burden of justifying every decision not to consider a highly unlikely alternative to a given action. The initial burden of establishing that an alternative is sufficiently material to require agency consideration, the Court suggested, properly rests with the challenger to the agency action.[45] Furthermore, the Court reasoned, even when the challenger has met that burden, the agency's subsequent duty to consider and explore little-known technological alternatives must necessarily be bounded by two practical constraints: the feasibility of those alternatives[46] and the extent of information about them currently available.[47]
 
 
 325
 In short, the Vermont Yankee II Court's discussion of Consumers Power confirmed a view this court has stated several times: that NEPA necessarily allows agencies some flexibility in determining the contents of their environmental impact statements in situations where uncertainty is abundant, technological alternatives are still developing, and much crucial information remains unavailable.[48] In such circumstances, as Judge Wright noted in Scientists' Institute for Public Information v. AEC,[49] "NEPA is not a paper tiger, but neither is it a straitjacket."[50]
 
 
 326
 Vermont Yankee II closed with the unambiguous command that courts should not employ judicial review of NRC action to encroach on fundamental policy choices in the nuclear power arena:
 
 
 327
 Nuclear energy may some day be a cheap, safe source of power or it may not. But Congress has made a choice to at least try nuclear energy, establishing a reasonable review process in which courts are to play only a limited role. The fundamental policy questions appropriately resolved in Congress and in the state legislatures are not subject to re-examination in the federal courts under the guise of judicial review of agency action. Time may prove wrong the decision to develop nuclear energy, but it is Congress or the States within their appropriate agencies which must eventually make that judgment. In the meantime courts should perform their appointed function.[51]
 
 III. OUR TASK ON REMAND
 
 328
 The majority has deviated from a clearly presented path-charted by the Supreme Court itself-to lead this court again on a confusing and unauthorized incursion into a policymaking area reserved by Congress to the NRC. I cannot participate in this trespass.
 
 
 329
 The Supreme Court's explicit directive in Vermont Yankee II was that we first, clarify the nature of the agency decision under challenge; second, seek a "contemporaneous explanation " of that decision; and third, judge the "propriety of that finding ... by the appropriate standard of review."[52] A conclusion that the agency's finding was sustainable on the administrative record would effectively end our inquiry.
 
 A. The Agency's Decision
 
 330
 The primary NRC choice still under review is the agency's decision to promulgate the final rule based on the factual record before it. As Judge Tamm noted in his original concurrence in Vermont Yankee I, that type of rule "encompass(es) both factual determinations and policy choices."[53] Although the line separating fact and policy has never been hard and fast,[54] we have often employed the distinction to calibrate the intensity with which we scrutinize an agency's contemporaneous explanation of its decisions.[55] Judge Tamm explained in Vermont Yankee I how the distinction has been commonly employed:
 
 
 331
 This court has also distinguished between factual determinations and policy choices more peculiarly within the expertise of the administrative agency. In the former case, we commonly have insisted upon sufficient attention to the facts to enable the reviewing court to ascertain the underlying rationality of the resultant regulations.... In contrast, "(w)here ... the regulations turn on choices of policy, on an assessment of risks, or on predictions dealing with matters on the frontiers of scientific knowledge, we will demand adequate reasons and explanations, but not 'findings' of the sort familiar from the world of adjudication."[56]
 
 
 332
 Contrary to intimations in the majority opinion[57] none of the specific figures in Table S-3 were intended to reflect factual certainties.[58] Rather, they were a series of estimated fuel cycle impacts based on agency predictions, educated guesses, and assumptions about the future, combined with quantitative analysis. As such, they fell squarely into the gray area between "fact" and "policy." When such predictions are asserted as facts based on hard data, with all uncertainties and assumptions underlying them undisclosed, they deserve to be scrutinized as factual determinations. When they are asserted as qualitative risk assessments, however, validly based on agency expertise and the best available information, with underlying uncertainties and assumptions fully exposed, they deserve the greater deference given to agency policy choices.[59] It is impossible to determine when predictions deserve the deference given policy choices and when they deserve the closer scrutiny given facts without assessing the purposes for which the predictions were made, the methodology by which they were developed, and the conclusions they served to support. For this information we must turn to the agency's contemporaneous explanation, as the Supreme Court directed.
 
 B. Contemporaneous Explanation
 1. The Commission's Purpose
 
 333
 A review of the record reveals that the Commission's expressed purpose in conducting the final S-3 rulemaking had evolved considerably since it had conducted the original rulemaking.[60] Its expressed purpose in conducting the final rulemaking was not to evaluate or select the most effective long-term waste disposal technology, to model precisely all of the fuel cycle impacts from a single reactor, or even to evaluate the likelihood that the nuclear waste could safely be stored in the long term.
 
 
 334
 The NRC's statement of basis and purpose for its "final" S-3 rule made clear that creation of an S-3 table had become only one part of an ongoing and wide-ranging Commission effort to evaluate long-term nuclear waste disposal issues. The Commission began by noting that "a general update of the rule with respect to all aspects of the uranium fuel cycle" was in progress.[61] It further noted its intent to conduct a supplementary rulemaking directed at producing and incorporating into the final rule an "explanatory narrative" summarizing in understandable terms the environmental significance of the table's numerical impact values.[62] Finally, the Commission noted its intent to conduct a parallel generic proceeding-a "waste confidence" proceeding, now in progress-to "consider the most recent evidence regarding the likelihood that nuclear waste can be safely disposed of and when that, or some other off-site storage solution, can be accomplished."[63]
 
 
 335
 Accordingly, the Commission's statement of basis and purpose referred again and again to the final rule's "limited purpose": to provide a table modeling some, but not all, of the fuel cycle impacts for a typical reactor:[64]
 
 
 336
 The table of impacts adopted as a final rule in this proceeding serves as an important first step in this consideration, relieving adjudicatory boards from the need to determine those numerical impacts of the uranium fuel cycle which have been extensively considered in generic rulemaking.[65]
 
 
 337
 Because individual licensing boards would incorporate the table into environmental cost-benefit analyses where costs would be measured in terms of the impact of effluent releases on human lives, not in terms of the effluent releases alone, the Commission expressly stated that "use of the table in individual licensing will not foreclose discussion of the significance" of the release values stated in the table, or of "other important aspects of the fuel cycle not addressed by the table."[66]
 
 
 338
 In short, the Commission's goal was not to produce an exhaustively comprehensive table of precisely accurate figures as to which all uncertainty had been eliminated. Indeed, had the Commission set that goal as the objective of the rulemaking it could never have produced a Table S-3 at all, since all of the figures stated there were based on some unprovable assumptions, predictions, and generalizations. The Commission candidly acknowledged that its rulemaking "necessarily involve(d) a wide-ranging inquiry and a certain amount of speculation."[67] Nevertheless, the Commission chose as a matter of policy not only to acknowledge that uncertainty, but to accept it, and then to proceed in the face of that uncertainty.[68]
 
 
 339
 The Commission gave two reasons for creating an admittedly imperfect table of model fuel cycle impact values: its concern that NEPA cost-benefit analysis demanded a prelicensing assessment of the environmental effects of the fuel cycle, generic to all licensing actions; and its determination that such assessment lay beyond the expertise of individual licensing boards:
 
 
 340
 A study of fuel cycle impact thus involves difficult generic analysis and prediction well outside the normal scope of facility-specific subjects dealt with by a reactor licensing board. This does not mean the subject can be ignored or deferred until the fuel cycle facilities themselves come up for licensing. It does mean that in reactor licensing fuel cycle impacts should be treated where possible by generic rulemaking rather than case-by-case adjudication.[69]
 
 
 341
 Aware that individual licensing boards would rely heavily on the table in future adjudications, however, the Commission deliberately selected its values so that, taken as a whole, the table would reflect "substantial conservatism."[70] So long as the table as a whole was conservative, the Commission assumed, it would adequately serve as a starting point in individual environmental cost-benefit analyses, even if not perfectly detailed and precise.
 
 2. The Commission's Methodology
 
 342
 To derive a conservative table of useable estimates amidst uncertainty about future technology, the NRC staff had to select some methodology. The staff chose to analyze intensively the most credible long-term waste disposal method then known-burial of the wastes in a bedded-salt geologic repository several hundred meters below ground-then "estimate(d) its impact conservatively, based on the best available information and analysis."[71] Because such a repository had not yet been built, the staff had to make a number of preliminary assumptions even to begin analysis. At the outset, it assumed that an appropriate salt deposit site would be found[72] that the particular salt formation chosen would likely remain essentially undisturbed for millions of years,[73] and that whatever repository built would be designed, operated, and regulated in such a way as to minimize the possibility of long-term failure.[74]
 
 
 343
 The staff then analyzed the possibility of a repository failure resulting from two types of events: (1) commonplace occurrences, such as long-term corrosion of waste cannisters and subsequent leakage into the groundwater;[75] and (2) unusual occurrences, such as violent disruption of the repository by sabotage or natural catastrophe.[76] Having thereby established a range of probabilities for potential waste release based on a variety of repository failure scenarios, the staff then used two approaches to assess the consequences to human life of a waste release: a "hazard index"[77] and a modeling of waste transport to the human environment.[78] Throughout the staff's analysis, working assumptions were expressly spelled out and uncertainties inherent in the models employed were candidly acknowledged.[79]
 
 3. The Commission's Conclusions
 
 344
 The Commission reiterated the staff's assumptions and uncertainties in its statement of basis and purpose.[80] Based on the record compiled by the staff and hearing board, the Commission then found that the
 
 
 345
 characteristics of a bedded-salt repository afford a reasonable basis for the staff's conclusion that the repository can maintain its integrity, provided that sites meeting the selection criteria can in fact be found and developed.[81]
 
 
 346
 While agreeing "that areas of uncertainty remain regarding both the likelihood of finding a site and the probability that it will perform as expected,"[82] the NRC noted that more precise evaluation and selection of the "best" waste disposal technology were properly the subject of other NRC proceedings.[83]
 
 
 347
 Then and only then did the Commission consider whether admitted uncertainties regarding the likelihood of successful waste disposal "can or should be reflected explicitly in the fuel cycle rule":
 
 
 348
 On the individual reactor licensing level, where the proceedings deal with fuel cycle issues only peripherally, the Commission sees no advantage in having licensing boards repeatedly weigh for themselves the effect of uncertainties on the selection of fuel cycle impacts for use in cost-benefit balancing. This is a generic question properly dealt with in this rulemaking as part of choosing what impact values should go into the fuel cycle rule. The Commission concludes, having noted that uncertainties exist, that for the limited purposes of the fuel cycle rule it is reasonable to base impacts on the assumption which the Commission believes the probabilities favor, i.e., that bedded-salt repository sites can be found which will provide effective isolation of radioactive waste from the biosphere.[84]
 
 
 349
 Based on staff findings of extremely low probabilities of repository failure from either commonplace occurrences or accidental intrusions and an assumption that all volatile radioactive products would be released from a repository before final sealing, the Commission found "that taking post-sealing releases as zero does not significantly reduce the overall conservatism of the table."[85] In concluding that the model chosen by the staff to assess waste disposal impacts was reasonable and adequate for the purposes of the rule, the Commission in no way foreclosed reassessment of its conclusions in light of new evidence. Observing that the "current rate of growth of knowledge (in this area) is very large,"[86] the NRC reiterated that "(a) continuing reassessment of the Commission's views on waste disposal is part of the commitment which the Commission has made to Congress."[87]
 
 C. The Appropriate Standard of Review
 
 350
 The agency action challenged here was an informal generic rulemaking. Under 5 U.S.C. § 706 of the Administrative Procedure Act, which governs judicial review of agency action, the well-established standard for our review of that action is whether the agency decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[88] That is the standard which Judge Tamm expected,[89] and the Supreme Court directed[90] us to use in evaluating the agency's decision. Although it is also the standard which the majority purports to use, a careful reading of their opinion reveals that they have paid it lip service only. The approach actually adopted results in a judgment-substituting analysis which not only exceeds the limits of proper judicial review but which denies the presumption of regularity normally accorded an agency's action.
 
 
 351
 In Citizens to Preserve Overton Park v. Volpe,[91] the Supreme Court described the appropriate focus of judicial review under § 706 by essentially consolidating the various overlapping standards listed in § 706(2)(A), (B), (C) and (D) under a single heading-"arbitrary, capricious, or an abuse of discretion"-under which it distinguished three necessary inquiries.[92] First, the Court held, a reviewing court is "required to decide whether the (agency) acted within the scope of (its) authority. This determination naturally begins with a delineation of the scope of the (agency's) authority and discretion."[93] Implicit in this determination is an assessment of the range of choices delegated by Congress to the agency's discretion and a decision whether the agency's action can reasonably be said to fall within that range of choices.
 
 
 352
 A second directive found in Overton Park was that reviewing courts carefully determine whether the agency's actions have followed the "necessary procedural requirements."[94] In this case, those requirements are found in both the relatively loose notice-and-comment procedures of § 553 of the Administrative Procedure Act[95] and the disclosure requirements of NEPA.[96]
 
 
 353
 Finally, Overton Park held that the court must engage in a limited substantive review of the agency's actual decision. Even if an agency has made a decision Congress has empowered it to make, has accorded the parties "administrative due process" by observing all required procedures, and has supported its decision with some evidence,[97] the court must still assure itself that the agency based its result on a sustainable rationale-i.e., that the agency demonstrated a logical connection between the evidence it adduced and the conclusion it reached.[98] In the words of Overton Park, § 706
 
 
 354
 requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.[99]
 
 
 355
 In recent years this court has elevated the Overton Park notion of limited substantive review of agency decisions in critical cases into a somewhat ill-defined doctrine commonly called the "hard look" doctrine of judicial review.[100] While the original concept, pioneered by the late Judge Leventhal, was that agencies should take a "hard look" at complicated technological decisions with serious environmental, health, and safety consequences,[101] later decisions have read the doctrine to require courts to take a hard look to ensure that agencies have taken a hard look.[102] Not surprisingly, the proper level and nature of judicial, as opposed to agency, scrutiny of informal rulemakings remains a subject of intense judicial[103] and scholarly[104] debate after Vermont Yankee II. Nevertheless, whether expressed in "hard look" terms or not, the limited substantive review endorsed by Overton Park addresses legitimate concerns. As Judge Wald recently noted in National Lime Ass'n v. EPA :[105]
 
 
 356
 Collectively, these concerns have sometimes been expressed as a need for "reasoned decision-making" and sometimes as a need for adequate "methodology." However expressed, these more substantive concerns have been coupled with a requirement that assumptions be stated, that process be revealed, that the rejection of alternate theories or abandonment of alternate courses of action be explained and that the rationale for the ultimate decision be set forth in a manner which permits the public to exercise its statutory prerogative of comment and the courts to exercise their statutory responsibility upon review.[106]
 
 
 357
 D. The Standard of Review Applied to the Agency's Decision
 
 
 358
 1. "Scope of Authority"
 
 
 359
 As this court has held time and again,[107] the Atomic Energy Act's statutory delegation of authority to the NRC is unusually broad. Judge McGowan noted in Siegel v. AEC,
 
 
 360
 (In the AEA) Congress ... enact(ed) a regulatory scheme which is virtually unique in the degree to which broad responsibility is reposed in the administering agency, free of close prescription in its charter as to how it shall proceed in achieving the statutory objectives.[108]
 
 
 361
 The Vermont Yankee II Court was emphatic in its reaffirmation of the NRC's broad authority to deal with fuel cycle issues by rulemaking.[109] Necessarily encompassed within that rulemaking authority is the power to treat certain factual and policy issues generically.[110] And the power to treat those issues generically itself must include the discretion to incorporate a certain amount of prediction into the final rule's table of release values.[111]
 
 
 362
 The NRC has confidently-and to my mind, correctly-determined that the decision to promulgate a rule in the form of a noncomprehensive table of predicted release values-whose significance for human lives is subject to discussion in individual licensing proceedings, whose accuracy is subject to update and refinement, and whose uncertainties are candidly acknowledged-lies well within the authority granted to it by Congress. Under the Supreme Court's directive in Power Reactor Development Co. v. International Union of Electrical, Radio, & Machine Workers,[112] we are obliged to give that determination considerable deference.[113]
 
 
 363
 In accordance with Power Reactor, this court has frequently held that where agency rules, such as the one here, are based on "choices of policy, ... assessment of risks, or ... predictions dealing with matters on the frontiers of knowledge" the agency has the authority to promulgate such rules, so long as they are based on such facts as are available and on rational predictions about how currently unanswerable questions will someday be answered.[114] Thus, an agency "may apply (its) expertise to draw conclusions from suspected, but not completely substantiated, relationships between facts, from trends among facts, from theoretical projections from imperfect data, from probative preliminary data not yet certifiable as 'fact,' and the like."[115] The agency does not merely have the power to promulgate a rule based on such predictions; it has a duty to do so as long as it exercises that authority "subject to the restraints of reasonableness, and does not open the door to ' "crystal ball" inquiry.' "[116]
 
 
 364
 Judge Bazelon does not openly challenge the broad powers exercised generally by the NRC under the authority of the AEA, but he does not expressly recognize them, either. And it is obvious that the deference due to the Commission has not tempered the majority's determination to find some error in the Table S-3 Rule. Here, as in Vermont Yankee I, it is a NEPA-based standard of Judge Bazelon's manufacture, bootstrapped into the APA, which provides the means to the "desired" end. Contrary to holdings in this court recognizing the flexibility of agency duties under NEPA in the face of uncertainties,[117] the majority has found in its construction of NEPA procedural and substantive standards by which to limit the NRC's broad substantive discretion. It holds that the Commission's action failed to meet NEPA's mandates and that it was taken without proper consideration of all relevant factors. These relate more to Overton Park's second and third inquiries than to the general question of authority.
 
 
 365
 2. "Observance of Procedure"
 
 
 366
 The Vermont Yankee II Court confirmed our duty to conduct a limited procedural review of the Commission's activity by restating the second aspect of the Overton Park analysis: "Of course, the (circuit) court (on remand) must determine whether the agency complied with the procedures mandated by the relevant statutes."[118] It warned, however, that we "should ... not stray beyond the judicial province to explore the procedural format or to impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good."[119] Judge Bazelon has effectively ignored this warning, however, and once again disguises a strict substantive review under NEPA in a fundamentally procedural rubric. While our scrutiny for compliance with NEPA's procedural mandate may be, as Judge Bazelon asserts, a close one, it must not extend across the line separating the Commission's procedural duty from substantive determinations and policymaking. The latter category of action is properly reviewable only under the "arbitrary and capricious" standard. Thus, although I agree with the majority opinion that NEPA's requirements are among those providing an overall procedural standard for the Commission's action, I disagree with Judge Bazelon's assertions of what those requirements are and how they are to be applied in the rulemaking context.
 
 
 367
 The Supreme Court emphasized in Vermont Yankee II that while "NEPA does set forth significant goals for the Nation, ... its mandate to the agencies is essentially procedural,"[120] and that "the only procedural requirements imposed by NEPA are those stated in the plain language of the Act."[121] The plain language of NEPA, to the extent relied upon by the majority,[122] requires simply that a detailed statement of environmental impacts, effects, and irretrievable resource commitments, as well as alternatives to the proposed activity, be included in recommendations for "major Federal actions."[123] And while this "detailed statement" is only "the outward sign that the environmental values and consequences have been considered during the planning stage of agency actions,"[124] the Act does not prescribe exactly how this consideration must be made. Thus, any NEPA-based review consistent with Vermont Yankee II must be limited to a scrutiny of compliance with only the "outward signs" of environmental consideration clearly prescribed by the Act.[125]
 
 
 368
 Notwithstanding the Supreme Court's clear guidelines, however, Judge Bazelon has again strayed beyond judicial province to register his dissatisfaction with the methodology underlying the Table S-3 Rule and to prescribe "procedural" mandates which, however promotive of an ideal that environmental concerns play a vital role in government decisionmaking, simply are not among those required by Congress under NEPA.[126]
 
 
 369
 The majority's first novelty is the elevation of "uncertainties" to the level of separate environmental impacts, effects, or costs. Although this is no easy task in logic, since uncertainty is a quality inherent in all impacts as well as benefits, of which there is less than complete certitude, the equation is accomplished semantically with apparent ease. Pointing to "1) uncertainty concerning the integrity of the (projected) permanent repository ... and 2) uncertainty over whether and when such a repository ... will be developed,"[127] he concludes that "these uncertainties reflect two environmental costs of licensing a plant."[128] From that point "costs" are treated as an equivalent to "uncertainties," and uncertainties thus become costs which must be considered under NEPA.
 
 
 370
 Judge Bazelon's prescription does not end there, however. Under his analysis no simple consideration of costs will do: "Although the Commission did consider these uncertainties, it did not do so in a manner that would allow licensing decisions to be affected."[129] The majority's bottom line is that uncertainties may be fully considered only if openly balanced against benefits, as costs now traditionally are. This, it is maintained, is the type of consideration described in Calvert Cliffs' ;[130] and thus, we are led to conclude, is the type of consideration required by NEPA in this case. And because the Commission "did not rule that the (uncertainties) were insignificant, (or) rule that they were outweighed by generic benefits that would also be excluded from the licensing boards' consideration,"[131] and because the promulgation of a rule calling for an assumption that post-sealing repository releases would be zero prevented licensing boards from considering uncertainties in their own balancing,[132] "the Commission directly contravened NEPA's requirement that environmental costs be considered 'at every stage where an overall balancing of environmental and non-environmental factors is appropriate.' "[133]
 
 
 371
 Thus, in a series of small steps, Judge Bazelon has held that uncertainties in the assumptions underlying the figures in the fuel cycle rule can be considered, consistent with NEPA, only as separate environmental costs, balanced in common EIS practice against benefits. He has severely qualified and limited the Commission's authority to determine by an otherwise reasonable generic process that certain factors do not merit separate consideration in individual licensing proceedings.[134] Clearly, the requirements described by Judge Bazelon are not among the procedural requirements "stated in the plain language of (NEPA); "[135] they are "creature(s) of judicial cloth, not legislative cloth,"[136] and are an improper basis for invalidating the Rule. Our critical review of an agency's action, such as the S-3 Table here under scrutiny, ends with a determination that the decisionmakers have satisfied the key "procedural" requirement of considering environmental consequences of and alternatives to the proposed action. Even though NEPA provides that environmental considerations must be made "to the greatest extent possible," we may not, under the guise of close scrutiny for procedural compliance, dictate to the agencies just how this consideration is best made. As each of the four major Supreme Court NEPA cases[137] has shown, judicial review of agency compliance with NEPA is to be tempered by a recognition that full compliance is measured against the agency's structuring of its own proceedings, in which the agency is to be accorded the greatest deference.
 
 
 372
 3. "Reasoned Decisionmaking"
 
 
 373
 I agree with Judge Bazelon's statement that "a reviewing court must set aside an agency finding as arbitrary if it determines that the finding is not based upon consideration of relevant factors or if it is based on a clear error of judgment." I strongly disagree, however, that this rule, properly applied to this case, should yield the result reached by the majority.
 
 
 374
 Although the fact is not specifically acknowledged, it is obvious from a careful examination of Judge Bazelon's opinion that the majority's holding against the Table S-3 Rule is rooted simply in its dissatisfaction with a single conclusion underlying the Rule: that licensing boards effectively may ignore the uncertainties inherent in any projections related to long-term storage of nuclear wastes in favor of the probability-based zero-release figure. Judge Bazelon concedes that "uncertainties can be assessed generically, and that attendant risks can be assessed generically,"[138] but states categorically that "the Commission cannot find the environmental cost represented by the uncertainties to be zero unless their cost is, in fact, zero."[139] He has obviously made from the zero-release figure included in the Rule something which it is not-a finding of fact rather than simply a practical estimate for limited purposes. A careful review of the Commission's contemporaneous explanations convinces me that there is no basis for finding this determination by the NRC to be arbitrary, capricious, or clearly erroneous; nor is it "otherwise not in accordance with law," as the majority suggests. The majority has simply substituted its "expertise" for that of the Commission.
 
 
 375
 The relevant question with regard to the zero-release assumption is not whether the zero figure itself is precisely accurate but whether the Commission's decision to adopt it was reasoned. The first step must be to recognize that the figure was never meant to be a "factual finding," as the majority proposes;[140] it is intended only as a generic determination of the appropriate weight to be accorded in licensing proceedings to risks of radioactive emission from long-term waste storage. The Commission did not decide that releases would never occur at the projected federal repository. It only decided, in view of the staff's assumption that fission-product gases would be released prior to sealing and its finding of extremely low probability of repository failure, that "taking post-sealing releases as zero does not significantly reduce the overall conservatism of the table."[141]
 
 
 376
 As noted earlier, the majority concedes that "the Commission's zero-release assumption is probably characterized better as a decisionmaking device, ... instructing licensing boards to assume that nuclear waste will have no impact on the environment once it is sealed in a repository, (and) allocat(ing) to the Commission sole responsibility for considering the risk that long-lived wastes will not be disposed of so successfully."[142] Yet rather than to afford the Commission any deference in its decision to include the zero figure "device" in the generic rule, Judge Bazelon has cut to the quick of the NRC's expertise and judgment: "For an agency to go forward in the face of significant uncertainty and issue such a rule indicates either a failure to consider a relevant factor or a clear error in judgment, ... (and) that is precisely what the Commission did in promulgating the Table S-3 Rule."[143] The record clearly contradicts this conclusion.
 
 
 377
 There is no question that the Commission considered relevant factors-including the uncertainties with which Judge Bazelon is so concerned-in deciding to promulgate the S-3 Rule. The record is replete with evidence that the Commission took fair account of these uncertainties. Judge Bazelon in fact observes that "(f)rom the time it proposed the original Rule ... through its promulgation of the final Rule, the Commission became increasingly candid in its acknowledgment of uncertainties underlying permanent waste disposal."[144] We can demand no more, and the majority's holding that relevant factors were not "properly considered" because the consideration did not take a particular form or yield a usable result[145] exceeds the limits of our judicial prerogative in a substantive review of agency decisions under the APA.[146]
 
 
 378
 The Commission's decision not to reflect uncertainties about long-term waste storage directly in the table was simply part of its overall decision to treat an issue generically. That decision was a quintessential policy judgment.[147] The Commission chose to incorporate into the table only those values to which it could reasonably assign a figure. It did not attempt to quantify the uncertainties surrounding the figures themselves because they were inherently unquantifiable.[148] It did not require individual licensing boards to weigh repeatedly the effects of uncertainties because it was aware that individual boards were incapable of doing a better job of analysis than the Commission had already done. It did not institute a separate generic proceeding to consider uncertainties because the Commission expected that long-term effects would be more fully analyzed and understood after the concurrent "waste confidence" proceeding had concluded. In view of all of these considerations, I do not believe the Commission abused its discretion by finding "no advantage in having licensing boards repeatedly weigh" for themselves the unquantifiable uncertainties inherent in the rule it adopted-a table whose values mixed both fact and prediction.
 
 
 379
 Nor did the Commission fail to take a hard look at the whole problem before it. Its avowed objective was to produce a conservative, noncomprehensive table of model fuel cycle impacts; its methodology was directed toward that objective. Its working assumptions were revealed, alternative theories exposed and explained, and its ultimate rationale set forth in a logical and comprehensible manner. The Commission's decision not to search out and eliminate all uncertainties from its table can hardly be characterized as irrational in view of the limited purpose for which that table was being created.
 
 
 380
 There was no clear error in the Commission's conclusion that the use of a zero-release figure, rather than one which reflected a post-sealing release probability which was zero to many decimal places, would have little effect on an individual board's decision to license any given plant.[149] Even after considering the uncertainties involved in its projections of long-term waste storage techniques, the NRC concluded that the probabilities (of which uncertainty is itself an element) still favored the assumptions made and that the presence of uncertainties required no modification of the judgmental zero-release figures. This conclusion did not foreclose further investigation into or consideration of the uncertainties, and it did not preclude the licensing boards from considering uncertainties which were not separately considered in the Commission's generic determination. It was not a conclusion which was outside the realm of reasonableness. A fortiori, I cannot find the Commission's decision to adopt the entire table, of which the zero-release figure was but one small part, arbitrary and capricious, given the compensating conservatism of the rest of the table.[150]
 
 
 381
 Nor can I say, in light of recent precedent, that the NRC has shirked its substantive obligations under NEPA. After Strycker's Bay Neighborhood Council, our only role "is to insure that the agency has considered environmental consequences."[151] Here the Commission satisfied its obligation to consider those consequences in two ways: by considering whether the assumption of complete repository integrity (inherent uncertainties and all) would disrupt the overall conservatism of Table S-3 and skew subsequent environmental cost-benefit analyses; and by permitting the significance to the environment of the chosen fuel cycle impact values to be the subject of discussion at individual licensing proceedings.
 
 
 382
 I cannot avoid contrasting Judge Bazelon's surprisingly stringent review of the Commission's conclusions concerning the technological feasibility of the assumptions underlying the values in Table S-3 with his deferential, straightforward, and proper application of the arbitrary and capricious test to the NRC's conclusions of economic feasibility. He concedes that standards guiding conclusions concerning economic feasibility "may be based on realistic, conservative, and reasoned forecasts,"[152] yet the forecasts upon which the Commission based its conclusions of technological feasibility were no less "realistic, conservative, and reasoned." And he is willing to look to the record as a whole for evidence that the NRC considered factors relevant to dollar cost and that it "reached a conclusion that is within the range of reasonability,"[153] yet is unwilling to afford the same deference to the Commission's consideration of the uncertainties relevant to its technological predictions.
 
 
 383
 I am puzzled only by Judge Bazelon's decision not to apply the standard which tempered his substantive review of the NRC's economic conclusions to the case as a whole.[154] If in the economic arena, then a fortiori in the technological arena, the court must accord to the Commission the deference due in this case.
 
 
 384
 Based on this review of the authority upon which the NRC acted in this informal rulemaking, the procedures it employed, and the stated rationale for its decision, I believe we have ample ground to affirm.
 
 IV. LIVING WITH UNCERTAINTY
 
 385
 Having expressed my concerns with the particulars of Judge Bazelon's analysis, I am compelled to respond specifically to the central, and equally harmful implication of the majority's opinion. Whether his holding is based outwardly on procedural or substantive grounds, the effect of the majority's analysis is to state that it is error for the Commission to proceed in the face of admitted uncertainties.
 
 
 386
 In our everyday lives we make countless minor and major decisions, hopefully without stepping beyond the bounds of reason, despite unfathomable uncertainties. We drive our cars without understanding fully the potential risk of injury and death; we eat, drink, and breathe without total certainty that the substances we ingest will not cause long-term disease; we plan for our futures without assurance that that future will not be obliterated by unexpected wars, plagues, or natural disasters. Of course we try to evaluate the risks of automobile accident, fatal disease, and possible calamity as well as we can. But when those risks are truly incalculable, and potential outcomes are truly uncertain, we necessarily face a decision: do we stop until all uncertainties are resolved, or do we proceed cautiously in the face of uncertainty, making tentative assumptions and predictions, and revising and perfecting those predictions as more information becomes available?
 
 
 387
 In the nuclear power area it is Congress which has made the decision to proceed in the face of uncertainties.[155] Congress has charged the NRC not only with authority and discretion to decide how best to proceed, but also with a mandate to predict likely future developments.[156] As a reviewing court we are entitled to demand that the Commission's predictions be based on logic and the best available information; we may further demand that the Commission seek out new information as it becomes available, and that it continually modify its rules to reflect the state of existing knowledge.[157] A reviewing court exceeds its authority, however, when by the stringency of its review it effectively forces an agency to employ new procedures or to rewrite its rules until it reaches what the court believes is the best or correct result.[158]
 
 
 388
 Judge Bazelon's opinion today invites this court to exceed the scope of its authority in just this manner. By holding that generic uncertainties must be treated as separate environmental impacts which, unless explicitly factored into a generic rule,[159] must be considered anew in each individual proceeding, Judge Bazelon is dictating to the Commission when and where, and under what conditions, it must consider a policy question Congress has empowered it to decide. Yet, after Vermont Yankee II, courts must candidly acknowledge that the choice of when, where, and under what conditions the regulatory agency makes such policy determinations lies within the agency's discretion, especially when uncertainty is rife and technology is fast-developing.
 
 
 389
 It is not clear just how the invalidation of the S-3 Rule and the remand ordered in this case will help the NRC to make a better decision than it has already made. Whenever toxic materials are placed in a container, a risk is created that human lives will be endangered. The magnitude of that risk, however, depends on a variety of factors, including the amount and toxicity of the materials being isolated, the duration of their isolation, and the long-term integrity of their container. A comprehensive assessment of the likelihood of injury to human life from waste repository releases would require examination and evaluation of almost an infinite and at this time incalculable number of variables.[160]
 
 
 390
 Judges Bazelon and Edwards have effectively imposed upon the NRC and its licensing boards an impossible task of predicting this court's response to their activities. The agency cannot be sure that another aspect of its rule or procedure will not be discredited in a future appeal unless it hunts down every factor it can think of and attempts somehow to qualify and evaluate its uncertainties as "environmental costs," an equivalence which has not been thought to exist before. It goes without saying that such an effort would require an enormous commitment of agency time and resources. The only certainty achievable by this process-and it will be achieved-is delay in the development of nuclear power.
 
 
 391
 More significantly, even if the NRC chose to devote all of its time and staff to studying the risk to human life of long-term waste storage-at best a questionable allocation of agency resources[161]-it still could not root out all uncertainties.[162] Even if it managed by further research to place boundary values on those uncertainties, and thus succeeded in producing a "risk value,"[163] of some sort, the NRC still would have accomplished only half of its statutory task. At some point the agency would still have to decide whether or not that level of risk and uncertainty was an acceptable one.[164]
 
 
 392
 There can be no doubt that the decision whether to stop or proceed in face of a certain level of risk and uncertainty is a policy choice clearly within the agency's discretion. Yet the majority's opinion today amounts to nothing more clearly than a judicial proclamation that the current level of risk-assumption is unacceptable. As then-Professor (now Judge) Breyer pointed out with respect to Judge Bazelon's Vermont Yankee I opinion, however, this kind of risk-acceptability determination disguised as "hard look" judicial review "allow(s) courts to play too prominent a role in determining how the United States will produce energy in the future."[165] Were courts to apply Judge Bazelon's unusually stringent standard of review to other NRC rulemakings, alternative energy sources-whose production is not so carefully regulated and whose long-term environmental effects are even less well-known-will become artificially attractive to the public utilities who must choose the most economical, reliable, and accessible of the available sources of energy generation.[166] Furthermore, if judges myopically focus on the risks and uncertainties peculiar to any particular type of energy, they will likely create another, equally real and equally problematic type of uncertainty-namely, uncertainty about regulatory delay which destroys the regulated firms' incentive to innovate.[167]
 
 
 393
 At oral argument in this case, counsel for the petitioners assailed the Commission for failing to reflect in its rule one particular type of risk-the risk of repository leakage resulting from random drilling. According to probabilities, counsel argued, such drilling could cause a repository leak once every 2,500 years-in retroactive perspective, once from now to before the Battle of Marathon. Given that some have projected the expected life of a long-term waste repository as 250,000 years, counsel contended that the Commission had ignored a "substantial risk."[168]
 
 
 394
 Lord Rothschild, a former director of the British Advisory Council for Science and Technology, has made a telling point about such "apparently authoritative utterance(s)" about "substantial risks":
 
 
 395
 There is no such thing as a risk-free society.... But there is no point in getting into a panic about the risks of life until you have compared the risks which worry you with those that don't-but perhaps should. Comparisons, far from being odious, are the best antidote to panic.[169]
 
 
 396
 Even assuming the worst-that counsel is perfectly correct[170] and that a repository failure caused by random drilling would in fact cost thousands and thousands of lives[171]-before we decide to panic we should compare the risks described by counsel with some of the risks we normally confront, and accept, in our everyday lives.
 
 
 397
 In effect, petitioners' counsel urges us to postpone all nuclear power plant construction because the Commission has adopted a rule which removes from individual licensing proceedings the consideration of a risk substantially less than the risk that he would die on a given day from a volcanic eruption[172] or from common influenza![173] I think it safe to say that such risks have never stopped petitioners' counsel from making either short-term or long-term plans in his everyday life. Indeed, he would probably deny that he had even failed to "consider" those risks; instead, he would probably assert that he had considered and dismissed them, just as we daily dismiss the countless possible, yet unpredictable, risks and uncertainties which fill our daily lives. I find it highly anomalous that counsel so fervently argues that far smaller risks should prove not merely significant, but dispositive, in an area so multifaceted and complex as the NRC's regulation of the licensing of a light water power reactor.
 
 V. CONCLUSION
 
 398
 A close examination of the majority's opinion today reveals that it has taken no more than a giant step sideways from an analysis rejected unanimously by the Supreme Court in Vermont Yankee II. It matters little that Judge Bazelon's latest approach has taken on a slightly different form or is presented under a different banner than his analysis in Vermont Yankee I. Its focus and effect are unchanged. Vermont Yankee III does not cure the first-round defects of Vermont Yankee I; it compounds them.
 
 
 399
 Simply put, the majority has created a new standard by which to gauge agency rulemaking against NEPA. It announces that uncertainties, even though inherent in the projections underlying environmental risk identification itself, must be considered as a separate category of environmental cost. It holds further that consideration of these uncertainties, however otherwise obvious and clearly disclosed in the rulemaking record, is insufficient if not made in a particular form or yielding a "usable" result-which in the last analysis is simply a result satisfactory to this court. Such a standard is clearly not mandated by NEPA and cannot be judicially foisted upon the Commission, however noble Judge Bazelon's intentions.
 
 
 400
 In view of the limited purposes of the fuel cycle rule, the other proceedings concurrently being conducted by the NRC, the overall conservatism of Table S-3, the massive record before us, and the rationale clearly stated in the Commission's statement of basis and purpose, I cannot say that the Commission acted arbitrarily and capriciously in promulgating its final rule. The Commission acted well within the scope of its authority throughout the S-3 proceeding; it faithfully observed all statutorily required procedures; and it acted reasonably both in adopting the assumption of complete repository integrity and in generically considering the uncertainties surrounding long-term fuel cycle impacts.
 
 
 401
 This is a rare case indeed. The Supreme Court has already unanimously mandated both the standard and the intensity by which we should scrutinize the very agency action being challenged. Faithful observance of that mandate demands that we now find that the agency's rule was reasonable. The majority has not done so. The decision and the stated rationale on which it is based, taken in conjunction with the recent action of this court in halting all operation at undamaged Three Mile Island Unit 1 on the basis of another completely novel theory, signal that this court has effectively taken over control of the nuclear industry. This is not the way I read either the substantive law or a judicial commission.
 
 On Petition for Rehearing
 
 402
 Before BAZELON, Senior Circuit Judge, GEORGE C. EDWARDS, Jr.* , Chief Judge, United States Court of Appeals for the Sixth Circuit, and Wilkey, Circuit Judge.
 
 ORDER
 
 403
 PER CURIAM.
 
 
 404
 Upon consideration of the petitions for rehearing filed by respondents and by intervenors Commonwealth Edison Company, et al., and Pacific Legal Foundation, it is
 
 
 405
 ORDERED, by the Court, that the aforesaid petitions are denied.
 
 
 406
 Statement of Senior Circuit Judge Bazelon as to why he voted to deny rehearing, attached.
 
 
 407
 Circuit Judge Wilkey's position is set forth in his statement attached to the en banc order entered this date.
 
 
 408
 Statement of Senior Circuit Judge BAZELON as to why he voted to deny rehearing.
 
 
 409
 In voting to deny these petitions for rehearing, I have carefully considered the parties' arguments and have concluded that no issue has been raised that has not been addressed in our opinion. I think it worthwhile, however, to respond briefly to the salient points of the petitions.
 
 
 410
 The petitioners assert, first, that we have prescribed procedures by which the NRC must consider the environmental impact of fuel-cycle activities, and second, that we have substituted our judgment for that of the NRC. In fact, we did neither. We held only that the NRC's environmental consideration must conform with the mandate of NEPA, as interpreted in Calvert Cliffs' Coordinating Committee, Inc. v. AEC, 449 F.2d 1109 (D.C.Cir.1971).
 
 
 411
 In addition, the NRC states that "(t)he panel envisaged a procedure in which waste disposal uncertainties would be quantified as costs...." NRC Petition at 10 (emphasis added). We said nothing about quantification; we said only that uncertain environmental costs must be considered in such a manner that they can potentially affect the ultimate decision to take an action. The Commission further argues that, under NEPA, an agency should be able to assess environmental costs in the abstract and subsequently exclude them entirely from consideration when the decision is being made whether to go forward with a project. Id. at 11. We held, and I strongly believe, that this type of consideration violates NEPA, and if permitted, would eviscerate the procedural regimen that NEPA established. As this court stated in Calvert Cliffs', NEPA requires that "environmental issues be considered at every important stage in the decisionmaking process concerning a particular action-at every stage where an overall balancing of environmental and nonenvironmental factors is appropriate and where alterations might be made in the proposed action to minimize environmental costs." 449 F.2d at 1118.
 
 On Suggestion for Rehearing En Banc
 
 412
 Before ROBINSON, Chief Judge, BAZELON, Senior Circuit Judge, WRIGHT,* Circuit Judge, GEORGE C. EDWARDS, Jr.,** Chief Judge, United States Court of Appeals for the Sixth Circuit, and WILKEY, WALD, MIKVA and GINSBURG, Circuit Judges.
 
 ORDER
 
 413
 PER CURIAM.
 
 
 414
 The suggestions for rehearing en banc filed by respondents and by intervenors Commonwealth Edison Company, et al., Pacific Legal Foundation, and Baltimore Gas & Electric Company, et al., have been circulated to the full Court and no member of the Court has requested the taking of a vote thereon. On consideration of the foregoing, it is
 
 
 415
 ORDERED, by the Court, en banc, that the aforesaid suggestions are denied.
 
 
 416
 Circuit Judge Wilkey does not ask for en banc consideration because he believes nothing should delay consideration of this case by the Supreme Court. Circuit Judges Tamm, MacKinnon, Harry T. Edwards and Bork are recused.
 
 
 
 *
 Sitting by designation pursuant to Title 28 U.S.C. § 291(a)
 
 
 [1]
 The Nuclear Regulatory Commission (NRC) was established by the Energy Reorganization Act of 1974, 42 U.S.C. §§ 5801 et seq. (1976), to assume the licensing and regulatory functions of the Atomic Energy Commission (AEC). The administrative proceedings challenged in this action began under the AEC and continued under the NRC. Hereinafter both agencies will be referred to as the "Commission" or the "NRC."
 
 
 [2]
 42 U.S.C. § 4332 (1976)
 
 
 [3]
 "Reprocessing" is a process by which reusable elements of spent fuel are extracted for recycling and the remaining radioactive wastes are concentrated
 
 
 [4]
 As we stated in our initial opinion in this case, waste "disposal" is a misnomer for what, under currently projected technology, should be termed long-term waste storage. It refers to the last stage of the waste-management process, where wastes are expected to be contained for the tens of thousands of years necessary for them to decay naturally into nontoxic substances. But see p. 480 infra (other disposal methods under consideration)
 
 
 [5]
 39 Fed.Reg. 14188 (1974)
 
 
 [6]
 42 Fed.Reg. 13803 (1977)
 
 
 [7]
 44 Fed.Reg. 45362 (1979) (codified at 10 C.F.R. §§ 51.20(e) & 51.23(c) (1981)). The original Rule was codified at 10 C.F.R. Part 50 App. D and then transferred to 10 C.F.R. §§ 51.20(e) & 51.23(c). 39 Fed.Reg. 26279 (1974). The interim and final Rules amended those two sections. Hereinafter only Federal Register citations will be noted
 Although the original and interim Rules have been superceded by the final Rule, their validity is still at issue. Individual licenses that were granted under those Rules have been challenged in separate actions, many of which are being held in abeyance pending the resolution of the broader issues presented in this case. In this circuit alone there are at least five such cases. Lloyd Harbor Study Group, Inc. v. NRC, No. 73-2266; Aeschliman v. NRC, No. 73-1776; Saginaw Valley Study Group v. NRC, No. 73-1867; NRDC v. NRC, No. 74-1385; Coalition for the Environment v. NRC, No. 77-1905.
 
 
 [8]
 The Rule is referred to as the "Table S-3 Rule" because the Table, which originated in a staff report, was initially labeled "S-3." See p. 469 infra. In most relevant respects, differences among the three versions of the Table S-3 Rule are insignificant. References to the "Table" or the "Rule," therefore, refer to all versions
 The fuel cycle activities addressed by the Table include uranium mining and milling, the production of uranium hexafluoride, isotopic enrichment, fuel fabrication, spent-fuel storage and disposal, reprocessing of irradiated fuel, transportation of radioactive materials and management of low-level and high-level wastes. For an explanation of the fuel cycle, see NRDC v. NRC, 547 F.2d 633, 637 n.3 (D.C.Cir.1976), rev'd sub nom. Vermont Yankee Nuclear Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). As stated above, these cases concern only the waste-management and disposal aspects of the Table. The final version of the Table is reproduced below.
 Data supporting this table are given in the "Environmental Survey of the Uranium Fuel Cycle," WASH-1248, April 1974; the "Environmental Survey of the Reprocessing and Waste Management Portion of the LWR Fuel Cycle," NUREG-0116 (Supp. 1 to WASH-1248); the "Public Comments and Task Force Responses Regarding the Environmental Survey of the Reprocessing and Waste Management Portions of the LWR Fuel Cycle," NUREG-0216 (Supp. 2 to WASH-1248); and in the record of the final rulemaking pertaining to Uranium Fuel Cycle Impacts from Spent Fuel Reprocessing and Radioactive Waste Management, Docket RM-50-3. The contributions from reprocessing, waste management and transportation of wastes are maximized for either of the two fuel cycles (uranium only and no recycle). The contribution from transportation excludes transportation of cold fuel to a reactor and of irradiated fuel and radioactive wastes from a reactor which are considered in Table S-4 of Sec. 51.20 (g). The contributions from the other steps of the fuel cycle are given in columns A-E of Table S-3A of WASH -1248.
 
 
 [10]
 C.F.R. § 51.20(e) (1981)
 
 
 [9]
 In this opinion, "EIS" shall refer to the applicant's Environmental Report as well as the Draft and Final Statements for both the construction and operating license stages. 10 C.F.R. §§ 51.20-51.26 (1981). The Rule specifies a single set of data to be used in all of these documents. Id. at §§ 51.20(e), 51.23(c), 51.26(a) (1981)
 
 
 [10]
 Licensing and Regulatory Policy and Procedures for Environmental Protection, 10 C.F.R. Part 51 (1981)
 Section 102(2)(C) of NEPA requires the EIS to accompany the license application through the existing review process. The Commission's general rules implementing NEPA provide that when matters covered by the EIS are at issue, the staff will offer the EIS in evidence at the adjudicatory hearing, and any party may take a position and offer evidence as well. The presiding officer will then decide the matters in controversy among the parties. 10 C.F.R. § 51.52(b) (1981). If such matters are resolved by rule, they are generally not subject to attack by way of discovery, proof, argument or other means in the adjudicatory proceeding. See 10 C.F.R. § 2.758 (1981).
 
 
 [11]
 See NRDC v. NRC, 547 F.2d 633, 638-39, 651-52 & n.54 (D.C.Cir.1976), rev'd sub nom. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); note 14 infra. High-level wastes, which are highly radioactive, are produced in liquid form when spent fuel is reprocessed. Transuranic wastes are nuclides heavier than uranium that are produced in the reactor fuel. These nuclides, which are also highly toxic and may have half-lives of tens of thousands of years, can contaminate pieces of the fuel apparatus. As a result, hardware, particularly from reprocessing plants will have to be disposed of in a permanent repository
 The Commission has considered three possible fuel cycles: the "once-through," cycle in which fuel is not reprocessed; the uranium-only reprocessing cycle; and, for a short time, the uranium and plutonium reprocessing cycle. Transuranic and high-level wastes are produced in both reprocessing cycles. The uranium-only cycle also produces plutonium, which must be disposed of with the transuranic and high-level wastes. In the once-through cycle, the spent-fuel assemblies themselves constitute the waste. Table S-3 is intended to represent the environmental impact of both the once-through and the uranium-only recycle options, which are the only options under current consideration. The Table does so by listing, for each effluent, the highest of the two releases that would be expected under each cycle. 41 Fed.Reg. 45849, 45850 (1977).
 
 
 [12]
 Actually, high-level and transuranic wastes are not even listed in the original Table. See 39 Fed.Reg. 14188, 14191 (1974)
 
 
 [13]
 The final Rule has eliminated this defect by explicitly requiring licensing boards to consider these impacts in individual proceedings pending the promulgation of a more complete generic resolution. 44 Fed.Reg. 45362, 45371 (1979). Petitioners, therefore, only challenge the original and interim Rules on this ground. NRDC Brief at 18, 31, 38
 
 
 [14]
 Neither the toxicity of radioactive wastes nor the time required for their decay to safe levels can be simply stated. Both involve uncertainties and disputed assumptions and both depend on other variables. See National Academy of Sciences, National Research Council Committee on the Biological Effects of Ionizing Radiation, The Effects on Populations of Exposure to Low Levels of Ionizing Radiation (1980) (hereinafter cited as BEIR Report); U. S. Nuclear Regulatory Comm'n, Environmental Survey of the Reprocessing and Waste Management Portions of the LWR Fuel Cycle 4-90 to 4-92 (NUREG-0116, Oct. 1976) (hereinafter cited as NUREG-0116). NUREG-0116 is included in the Joint Appendix Supplement as Volume V (hereinafter the Joint Appendix is cited as JA, and the Joint Appendix Supplement as JAS). (To avoid repetition, page citations will refer to NUREG-0116 and not to same page numbers in the JAS.) One federal government report summarizes the problem as follows:
 Waste consists of radioactive species of almost all chemical elements; some contain naturally occurring radioactive materials and others contain man-made radioactive materials; the wastes exist as gases, liquids, and solids. Yet for all their variety, radioactive wastes have one thing in common: as long as they remain highly radioactive, they will be potentially hazardous. This potential hazard results from the fact that exposure to and/or uptake of radioactive material can cause biological damage.
 In man, it can lead to death directly through intense exposure and a variety of diseases, including cancer, which can be fatal. In addition, radioactive material can be mutagenic thereby transmitting biological damage into the future.
 The central scientific fact about radioactive material is that there is no method of altering the period of time in which a particular species remains radioactive, and thereby potentially toxic and hazardous without changing that species. Only with time will the material decay to a stable (non-radioactive) element. The pertinent decay times vary from hundreds of years for the bulk of the fission products to millions of years for certain of the actinide elements and long-lived fission products. Thus, if present and future generations are to be protected from potential biological damage, a way must be provided either to isolate waste from the biosphere for long periods of time, to remove it entirely from the earth, or to transform it into non-radioactive elements.
 Interagency Review Group on Nuclear Waste Management, Report to the President 8-9 (TID-29442, March 1979) (hereinafter cited as IRG Report).
 
 
 [15]
 NUREG-0116, supra note 14, at 4-72. See also 44 Fed.Reg. 45362, 45374 (1979) (Separate Views of Commissioner Gilinsky)
 
 
 [16]
 See pp. 480-481 infra. See also 44 Fed.Reg. 45362, 45368 (1979); id. at 45374 (Separate Views of Commissioner Gilinsky)
 
 
 [17]
 The term "license" as used in this opinion, shall refer to both construction permits and operating licenses
 
 
 [18]
 Order Determining Objections to Interrogatories Submitted by Natural Resources Defense Council, In re Vermont Yankee Nuclear Power Corp. (Vermont Yankee Nuclear Power Station), Docket No. 50-271, U. S. Atomic Energy Comm'n, Atomic Safety and Licensing Board (May 11, 1971)
 
 
 [19]
 A proposed nuclear plant goes through an extensive licensing process before coming on line. See 10 C.F.R. § 2.50 (1981). Before construction may begin, the Commission must issue a plant a construction permit. Id. at § 50.10(b). Then, before a plant may begin operation, the Commission must issue it an operating license. Id. at § 50.10(a). At each point, an applicant must prove that it will be able to run the plant properly, that the plant will meet the necessary safety standards, and that the benefits of the plant outweigh its costs. Id. at §§ 50.40, 50.42. Each decision is first rendered by the Atomic Safety and Licensing Board (ASLB) and is then reviewable by the Atomic Safety and Licensing Appeal Board (ASLAB). Id. at § 2.785. The Commission itself has the discretionary power to hear appeals from the ASLAB. Id. at § 2.786. The Commission also has generic rulemaking power. Id. at §§ 2.800-2.801
 
 
 [20]
 Order Determining Objections to Interrogatories submitted by Natural Resources Defense Council, In re Vermont Yankee Nuclear Power Corp. (Vermont Yankee Nuclear Power Station), Docket No. 50-271, U. S. Atomic Energy Comm'n, Atomic Safety and Licensing Board (May 11, 1971). See In re Vermont Yankee Nuclear Power Corp. (Vermont Yankee Nuclear Power Station), ALAB-56, 4 A.E.C. 930 (1972)
 
 
 [21]
 4 A.E.C. at 934-36. The Atomic Safety Licensing and Appeal Board did reverse the Licensing Board to the extent that the latter board had excluded evidence on the environmental effects of transporting spent fuel and other wastes to and from the plant, and of decontaminating and decommissioning the plant at the end of its useful life. Id. at 939
 
 
 [22]
 37 Fed.Reg. 24191 (1972)
 
 
 [23]
 Id. at 24192. The Commission staff had recently completed a study that reached that conclusion. Environmental Survey of the Nuclear Fuel Cycle (November 6, 1972). The Commission later revised the Survey and published it as Environmental Survey of the Uranium Fuel Cycle (WASH-1248, April, 1974) (hereinafter cited as WASH-1248). (All references to the Survey will be to WASH-1248, which is included in the Joint Appendix as Volume II. To avoid repetition, page citations will refer to WASH-1248 and not to the same page numbers in the J.A.) The revised Survey added a discussion of waste management and reprocessing based on the testimony at the rulemaking hearing of Dr. F. K. Pittman, Director of the AEC's Division of Waste Management. WASH-1248 at iv
 
 
 [24]
 37 Fed.Reg. 24192-93 (1972)
 
 
 [25]
 The notice referred to WASH-1248, supra note 23, as providing support for Table S-3. 37 Fed.Reg. 24192 n.1
 
 
 [26]
 WASH-1248 states:
 The facility will be designed to prevent the release of significant amounts of radioactive material to the environment under all credible environmental conditions and human actions. Therefore, such wastes will not be released as effluents to the environment.
 Id. at S-23.
 
 
 [27]
 39 Fed.Reg. 14188 (1974)
 
 
 [28]
 Id. at 14191
 
 
 [29]
 In re Vermont Yankee Nuclear Power Corp. (Vermont Yankee Nuclear Power Station), LPB-73-8, 6 A.E.C. 130 (1973)
 
 
 [30]
 In re Vermont Yankee Nuclear Power Corp. (Vermont Yankee Nuclear Power Station), ALAB-179, 7 A.E.C. 159, 163 (1974)
 
 
 [31]
 NRDC v. NRC, 547 F.2d 633 (D.C.Cir.1976), rev'd sub nom. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)
 
 
 [32]
 547 F.2d at 653-54
 
 
 [33]
 547 F.2d at 647-52
 
 
 [34]
 547 F.2d at 641. On October 8, 1976, this court stayed its mandate in these actions. Due to the Supreme Court's decision, Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), the mandate never issued
 
 
 [35]
 Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)
 
 
 [36]
 435 U.S. at 541-42, 98 S.Ct. at 1210-11
 
 
 [37]
 435 U.S. at 542-48, 98 S.Ct. at 1210-14
 
 
 [38]
 435 U.S. at 549, 98 S.Ct. at 1214. The Supreme Court did not disturb this court's ruling that, in the absence of a valid generic rule, the environmental impact of the fuel cycle must be dealt with in individual licensing proceedings. 435 U.S. at 538-39, 98 S.Ct. at 1208-09. The Supreme Court also remanded our decision holding Vermont Yankee's operating license invalid. By the time of the Supreme Court's decision, that license had been reconsidered in light of the interim Rule. See TAN 480-490 infra. 435 U.S. at 535 n.14, 98 S.Ct. at 1207 n.14; In re Vermont Yankee Nuclear Power Corp. (Vermont Yankee Nuclear Power Station), ALAB-421, 6 N.R.C. 25 (1977). The validity of Vermont Yankee's license is the subject of No. 74-1385, which was originally consolidated with No. 74-1586, but is now being held in abeyance pending decision in the present cases. See Order of Consolidation for Nos. 74-1586, 77-1448, 79-2110, and 79-2131, Feb. 11, 1980; Order Clarifying Application of Order of February 11, 1980 to No. 74-1385, March 12, 1980
 
 
 [39]
 435 U.S. at 535 n.14, 98 S.Ct. at 1207 n.14. The parties to the present action have stipulated that this court "may consider the entire record in deciding the challenge to any of the orders under review." Stipulation filed February 29, 1980
 
 
 [40]
 41 Fed.Reg. 45849 (1976)
 
 
 [41]
 NUREG-0116, supra note 14
 
 
 [42]
 41 Fed.Reg. 45849 (1976). A table entitled "Summary of Impacts of Reprocessing and Waste Management Per RRY (reference reactor year)," was reproduced in the notice. Id. at 45852 (1976). That table disaggregated Table S-3's list of environmental impacts, indicating the contribution of each stage of the back end of the fuel to the total impacts. It, therefore, represented a more detailed version of a revised Table S-3
 
 
 [43]
 See 41 Fed.Reg. 34707, 34709 (1976)
 
 
 [44]
 In re Vermont Yankee Nuclear Power Corp. (Vermont Yankee Nuclear Power Station); CLI-76-18, 4 N.R.C. 471 (1976)
 
 
 [45]
 41 Fed.Reg. 45849, 45850-51 (1976)
 
 
 [46]
 See note 8 supra (sample Table)
 
 
 [47]
 NUREG-0116, supra note 14, at 2-31 n."f", 2-33
 48 U.S. Nuclear Regulatory Comm'n, Public Comments and Task Force Responses Regarding the Environmental Survey of the Reprocessing and Waste Management Portions of the LWR Fuel Cycle (NUREG-0116) B-96, B-102 (NUREG-0216, March 1977) (hereinafter cited as NUREG-0216).
 
 
 [49]
 Id. at B-107
 
 
 [50]
 Id. at 3-5 to 3-7; 42 Fed.Reg. 13803 (1977)
 
 
 [51]
 42 Fed.Reg. 13803 (1977)
 
 
 [52]
 See id. at 13807
 
 
 [53]
 Id. at 13806
 
 
 [54]
 43 Fed.Reg. 15613, 15617 (1978). This amendment was foreshadowed, to a limited degree, by a January 1977 Appeal Board ruling that, in an individual licensing proceeding, the discussion of health effects, such as that previously requested by the NRDC, was required when comparing a proposed nuclear power plant to the alternative of a coal-burning plant. In re Tennessee Valley Authority (Hartsville Nuclear Plant), ALAB-367, 5 N.R.C. 92 (1977)
 
 
 [55]
 In re Vermont Yankee Nuclear Power Corp. (Vermont Yankee Nuclear Power Station), CLI-77-10, 5 N.R.C. 717 (1977). Initially, however, in promulgating the interim Rule, the Commission had simply terminated the Licensing Board's reconsideration of Vermont Yankee's license. 42 Fed.Reg. 13806 (1976)
 
 
 [56]
 In re Vermont Yankee Nuclear Power Corp. (Vermont Yankee Nuclear Power Station), ALAB-421, 6 N.R.C. 25 (1977)
 When Vermont Yankee and other facilities were licensed, it was anticipated that spent reactor fuel would be stored on site for only a brief period to allow cooling; thereafter, it would be shipped off site for reprocessing or permanent disposal. Plans for off-site reprocessing and storage had not materialized, however, and in 1977 President Carter suspended indefinitely all commercial reprocessing. 13 Weekly Comp. of Pres. Doc. 506 (1977). Vermont Yankee's on-site storage capacity of 600 fuel assemblies would have been exhausted by 1977-and the plant forced to shut down in August 1978-had the utility not sought and received a license amendment from the Commission allowing it to increase its spent-fuel storage capacity to 2,000 assemblies. In re Vermont Yankee Nuclear Power Corp. (Vermont Yankee Nuclear Power Station), LBP-77-54, 6 N.R.C. 436 (1977). That license amendment would allow the plant to operate through 1987 without shipping waste to an off-site storage facility.
 Intervenors protested that such a license amendment requires a formal EIS, but both the Licensing Board and the Appeal Board ruled that the amendment was "not a major Federal action that significantly affects the quality of the human environment." 6 N.R.C. at 445; In Re Northern States Power Co. (Prairie Island Nuclear Generating Plant), ALAB-455, 7 N.R.C. 41 (1978). The boards relied on the Commission's prior denial of NRDC's petition for rulemaking on the issue of waste disposal, see note 60 infra, as support for their finding that the Commission had "reasonable confidence" that waste disposal facilities would be available when needed. 7 N.R.C. at 49-51. On review of the Appeal Board decision, this court ruled that under the AEA, the Commission could make a finding of "reasonable confidence" only following a fact-finding proceeding. Minnesota v. NRC, 602 F.2d 412 (D.C.Cir.1979). The court remanded the case to the Commission for it to reconsider its reasonable confidence in light of the ongoing Table S-3 rulemaking proceedings. In response, the Commission instituted a separate "Waste Confidence" proceeding. 44 Fed.Reg. 61372 (1979).
 
 
 [57]
 In re Vermont Yankee Nuclear Power Corp. (Vermont Yankee Nuclear Power Station), ALAB-392, 5 N.R.C. 759, 765 n.7 (1977); see also In re Vermont Yankee Nuclear Power Corp. (Vermont Yankee Nuclear Power Station), ALAB-421, 6 N.R.C. 25, 30-32 (Farrar concurring)
 
 
 [58]
 5 N.R.C. at 765 & n.7
 
 
 [59]
 6 N.R.C. at 30-32 (Farrar concurring)
 
 
 [60]
 NRDC petitioned for review of the interim Rule on May 13, 1977. On July 5, 1977, however, NRDC filed a Motion To Hold Petition For Review In Abeyance, which was granted. That motion was based on several events that could have materially altered the facts and law of the case, including the presidential decision of April 7, 1977, see note 56 supra, to defer indefinitely the reprocessing of spent fuel, and the then pending Supreme Court review of this court's previous decision. NRDC v. NRC, 547 F.2d 633 (D.C.Cir.1976), rev'd sub nom. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)
 At about the time that the interim Rule was under consideration, the NRDC petitioned the Commission to conduct a rulemaking on a related issue: whether the wastes from nuclear power reactors could be permanently disposed of without undue risk to public health and safety. NRDC argued that, until such a determination is made, the Commission has no authority under the Atomic Energy Act (AEA) to issue additional power-plant licenses. The Commission denied the petition without a hearing, ruling that the AEA did not make assured safe disposal a prerequisite for plant licensings. 42 Fed.Reg. 34391 (1977). The Commission contended that the AEA only required safe interim storage and reasonable confidence in an eventual permanent solution. The Commission cited the contemporaneous Table S-3 rulemaking, as well as work by the Energy Research and Development Administration-the agency responsible for waste management-as providing the confidence needed to continue licensing. Id. at 34393. The Second Circuit upheld the Commission's reading of the AEA, although it expressly distinguished the broad delegation under that statute from the more explicit requirements of NEPA. NRDC v. NRC, 582 F.2d 166, 172 (2d Cir. 1978). Cf. Minnesota v. NRC, 602 F.2d 412 (D.C.Cir.1979) (fact-finding proceeding necessary prior to reaching "reasonable confidence" conclusion).
 
 
 [61]
 42 Fed.Reg. 26987 (1977)
 
 
 [62]
 See 44 Fed.Reg. 45362, 45366-67 (1979)
 
 
 [63]
 Closing Statement of the Natural Resources Defense Council, June 26, 1978, at 2-5, V JAS at 1364-67
 
 
 [64]
 First Round of Suggested Staff Questions and Comments on Scope of Proceeding, October 31, 1977, at 6-7, II JAS at 439-40
 
 
 [65]
 Commission's Order, February 9, 1978, IV JAS at 1254
 
 
 [66]
 E.g., Supplementary Testimony of Dr. Irwin C. Bupp, II JAS at 662; Statement of Peter N. Skinner, September 30, 1977, III JAS at 1099
 
 
 [67]
 E.g., Staff Testimony on Economic Data to Support the Feasibility of the S-3 Model, February 3, 1978, III JAS at 1195; Final Written Statement on Behalf of Commonwealth Edison, June 26, 1978, XI-1 to XI-39, II JAS at 763-801
 
 
 [68]
 44 Fed.Reg. 45362 (1979)
 
 
 [69]
 See note 8 supra ; 44 Fed.Reg. 45362, 45369, 45373 (1979)
 
 
 [70]
 The Commission stated:
 The rulemaking record makes clear that effluent release values, standing alone, do not meaningfully convey the environmental significance of uranium fuel cycle activities. The focus of interest and the ultimate measure of impact for radioactive releases are the resulting radiological dose commitments and associated health effects. To convey in understandable terms the significance of releases in the Table, the Hearing Board recommended that the modified Table be accompanied by an explanatory narrative promulgated as part of the rule. The recommended narrative would also address important fuel cycle impacts now outside the scope of the Table, including socioeconomic and cumulative impacts, where these are appropriate for generic treatment. The Commission has directed the NRC staff to prepare by October 1 such a narrative, as described in more detail later in this notice. The narrative will be submitted for public comment in a further rulemaking.
 Id. at 45362.
 
 
 [71]
 Id
 
 
 [72]
 Id. at 45368 (citing IRG Report, supra note 14, at 42)
 
 
 [73]
 Id. at 45369 (footnote omitted)
 
 
 [74]
 Id. at 45367. The Commission also agreed with the Hearing Board that the costs of decontamination were site specific and not within the Rule. Id. at 45367 n.18
 
 
 [75]
 Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 549, 98 S.Ct. 1197, 1214, 55 L.Ed.2d 460 (1978). We are here reviewing the original, interim and final Rules on their faces-not the procedures that produced them. We also do not consider whether nuclear power plants are "good" or "bad." Congress has left it up to the Commission to determine whether, in individual instances, the benefits of nuclear power outweigh the costs. All we consider is whether the Commission has complied with the mandates of the APA and NEPA in performing this task
 
 
 [76]
 5 U.S.C. § 706(2)(A) (1976)
 
 
 [77]
 See Calvert Cliffs' Coordinating Committee, Inc. v. AEC, 449 F.2d 1109 (D.C.Cir.1971) (review of rules implementing NEPA to determine whether they complied with NEPA)
 
 
 [78]
 Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86, 95 S.Ct. 438, 441-42, 42 L.Ed.2d 447 (1974)
 
 
 [79]
 42 U.S.C. § 4332(2)(C) (1976). See Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 538-39, 98 S.Ct. 1197, 1208-09, 55 L.Ed.2d 460 (1978)
 
 
 [80]
 42 U.S.C. § 4332(2)(C) (1976)
 
 
 [81]
 Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 539, 98 S.Ct. 1197, 1209, 55 L.Ed.2d 460 (1978)
 
 
 [82]
 See, e.g., Trout Unlimited v. Morton, 509 F.2d 1276, 1282 (9th Cir. 1974); Environmental Defense Fund, Inc. v. Corps of Engineers, 325 F.Supp. 749, 759 (E.D.Ark.1971)
 
 
 [83]
 Weinberger v. Catholic Action of Hawaii/Peace Education Project, --- U.S. ----, ---- - ----, 102 S.Ct. 197, 201, 70 L.Ed.2d 298 (1981)
 
 
 [84]
 Id
 
 
 [85]
 Id
 
 
 [86]
 Andrus v. Sierra Club, 442 U.S. 347, 350, 99 S.Ct. 2335, 2337, 60 L.Ed.2d 943 (1979) (footnote omitted)
 
 
 [87]
 449 F.2d 1109 (D.C.Cir.1971)
 
 
 [88]
 449 F.2d at 1118
 
 
 [89]
 Under NEPA's Rule of Reason, an agency must consider only "reasonably foreseeable" environmental impacts. See, e.g., Scientists' Institute for Public Information, Inc. v. AEC, 481 F.2d 1079, 1092 (D.C.Cir.1973); Carolina Environmental Study Group v. United States, 510 F.2d 796, 798 (D.C.Cir.1975)
 
 
 [90]
 449 F.2d at 1114
 
 
 [91]
 449 F.2d at 1114, 1115
 
 
 [92]
 It is well accepted that courts must exercise heightened review of agencies' compliance with section 102(2)(C) of NEPA. See NRDC v. SEC, 606 F.2d 1031, 1048 (D.C.Cir.1979); Scientists' Institute for Public Information, Inc. v. AEC, 481 F.2d 1079, 1094 (D.C.Cir.1973); Calvert Cliffs' Coordinating Committee, Inc. v. AEC, 449 F.2d 1109, 1114 (D.C.Cir.1971). See also W. Rogers, Environmental Law 716-17 (1977) (procedural requirements of NEPA "enforced with a vengeance")
 
 
 [93]
 The Commission does not argue that the environmental impact of fuel-cycle activities is insignificant, nor does it appear that such an argument could legitimately be made. The ASLAB has stated that
 although the adverse environmental consequences of the fuel cycle attributable to individual nuclear generating plants are small, they are not without any weight.... (I)n a close situation they might throw the cost/benefit balance against issuing a construction permit. This opens the distinct possibility that construction permits would be vulnerable to judicial challenge under NEPA if issued after hearings which did not take relevant and potentially significant adverse environmental factors into account.
 In re Potomac Electric Power Co. (Douglas Point Nuclear Generating Station, Units 1 and 2), ALAB-218, 8 A.E.C. 79, 87 (1974). This view was approved by the Commission, which noted that excluding fuel-cycle effects in a close case would place the boards in the almost untenable posture of refusing to consider known relevant environmental factors which could possibly affect the cost-benefit balance. In re Philadelphia Electric Co., et al. (Peach Bottom Power Station, Units 2 and 3), CLI-74-32, 8 A.E.C. 217, 220 (1974).
 
 
 [94]
 The issues in Calvert Cliffs' were presented in a posture similar to that of this case. In that case, as in this, we reviewed regulations that the AEC had promulgated to govern the implementation of NEPA
 
 
 [95]
 See pp. 470, 472, 474-475 supra ; In re Potomac Electric Power Co. (Douglas Point Nuclear Generating Station), ALAB-218, 8 A.E.C. 79, 88-90 (1974); In re Vermont Yankee Nuclear Power Corp. (Vermont Yankee Nuclear Power Station), ALAB-421, 6 N.R.C. 25, 30-32 (1977) (Farrar concurring)
 
 
 [96]
 Contrary to the implication of Judge Wilkey's dissent, see, e.g., Wilkey op. at 531, 534, 540-545, the NRDC does not challenge, and we do not decide, the reasonableness of the Commission's conclusion that the probabilities favor the zero-release assumption. Rather, the NRDC objects to the fact that the Commission has not factored the consideration of uncertainties into the licensing process in such a manner that they can potentially affect the outcome of any decision to license a plant
 
 
 [97]
 In the original Rule's Statement of Consideration, the Commission made no reference to any uncertainty underlying its conclusion that a permanent repository would be built. In contrast, in the Statements of Consideration for the interim and final Rules, the Commission repeatedly acknowledged the uncertainties involved in its "judgments." See note 118 infra. The Commission nonetheless stated that there was "no advantage in having licensing boards repeatedly weigh for themselves the effect of uncertainties on the selection of fuel cycle impacts for use in cost-benefit balancing." 44 Fed.Reg. 45362, 45369 (1979). The Commission believed that the
 "question (was) properly dealt with in this rulemaking as part of choosing what impact values should go into the fuel cycle rule. The Commission conclude(d), (that) having noted that uncertainties exist, that for the limited purpose of the fuel cycle rule it (was) reasonable to base impacts on the assumption which the Commission believe(d) the probabilities favor."
 Id. Commissioner Bradford, writing separately, stated that he thought
 "that the Commission (had gone) too far in terming its assumption that a 'bedded salt repository or its equivalent will be found' to be a 'judgment'. (Instead,) little more can be said by a prudent regulatory agency at this time in the face of this record and the general uncertainty than that the direction of current federal programs makes a bedded salt repository a responsible working assumption for NEPA purposes."
 Id. at 45373 (Separate Views of Commissioner Bradford). See p. 482 infra.
 
 
 [98]
 Contrary to Judge Wilkey's assertions, see, e.g., Wilkey op. at 537, our conclusions do not turn on a characterization of the zero-release assumption as a finding of fact. See pp. 481-485 infra
 
 
 [99]
 See p. 475
 
 
 [100]
 See, e.g., Izaak Walton League of America v. Marsh, 655 F.2d 346, 377 (D.C.Cir.), cert. denied sub nom. Atchison, Topeka & Santa Fe Railway Co. v. Marsh, --- U.S. ----, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981); Alaska v. Andrus, 580 F.2d 465, 473 (D.C.Cir.), vacated in part sub nom. Western Oil & Gas Assoc. v. Alaska, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978); Concerned About Trident v. Rumsfeld, 555 F.2d 817, 830 (D.C.Cir.1976)
 Risk, in this context, refers to the product of the environmental damage that could occur and the probability of its occurrence. Thus, an environmental risk can be high if the probability is high that damage will occur, even if the damage itself would not be terribly severe. Alternatively, an environmental risk can be significant if the probability is low that damage will occur, but the possible damage, should it occur, would be severe. Thus, even if the probability that environmental damage will occur is very low, the risk is nonetheless significant if the potential damage is sufficiently severe. These risks are, therefore, of the same character as other environmental damage costs and, Judge Wilkey's dissent notwithstanding, Wilkey op. at 536-37, they must be considered in the NEPA inquiry. See, Ethyl Corp. v. Environmental Protection Agency, 541 F.2d 1, 25 n.52 (D.C.Cir.1976) (en banc), cert. denied sub nom. E.I. DuPont de Nemours & Co. v. Environmental Protection Agency, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (all environmental costs involve some degree of uncertainty); Carolina Environmental Study Group v. United States, 510 F.2d 796, 799 (D.C.Cir.1975) (it is necessary "to consider the probabilities as well as the consequences of certain occurrences in assessing (an action's) environmental impact").
 
 
 [101]
 When confronting a set of uncertain environmental effects, or an environmental risk that is known, an agency's goal should be to trace each reasonably foreseeable contingency and determine, first, the likelihood of its occurring, and second, the environmental damage that it would entail should it occur. Of course, precision in this context can only be the ideal, and the detail with which an agency must consider and disclose the likelihood and nature of each contingency is somewhat flexible. If a contingency is not expected to entail a serious environmental risk less detail is required. See, e.g., Izaak Walton League of America v. Marsh, 655 F.2d 346, 377 (D.C.Cir.), cert. denied sub nom. Atchison, Topeka & Santa Fe Railway Co. v. Marsh, --- U.S. ----, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981). Alternatively, an agency may evaluate an uncertain environmental effect by considering and disclosing a worst-case scenario along with an estimation of the probability that the scenario will occur. See North Slope Borough v. Andrus, 642 F.2d 589, 605 (D.C.Cir.1980); 40 C.F.R. § 1502.22 (1981). At the outset of the NEPA inquiry, however, a federal agency bears the obligation to seek information concerning the environmental consequences of proposed actions. Alaska v. Andrus, 580 F.2d 465, 473 (D.C.Cir.1978), vacated, in part, sub nom. Western Oil & Gas Assoc. v. Alaska, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978); Concerned About Trident v. Rumsfeld, 555 F.2d 817 (D.C.Cir.1977)
 
 
 [102]
 See, e.g., Alaska v. Andrus, 580 F.2d 465, 473 n.36 (D.C.Cir.1978), vacated, in part, sub nom. Western Oil & Gas Assoc. v. Alaska, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978); Scientists' Institute for Public Information, Inc. v. AEC, 481 F.2d 1079, 1092 (D.C.Cir.1973)
 
 
 [103]
 Bowman Transportation, Inc. v. Arkansas-Best Freight, Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971)
 
 
 [104]
 WASH-1248, supra note 23
 
 
 [105]
 Id. at G-6 to G-7
 
 
 [106]
 Id. at G-7
 
 
 [107]
 NUREG-0116, supra note 14, at 4-71 to 4-73
 
 
 [108]
 Id. at 4-72
 
 
 [109]
 Id. at 4-29. The present status of the RSSF is also, at best, uncertain. See Office of Management and Budget, Major Themes & Additional Details, Fiscal Year 1983, at 160 (1982); Vepco Says Crisis Near in Used Nuclear Fuel Storage, Washington Post, March 1, 1982, at A1 col. 2
 
 
 [110]
 Transcript of Hearing at 729-30, II JAS at 622-23
 
 
 [111]
 IRG Report, supra note 14. This report was entered in the record in draft form and discussed in an oral presentation. See 44 Fed.Reg. 45362, 45368 n.24 (1979)
 
 
 [112]
 IRG Report, supra note 14, at 45
 
 
 [113]
 Id. at 17
 
 
 [114]
 Statement of Todd R. LaPorte, Oct. 3, 1977, I JAS at 393; Statement of Dr. Terry Lash, Oct. 3, 1977, II JAS at 437
 
 
 [115]
 IRG Report, supra note 14, at 87
 
 
 [116]
 NUREG-0116, supra note 14, at 4-94. See p. 471 supra
 
 
 [117]
 44 Fed.Reg. 45362, 45368 (1979) (footnote omitted)
 
 
 [118]
 Id. From the time it proposed the original Rule through its promulgation of the final Rule, the Commission became increasingly candid in its acknowledgement of uncertainties underlying permanent waste disposal. In promulgating the original Rule, the Commission referred to no uncertainty. In promulgating the interim Rule, however, the Commission "observed that there (were) gaps in the information needed for detailed assessment of waste management and disposal technology." 42 Fed.Reg. 13803, 13805 (1977). Nevertheless, the Commission believed that such uncertainties did not prevent it "from making an informed and reasoned judgment ... regarding the environmental impacts which may flow from waste management and reprocessing activities." Id. Even more candidly, in the final rulemaking, the Commission stated that it was its "judgment that a suitable bedded-salt repository site or its equivalent will be found, but the Commission note(d) ... that areas of uncertainty remain regarding both the likelihood of finding a site and the probability that it will perform as expected." 44 Fed.Reg. 45362, 45368 (1979) (footnote omitted). The Commission found that its staff's assumption that there would be no release of effluents from a sealed repository was "afford(ed) a reasonable basis" by evidence that was "tentative but favorable." Id. The Commission was convinced that "the general evidence (presented), coupled with the absence of any strong argument that a site cannot be found, probably affords as strong a record as can be made on the issue until a specific site has been thoroughly investigated and found to be suitable." Id. (emphasis added)
 
 
 [119]
 44 Fed.Reg. 45362, 45369 (1979) (footnote omitted). See note 97 supra
 
 
 [120]
 See Ecology Action v. AEC, 492 F.2d 998, 1002 (2d Cir. 1974); Note, The Use of Generic Rulemaking to Resolve Environmental Issues in Nuclear Power Plant Licensing, 61 Va.L.Rev. 869 (1975)
 
 
 [121]
 We express no view as to whether this type of generic balancing could be done in the context of this case
 
 
 [122]
 449 F.2d 1109, 1118 (D.C.Cir.1971). See pp. 476-477 supra
 
 
 [123]
 At this point, the temporary RSSF has not been built. See note 109 supra. Once it is built, the uncertainty over the development of a permanent repository translates into a possibility that wastes will remain indefinitely at the RSSF. Prior to the point at which the RSSF is built, however, that uncertainty translates into the possibility that the wastes will remain either at reprocessing plants or at the power plants themselves. Similarly, uncertainty concerning the development of the RSSF and of reprocessing plants gives rise to the possibility that wastes will have to remain in individual power plants' spent-fuel pools. To the extent that any of these possibilities entails significant risks, those risks must be factored into the NEPA calculus. If the risks are generic, they can be assessed, and possibly weighed against generic benefits, in generic rulemaking proceedings. If they are site-specific, however, they must be assessed with particular reference to the relevant site, and balanced along with other site-specific costs against site-specific benefits. Cf. Minnesota v. NRC, 602 F.2d 412 (D.C.Cir.1979) (before allowing expansion of on-site repositories, NRC must examine possibility that spent fuel will remain on site due to lack of temporary or permanent off-site repositories); Storage and Disposal of Nuclear Waste, 44 Fed.Reg. 61373 (1979) (generic rulemaking initiated in response to Minnesota )
 
 
 [124]
 See note 93 supra (rule of reason); pp. 479-481 supra (Commission recognition of uncertainties involved)
 
 
 [125]
 Calvert Cliffs' Coordinating Committee, Inc. v. AEC, 449 F.2d 1109, 1118 (D.C.Cir.1971)
 
 
 [126]
 NRC Brief at 36-38
 
 
 [127]
 See In re Vermont Yankee Nuclear Power Corp. (Vermont Yankee Nuclear Generating Station), ALAB-421, 6 N.R.C. 25, 30-32 (1977) (Farrar concurring)
 
 
 [128]
 NRC Brief at 37
 
 
 [129]
 See p. 481 supra
 
 
 [130]
 See pp. 482-483 supra
 
 
 [131]
 As stated above, it may be that certain costs can be assessed and balanced against certain benefits at the generic level. See p. 482 supra. That, however, is not what the NRC has done here
 
 
 [132]
 See p. 482 supra
 
 
 [133]
 See p. 476 supra. This is not a simple matter of how and where the environmental impact of an action is disclosed as Intervenor-Resopndent Commonwealth Edison et al. contend. See Commonwealth Edison et al. Brief at 12 n.4; Scientists' Institute for Public Information, Inc. v. AEC, 481 F.2d 1079, 1092-93 (D.C.Cir.1973)
 
 
 [134]
 We emphatically do not hold that the Commission may not proceed in the face of uncertainty, as Judge Wilkey maintains, see, e.g., Wilkey op. at 540, or that the uncertainty surrounding the zero-release assumption may be factored into the cost-benefit calculus only at the individual licensing level. Judge Wilkey has seriously misconstrued this issue. We do, however, hold that where the Commission has not factored the uncertainties surrounding its assumptions into a generic rule like the Table S-3 Rule, it cannot also preclude individual licensing boards from considering those uncertainties when applying the values provided by the Rule
 
 
 [135]
 At one point in its opinion remanding this case, the Supreme Court implied that this court could review the Table S-3 Rule only under the arbitrary and capricious standard. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 535-36 n.14, 98 S.Ct. 1197, 1207-08 n.14, 55 L.Ed.2d 460. Although we do not believe that this was the Supreme Court's intention-particularly in view of the fact that the later versions of the Rule reveal that the zero-release assumption may not have been simply a factual finding-we reach the same result under the "not in accordance with law" standard and the "arbitrary and capricious" standard
 
 
 [136]
 Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). See p. 475 supra
 
 
 [137]
 Judge Wilkey maintains that an agency may assess an uncertain environmental effect generically and prescribe that individual EIS's reflect only a most probable-or modal-value for the effect. See, e.g., Wilkey op. at 537-539. We strongly disagree. NEPA requires the consideration and disclosure of significant uncertainties concerning environmental effects. A generic rule limiting consideration and disclosure to modal values would fly in the face of that requirement, allowing individual decisions to be made without regard to improbable yet potentially severe environmental damage. Improbable yet potentially severe environmental damage is as much an environmental cost as certain or probable damage, and to allow decisions to be made without consideration of any significant-even if probabilistic-environmental effect constitutes a violation of NEPA. Judge Wilkey states that an agency's consideration of uncertainties prior to promulgating a generic rule satisfies NEPA's requirement that uncertainty be considered. Id. In this case, however, that consideration was undertaken in the abstract. It did not allow the agency to reflect upon whether potentially severe environmental costs are warranted by the benefits expected to attend the licensing of a particular plant or nuclear plants in general. That consideration, therefore, was not sufficient to comply with NEPA
 
 
 [138]
 See NRDC Brief at 31-38
 
 
 [139]
 See NRC Brief at 34-39
 
 
 [140]
 See note 8 supra (copy of Table S-3)
 
 
 [141]
 See Conclusions and Recommendations of the Hearing Board (October 26, 1978), IV JAS at 1439-40
 
 
 [142]
 Id. at 1443-46
 
 
 [143]
 See pp. 476-477 supra
 
 
 [144]
 See North Slope Borough v. Andrus, 642 F.2d 589, 605 (D.C.Cir.1980)
 
 
 [145]
 These include uncertainties surrounding the health, socioeconomic, and cumulative impacts of the back end of the uranium fuel-cycle and the economics of the projected waste-management and disposal facilities. See pp. 486-494 infra
 
 
 [146]
 NRDC Brief at 18-31
 
 
 [147]
 See, e.g., Kleppe v. Sierra Club, 427 U.S. 390, 410, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976) (cumulative effects); NRDC v. Callaway, 524 F.2d 79, 88 (2d Cir. 1975) (cumulative effects); Named Individual Members of San Antonio Conservation Society v. Texas Highway Dept., 446 F.2d 1013 (5th Cir. 1971), cert. denied, 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972) (cumulative effects); Trinity Episcopal School Corp. v. Romney, 523 F.2d 88, 93 (2d Cir. 1975) (socioeconomic effects); Prince George's County v. Holloway, 404 F.Supp. 1181, 1186 (D.D.C.1975) (socioeconomic effects); 40 C.F.R. §§ 1508.7, 1508.8 (1981) (health, social, economic, cumulative)
 
 
 [148]
 See, e.g., Silva v. Lynn, 482 F.2d 1282, 1285 (1st Cir. 1973): "(The EIS) must be written in language that is understandable to nontechnical minds and yet contain enough scientific reasoning to alert specialists to particular problems within the field of their expertise." (quoting Environmental Defense Fund, Inc. v. Corp. of Engineers, 348 F.Supp. 916, 933 (W.D.Miss.1972)). Cf. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 557, 98 S.Ct. 1197, 1218, 55 L.Ed.2d 460 (1978) (the reports used to prepare the EIS may be technical in nature); 40 C.F.R. § 1502.8 (1981) (EIS should be written so that "decisionmakers and the public can readily understand them")
 
 
 [149]
 40 C.F.R. § 1508.8 (1981). Environmental impacts must be considered and disclosed in these terms in order to facilitate the comparison of alternative actions that entail different types of environmental damage-for example, radiological and chemical releases. Furthermore, an EIS must translate technical effluent data into such terms if it is effectively to disclose the environmental impacts of a proposed project to its intended readership: interested members of the public, public servants, and legislators. That audience cannot be expected to convert curies or mrems into such costs as cancer deaths, or social disturbance. Moreover, the expression of environmental costs in terms of actual health and socioeconomic effects is necessary to convey to that audience the basis of an agency's decision. The impacts of nuclear reactors on human health and society are matters of legitimate scientific debate, and NEPA gives the public the right to know the tangible environmental costs that the Commission expects it to pay in return for the anticipated benefits of such a plant
 
 
 [150]
 39 Fed.Reg. 14188, 14191 (1974); 42 Fed.Reg. 13803, 13806 (1977). The staff report supporting the original Rule did not address the health, socioeconomic or cumulative effects of the fuel cycle at all; and the report supporting the interim Rule contained only cursory references to those effects. See, e.g., NUREG-0116, supra note 14, at 2-19 to 2-20, 4-168 to 4-171
 
 
 [151]
 See p. 489 infra
 
 
 [152]
 In re Tennessee Valley Authority (Hartsville Nuclear Plant), ALAB-367, 5 N.R.C. 92 (1977)
 
 
 [153]
 43 Fed.Reg. 15613, 15617 (1978) (change in footnote 1); see id. at 15616
 
 
 [154]
 Id. at 15617 (emphasis added)
 
 
 [155]
 44 Fed.Reg. 45362, 45371 (1979)
 
 
 [156]
 Id.; see 46 Fed.Reg. 15154 (1981) (proposed narrative Rule); note 168 infra
 
 
 [157]
 NRDC Brief at 18-31
 
 
 [158]
 39 Fed.Reg. 14188, 14191 (1974); 42 Fed.Reg. 13803, 13806 (1977) (emphasis added)
 
 
 [159]
 See p. 469 supra
 
 
 [160]
 In proposing the original Rule, the Commission commented that "such matters, if they are to be considered at all, be considered in a generic fashion through a rulemaking process." 37 Fed.Reg. 24191, 24192 (1972)
 
 
 [161]
 44 Fed.Reg. 45362, 45364 (1979)
 
 
 [162]
 Id
 
 
 [163]
 As is true of the Commission's treatment of the zero-release assumption, this violation of NEPA could also be characterized as being arbitrary and capricious. See p. 485 & note 135 supra. Under NEPA, the health, socioeconomic and cumulative effects of a proposed action must be considered and disclosed. The presence of such effects is relevant to an agency's decision to promulgate a generic rule prescribing the scope of its consideration and disclosure of the environmental effects of proposed actions prior to taking such actions. In promulgating the original and interim Table S-3 Rules, however, the Commission ignored the presence of those types of environmental effects. Its action, therefore, was arbitrary and capricious. See p. 475 supra
 
 
 [164]
 In re Tennessee Valley Authority (Hartsville Nuclear Plant), ALAB-367, 5 N.R.C. 92 (1977)
 
 
 [165]
 NRC Brief at 41-42
 
 
 [166]
 In re Tennessee Valley Authority (Hartsville Nuclear Plant), ALAB-367, 5 N.R.C. 92 (1977)
 
 
 [167]
 Id. at 103 n.52
 
 
 [168]
 We also cannot accept the argument that the Commission made a factual finding that these fuel cycle effects were insignificant. The Commission has acknowledged:
 A record is not yet available to support a comprehensive rule dealing with all generic aspects of fuel cycle impacts relevant to reactor licensing.... The table of impacts adopted as a final rule ... serves as an important first step (by) relieving adjudicatory boards from the need to determine those numerical impacts of the uranium fuel cycle which have been extensively considered in generic rulemaking. Ultimately, however, the impacts of the releases and not the releases themselves dictate the standards the Commission must set.
 
 
 [44]
 Fed.Reg. 45362, 45363 (1979). The Commission then initiated the process to consider the significance of the health, socioeconomic, and cumulative effects of the uranium fuel cycle in a generic rulemaking proceeding. Id. at 45371; see 46 Fed.Reg. 15154 (1981). The proposed outcome of that proceeding is to find most of these effects to be insignificant. Id. at 15154. That result is, at this stage only proposed. Even if adopted, it is not before us and we express no opinion on whether the Commission may make such a determination by rule, whether an EIS is required for such a determination, or whether such a determination can be adequately supported. Before deciding not to delay the issuance of our opinions pending completion of the narrative rulemaking, see Edwards op. at n.2, we ordered the NRC to advise us as to the status of that proceeding. In response, the Commission stated that
 The Commission has received public comments regarding the proposed rule, and the NRC staff is continuing to analyze those comments and prepare proposed responses for the Commission's approval. As yet, however, a proposed final rule has not been submitted to the Commission and no date has been set for such submission. Therefore it appears that the Commission's present fuel cycle rule (Table S-3) is not likely to be supplanted in the immediate future.
 Letter from NRC, dated October 16, 1981.
 
 
 [169]
 See 43 Fed.Reg. 15613 (1978)
 
 
 [170]
 See p. 487 supra
 
 
 [171]
 See id
 
 
 [172]
 See note 7 supra
 
 
 [173]
 New York argued before the Hearing Board that the Commission must address the economic feasibility of its projections. The Commission staff argued, in response, that the issue need not be addressed. II JAS at 439-40. The Hearing Board, however, held that the issue should be addressed and took evidence from New York, Wisconsin, and Ohio purporting to show that the values projected in Table S-3 were not economically feasible. See Commission's Order, Feb. 9, 1978, IV JAS at 1254 (Commission affirming Hearing Board)
 
 
 [174]
 Judge Wilkey's dissent questions why we treat this issue differently than the uncertainty issue. The answer is simple: the issues are significantly different. The NRDC challenges not the conclusion that the zero-release assumption is reasonable, but rather the arbitrary exclusion of the uncertainties surrounding that assumption from any consideration in the licensing process. Here, New York challenges the Commission's conclusion that the facilities will be economically feasible. Economic uncertainties, of course, still must be factored into the analysis. See note 145 supra
 
 
 [175]
 NRDC v. NRC, 547 F.2d 633, 661 (D.C.Cir.1976) (Tamm, J., concurring), rev'd sub nom. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (NEPA requires Commission to find technological and economic feasibility). See also 547 F.2d at 658 (same)
 
 
 [176]
 See, e.g., pp. 480-481 supra
 
 
 [177]
 In the abstract, economic and technological feasibility may be closely related. A piece of technology that is so expensive that no private or public institution could ever amass the resources necessary to develop it may be characterized as technologically infeasible when in fact it is feasible as a purely technological matter. That type of economic feasibility is addressed, though indirectly, in Sections A and B, above. The concept of economic feasibility that New York and Wisconsin are questioning seems to be one that is well within the bounds of affordability in this extreme sense. The concept of economic feasibility that underlies New York's and Wisconsin's argument seems to be one of affordability by particular economic institutions that can reasonably be expected to have responsibility for bearing the cost of a piece of technology
 
 
 [178]
 44 Fed.Reg. 45362, 45367 (1979)
 
 
 [179]
 In its Statement of Consideration the NRC stated:
 Whether nuclear power is good business is not an issue in this rulemaking. The fuel cycle rule will be used only when somebody has decided, rightly or wrongly, that nuclear power is sufficiently viable economically to warrant applying for a reactor license. Once the reactor has operated, back-end fuel cycle activities must be carried out, whatever the cost.
 Id.
 
 
 [180]
 New York/Wisconsin Reply Brief at 6
 
 
 [181]
 New York/Wisconsin Brief at 28
 
 
 [182]
 Scientists' Institute for Public Information, Inc. v. AEC, 481 F.2d 1079, 1092 (D.C.Cir.1973)
 
 
 [183]
 NUREG-0116, supra note 14, at 4-29, 4-71
 
 
 [184]
 See Sierra Club v. Morton, 510 F.2d 813, 827-28 (5th Cir. 1975) (NEPA analysis does not have to ignore continuing regulatory and monitoring responsibilities); NRDC v. Morton, 458 F.2d 827, 837 (D.C.Cir.1972) (elimination of fundamental legislative schemes, such as antitrust laws, need not be considered)
 
 
 [185]
 In its brief, the NRC states that:
 the "operators" of fuel cycle facilities, whether government or private, will be subject to NRC regulation and will not have the option of cutting costs by allowing further releases if these would exceed the Commission's regulatory standards. The Commission's finding of economic feasibility thus in a sense expresses agency policy not to lower standards, even if this were legally permissible, on account of the predicted level of costs.
 NRC Brief at 27 (emphasis added). A future change in such an agency policy may well be an agency action that significantly affects the environment.
 As Judge Edwards correctly points out, an agency may not simply assume that the federal government will subsidize the prevention of foreseeable environmental damage. Nevertheless, in an area such as this, where there is a long history of federal involvement-including subsidization-we cannot say that an agency errs if it projects that a relatively minimal level of federal funding would become available if it turns out that private industry alone cannot prevent serious environmental damage.
 
 
 [186]
 New York/Wisconsin Brief at 35-50
 
 
 [187]
 See 44 Fed.Reg. 45362, 45367 (1979); Hearing Board Conclusions and Recommendations, at 58, IV JAS at 1480
 
 
 [188]
 Report of Hearing Board, August 31, 1978, at 126-130, III JAS at 1056-1060
 
 
 [189]
 44 Fed.Reg. 45362, 45367 & n.18 (1979); Hearing Board Conclusions and Recommendations, at 52-53, 57-58; IV JAS at 1475-1476, 1479-80
 
 
 [190]
 Hearing Board Conclusions and Recommendations, at 54-56, IV JAS 1476-78; New York/Wisconsin Brief at 35-50
 
 
 [191]
 44 Fed.Reg. 45362, 45367 n.18 (1979); see Hearing Board Conclusions and Recommendations, at 56, IV JAS at 1478
 
 
 [192]
 See note 8 supra
 
 
 [193]
 The Hearing Board stated that "(t)he cost (of decommissioning a reactor) is specific to each plant and depends on the method chosen. Controversies regarding the decommissioning costs should be resolved in individual reactor licensing proceedings." Hearing Board Conclusions and Recommendations, at 56, IV JAS at 1478 (emphasis added). Similarly the Commission found the "costs of decommissioning a power reactor ... (to be) facility-specific and should be considered in individual reactor proceedings rather than included among the costs of the fuel cycle activities which are the subject of the generic rule." 44 Fed.Reg. 45362, 45367 n.18 (1979) (emphasis added)
 
 
 [194]
 Hearing Board Conclusions and Recommendations, at 52, 54, IV JAS 1474, 1476
 
 
 [195]
 These figures are for the once-through and uranium-only reprocessing cycles, respectively. Hearing Board Conclusions and Recommendations, at 51, IV JAS at 1473
 
 
 [196]
 These ranges are from zero percent discount rate to ten percent discount rate. Id. at 52, 54, 57, IV JAS at 1474, 1476, 1479
 
 
 [197]
 These percentages are based on cost estimates, excluding waste management and disposal, of one billion dollars in capital costs and operating expenses of 30 mills/KWh for the model or "typical" reactor. The 5% figure is based on the operating cost of the once-through cycle (1.4 mills/KWh / 30 mills/KWh). It therefore represents an upper bound, because it is assumed that no reprocessing would take place unless the value of uranium that would be recovered makes up for the higher operating cost of the uranium-only reprocessing cycle. Such an assumption is clearly reasonable. Hearing Board Conclusions and Recommendations, at 51 & n.27, 52, 58-59, IV JAS at 1473 & n.27, 1474, 1480-81
 
 
 [198]
 Id. at 58, IV JAS at 1480; see 44 Fed.Reg. 45362, 45367 (1979)
 
 
 [199]
 SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)
 
 
 [200]
 Colorado Interstate Gas Co. v. Fed. Power Comm'n, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945)
 
 
 [201]
 Bowman Transportation, Inc. v. Arkansas-Best Freight System, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)
 
 
 [202]
 See Hearing Board Conclusions and Recommendations, at 58 & n.41, IV JAS 1480 & n.41; Transcript at 1291, II JAS 744 (comment of Hearing Board member Briggs)
 See also note 185 supra. Our doubts about the Commission judgment that such resources will be available would be greater if these costs did not represent such a relatively small increment to the present costs of nuclear power.
 
 
 [203]
 See note 7 supra
 
 
 *
 Honorable George Clifton Edwards, Jr., Chief Judge, U. S. Court of Appeals for the Sixth Circuit, sitting by designation
 
 
 *
 Honorable George Clifton Edwards, Jr., Chief Judge, U. S. Court of Appeals for the Sixth Circuit, sitting by designation
 
 
 [1]
 5 U.S.C. § 706(2)(A) (1976)
 
 
 [2]
 I choose the term "insignificant" to describe the impact of the many release figures set forth in the three S-3 Tables because the NRC's staff has equated them with the impact on human health of "a few puffs on a cigarette (or) a few sips of wine." 46 Fed.Reg. 15154, 15167 (March 4, 1981)
 
 
 [3]
 Each 1,000 MWe Light Water Reactor produces 200-250 kilograms of plutonium a year. Speth, Tamplin & Cochran, Plutonium Recycle: The Fateful Step, Bulletin of Atomic Scientists 15, 16 (November 1974). Two hundred-250 kgs. times 2.2 lbs/kg. equals 440-550 lbs. per reactor per year. If we assume a figure of 70 operating reactors, 70 times 440-550 equals 30,800-38,500. If we assume 170 projected reactors, 170 times 440-550 equals 74,800-93,500
 
 
 [4]
 J. McPhee, The Curve of Binding Energy 124 (1974) (figure from interviews with physicist Theodore Taylor). See H. Feiveson & T. Taylor, Nuclear Proliferation 136-144 (1977); T. Taylor & M. Willrich, Nuclear Theft: Risks & Safeguards 12-20 (1974)
 
 
 [5]
 We, of course, are aware that on March 4, 1981, long after this case had been submitted to this court and after respondent had made Table S-3 effective in licensing of additional nuclear power reactors, the Commission did release, by printing in the Federal Register, a proposed "Narrative." 46 Fed.Reg. 15154 (Mar. 4, 1981). I understand this term to represent a statement in explanation of the terse and difficult language of Table S-3. Because the Narrative, at present, is proposed and has not been finally adopted by the NRC, it is not ripe for judicial review. However, the Narrative represents the fullest expression of the NRC's most recent findings and thinking concerning the matters comprehended by Table S-3. For this reason, it has been deemed part of the record and considered
 I am unable to understand why this "explanation" (incomplete as it is) was not made available long ago and in ample time for our present decision. I have proposed to my colleagues on this panel the delay of the release of our decision pending completion of rulemaking on the Narrative, and, understandably, they feel such delay would be inadvisable from the point of view of their court. It seems likely to me, however, that with the issuance of the opinions of this case and the anticipated application for writ of certiorari in the Supreme Court, the Commission will proceed to complete its rulemaking with such modifications of the Narrative as it deems advisable and will then argue that the newly adopted Narrative requires another remand of the case on a claim that the subsequently adopted Narrative has rendered this panel's action moot.
 Additionally, we are informed that the NRC has initiated a "waste confidence" proceeding which may update Table S-3. See 44 Fed.Reg. 45362, 45363 (Aug. 2, 1979).
 Appreciating as I do the complexities and hazards with which respondent is required to deal, I am still compelled to wonder whether the "moving target" aspects of this case have all been required by uncontrollable circumstances or have been in part contrived to frustrate effective judicial review. At oral argument of this case, when a question concerning the "moving target" issue was posed by the author of this opinion, the response was, "Judge, we have able lawyers."
 
 
 [6]
 The as yet unadopted Narrative makes clear that the current staff thinking favors deep layers of bedded salt. See generally U.S. Nuclear Regulatory Commission, Environmental Survey of the Reprocessing & Waste Management Portions of the LWR Fuel Cycle, NUREG-0116 (Oct. 1976)
 
 
 [7]
 At the adoption of Table S-3 as a final rule, the NRC listed 70 licensed nuclear power plants. See 44 Fed.Reg. 45362, 45370 n.30 (Aug. 2, 1979). That number appears to have changed, however. See note 8 infra and accompanying text
 
 
 [8]
 Public information furnished by telephone by the NRC, August 26, 1981
 
 
 [9]
 This case and opinion pertain, of course, to commercial nuclear power. The result in this case, therefore, would not apply to the licensing, construction and operation of military and experimental reprocessing plants
 
 
 [10]
 Other proposed plans for high-level waste disposal include a) deep burial in geologic granite formations, b) burial in clay beds in the bottom of the Pacific Ocean, and c) dispatching canisters of high-level waste into permanent orbit around other planets
 
 
 [11]
 Table 2.10 in NUREG-0116 became part of the basis for Table S-3a in the "Proposed Narrative" of March 1981. See 46 Fed.Reg. 15154 (March 4, 1981)
 
 
 [12]
 I recognize that the closely related Table S-4 allegedly measures the impacts of transportation "of cold fuel to a reactor and of irradiated fuel and radioactive wastes from a reactor." 10 C.F.R. § 51.20(e) n.1. Thus, it may be contended that the risk of plutonium diversion during transportation is not before us for review. Table S-4, however, measures the risk of transporting cold fuel to and radioactive wastes from the reactor, not the larger risks of transporting PuO 2 from reprocessing plants to fuel fabrication plants
 Additionally, the relation of S-3 and S-4 is exceedingly unclear. Table S-3 also contains an entry for transportation effects, and Table S-4 purports to measure "Normal Conditions of Transport" and "Accidents in Transport," not the risks of intentional diversion of nuclear fuel. The NRC has never attempted to clarify this interrelationship. The risks of plutonium recycling are too great to leave a loophole through which the NRC's "able lawyers" could evade review of these hazards.
 Finally, the material from NUREG-0216 and the Hearing Board Recommendations, supra, indicates that the NRC did not include the risk of diversion in Table S-3 because it thought the risks insignificant, not because it thought the problem outside the scope of Table S-3.
 
 
 [13]
 The NRC promulgated these regulations in November 1979, well after they terminated the GESMO proceeding. See 44 Fed.Reg. 68187 (Nov. 28, 1979)
 
 
 [14]
 Also instructive is an alternative version of S-3 which the NRC promulgated during the pendency of the GESMO proceeding. This version of Table S-3 purported to define the impacts of a mixed oxide fuel cycle. Like its successor, this version of Table S-3 neglected the risk of accidental or intentional diversion of plutonium. See 41 Fed.Reg. 40506, 40509-510 (Sept. 20, 1976)
 
 
 [1]
 444 F.2d 841 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)
 
 
 [2]
 Id. at 851-53. See Pikes Peak Broadcasting Co. v. FCC, 422 F.2d 671, 682 (D.C.Cir.), cert. denied, 395 U.S. 979, 89 S.Ct. 2134, 23 L.Ed.2d 767 (1969). See also infra pp. 532-533
 
 
 [3]
 NRDC v. NRC, 547 F.2d 633, 644 (D.C.Cir.1976) (emphasis added) (hereinafter Vermont Yankee I maj. op.)
 
 
 [4]
 Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (hereinafter Vermont Yankee II )
 
 
 [5]
 Vermont Yankee II 435 U.S. at 536 n.14, 98 S.Ct. at 1207 n.14
 
 
 [6]
 I express here only my disagreement with the analysis found in sections IV.A.-C. of Judge Bazelon's opinion (hereinafter Bazelon op.) and the disposition found on page 69
 I agree with the analysis under Section IV.D. of Judge Bazelon's opinion, affirming the Commission's decisions regarding economic feasibility on the ground that they were not arbitrary and capricious. I question only Judge Bazelon's decision not to apply the same form of the arbitrary and capricious test to the other issues in this case. See infra p. 540.
 
 
 [7]
 Bazelon op. at 468-475
 
 
 [8]
 NRDC v. NRC, 547 F.2d 633, 658 (D.C.Cir.1976) (Tamm, J., concurring in result) (hereinafter Vermont Yankee I concurrence)
 
 
 [9]
 Licensing and Regulatory Policy and Procedures for Environmental Protection, 10 C.F.R. Part 51 (1980), 44 Fed.Reg. 45,362, 45,369 (1979) (emphasis added) (hereinafter Final Rule Statement Basis and Purpose)
 
 
 [10]
 42 U.S.C. § 4332(2)(C) (1976)
 
 
 [11]
 5 U.S.C. § 551 et seq. (1976)
 
 
 [12]
 Industrial Union Dep't, AFL-CIO v. Hodgson, 499 F.2d 467, 474 n.18 (D.C.Cir.1974) (emphasis added)
 
 
 [13]
 Petitioners challenge the validity of the original interim, and final versions of the rule published at 44 Fed.Reg. 45,362 (1979) and codified at 10 C.F.R. §§ 51.20(e) & 51.23(c) (1981). While Vermont Yankee I addressed the original rule and Vermont Yankee II issued after the interim rule had been promulgated, this is the first case to address the validity of the final rule
 
 
 [14]
 That section requires only that the agency provide adequate notice of the proposed rulemaking, 5 U.S.C. § 553(b), "give interested persons an opportunity to participate" in the rulemaking, 5 U.S.C. § 553(c), and "(a) fter consideration of the relevant matter presented ... incorporate in the rule ( ) adopted a concise general statement of (its) basis and purpose." Id
 
 
 [15]
 See, e.g., 39 Fed.Reg. 1001 (1974) (emergency core cooling systems); 40 Fed.Reg. 19,439 (1975) (radiation emissions must be "as low as practicable"); 39 Fed.Reg. 43,101 (1974) (environmental impact of using mixed oxide fuels)
 
 
 [16]
 The rule is reproduced in both Judge Bazelon's and Judge Edwards' opinions above
 
 
 [17]
 Section 102(2)(C) requires a "detailed statement" on the environmental impact of major federal actions. As this court recently noted, however, "(t) he EIS ... is not an end in itself, but rather a means toward the goal of better decisionmaking." North Slope Borough v. Andrus, 642 F.2d 589, 599-600 (D.C.Cir.1980). Thus, the decision regarding how much detail to include an EIS is primarily one for the agency itself, guided by a "rule of reason." Id. at 600. See also Scientists' Inst. for Pub. Information, Inc. v. AEC, 481 F.2d 1079, 1091 (D.C.Cir.1973); NRDC v. Morton, 458 F.2d 827, 833 (D.C.Cir.1972). All NEPA demands of an agency is that it give "reasonable consideration to all significant impacts." North Slope Borough v. Andrus, 642 F.2d 589, 599 (D.C.Cir.1980)
 Although NEPA's own language does not require it, since this court's decision in Calvert Cliffs' Coordinating Comm. v. AEC, 449 F.2d 1109 (D.C.Cir.1971), NRC licensings have included a cost benefit analysis that "considers and balances the environmental effects of the facility and the alternatives available for reducing or avoiding adverse environmental effects, as well as the environmental, economic, technical and other benefits of the facility." 10 C.F.R. § 51.20(b) (1980).
 
 
 [18]
 See generally Note, The Use of Generic Rulemaking to Resolve Environmental Issues in Nuclear Power Plant Licensing, 61 Va.L.Rev. 869, 881-82 (1975)
 
 
 [19]
 "Local" issues, unlike generic issues, are particularized and unique issues specific to the construction and operation of a given nuclear power plant and hence, are properly determined in individualized license adjudications. Following the recommendations of the Administrative Conference of the United States and numerous commentators, however, the NRC began the practice of generic rulemakings because the "practice of resolving generic issues in individual, adjudicatory-style hearings (had) proved a procedural failure when judged by the criteria of efficiency, acceptability, and accuracy." Note, Judicial Review of Generic Rulemaking: The Experience of the Nuclear Regulatory Commission, 65 Geo.L.J. 1295, 1301 (1977). See also Recommendations of the Administrative Conference of the United States, 1 C.F.R. § 305.73-6 (1977)
 
 
 [20]
 Vermont Yankee I maj. op. at 646
 
 
 [21]
 Id. at 655
 
 
 [22]
 Id. at 641
 
 
 [23]
 The majority's two rationales for remand were intertwined to the point of being merged. Compare the majority's statement of the issue to be decided:
 we are called upon to decide whether the procedures provided by the agency were sufficient to ventilate the issues,
 Id. at 643 (emphasis added) with the panel's final mandate to the Commission:
 Whatever techniques the Commission adopts, before it promulgates a rule limiting further consideration of waste disposal and reprocessing issues, it must in one way or another generate a record in which the factual issues are fully developed.
 Id. at 654 (emphasis added).
 
 
 [24]
 Vermont Yankee I concurrence at 658 (emphasis added)
 
 
 [25]
 Id. at 659 (emphasis in original)
 
 
 [26]
 Id. at 661 (emphasis added)
 
 
 [27]
 Justices Blackmun and Powell took no part in the consideration or decision of the case. See Vermont Yankee II 435 U.S. at 521, 98 S.Ct. at 1201
 
 
 [28]
 Id. at 548, 98 S.Ct. at 1214 (emphasis added). While the Court found it "not entirely free from doubt" whether the majority had struck down the rule because of inadequate procedures or because of an inadequate record, id. at 541, 98 S.Ct. at 1210, it eventually concluded that Judge Bazelon's majority opinion had "struck down the rule because of the perceived inadequacies of the procedures employed in the rulemaking proceedings. ... (W)e feel compelled to address the opinion on its own terms, and we conclude that it was wrong." Id. at 541-42, 98 S.Ct. at 1210
 
 
 [29]
 Id. at 549, 98 S.Ct. at 1214 (emphasis added). In two footnotes to its opinion, the Court elaborated on its general directive. See id. at 535-37 n.14, 98 S.Ct. at 1207-08 n.14:
 Upon remand, the majority of the panel of the Court of Appeals is entirely free to agree or disagree with Judge Tamm's conclusion that the rule pertaining to the back end of the fuel cycle under which petitioner Vermont Yankee's license was considered is arbitrary and capricious within the meaning of § 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706 (1976 ed.), even though it may not hold, as it did in its previous opinion, that the rule is invalid because of the inadequacy of the agency procedures. Should it hold the rule invalid, it appears in all probability that the Commission will proceed to promulgate a rule resulting from rulemaking proceedings currently in progress.... In all likelihood the Commission would then be required, under the compulsion of the court's order, to examine Vermont Yankee's license under that new rule.
 If, on the other hand, a majority of the Court of Appeals should decide that it was unwilling to hold the rule in question arbitrary and capricious merely on the basis of § 10(e) of the Administrative Procedure Act, Vermont Yankee would not necessarily be required to have its license reevaluated.
 (emphasis added). See also id. 435 U.S. at 549 n.21, 98 S.Ct. at 1214 n.21.
 
 
 [30]
 The Court observed that "(i)n the Court of Appeals no one questioned the Commission's authority to deal with fuel cycle issues by informal rulemaking as opposed to adjudication. Neither does anyone seriously question before this Court the Commission's authority in this respect." Id. at 535 n.13, 98 S.Ct. at 1207 n.13 (citations omitted). See also infra p. 533
 
 
 [31]
 Vermont Yankee II at 547, 98 S.Ct. at 1213
 
 
 [32]
 Id. (emphasis added)
 
 
 [33]
 Section 101(a) of NEPA declares in broad language that it is the "continuing policy" of the federal government "to use all practicable means and measures" to achieve a variety of environmental goals. 42 U.S.C. § 4331(a) (1976). Section 101(b) then declares that the Government had the "continuing responsibility ... to use all practicable means, consistent with other essential considerations of national policy" to achieve those goals. 42 U.S.C. § 4331(b) (1976)
 The specific procedural directives found in section 102, including the EIS requirement, see note 17 supra, are "action-forcing" procedures designed to help implement the broad goals of section 101. See Kleppe v. Sierra Club, 427 U.S. 390, 409, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976).
 
 
 [34]
 449 F.2d 1109 (D.C.Cir.1971)
 
 
 [35]
 Id. at 1112-13 & n.5. See also EDF v. Corps of Eng'rs, 470 F.2d 289, 298 (8th Cir. 1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973)
 
 
 [36]
 Vermont Yankee II 435 U.S. at 558, 98 S.Ct. at 1219 (emphasis added). The opinion continued by clarifying that the role of NEPA
 is to insure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decisionmaking unit of the agency. Administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute, ... not simply because the court is unhappy with the result reached. And a single alleged oversight on a peripheral issue, urged by parties who never fully cooperated or indeed raised the issue below, must not be made the basis for overturning a decision properly made after an otherwise exhaustive proceeding.
 Id.
 
 
 [37]
 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (per curiam)
 
 
 [38]
 Id. at 227-28, 100 S.Ct. at 499-500 (citing Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 2730 n.21, 49 L.Ed.2d 576 (1976) (emphasis added)
 
 
 [39]
 Vermont Yankee II 435 U.S. at 548, 98 S.Ct. at 1214 (citing Vermont Yankee I maj. op. at 653) (emphasis added)
 
 
 [40]
 Id. (citations omitted) (emphasis added)
 
 
 [41]
 No. 76-528, reversing Aeschliman v. NRC, 547 F.2d 622 (D.C.Cir.1976)
 
 
 [42]
 Vermont Yankee II 435 U.S. at 555, 98 S.Ct. at 1217. In Consumers Power, opponents of a nuclear power plant had challenged an NRC construction permit on the grounds that the accompanying EIS had failed to consider certain energy conservation alternatives to plant construction, in violation of Council on Environmental Quality (CEQ) regulations. The Commission rejected their challenge for failure to meet a "threshold test"-that the proposed alternatives were as yet "reasonably available." Until the challengers had crossed that threshold, the agency determined, it was not required to consider their proposed alternatives. Id. at 533, 98 S.Ct. at 1206
 This court, again speaking through Judge Bazelon, had reversed, holding that the NRC's "threshold test" was both arbitrary and capricious and inconsistent with NEPA, Aeschliman v. NRC, 547 F.2d 622, 629 (D.C.Cir.1976). Once the challenger had drawn the NRC's attention to an alternative, Judge Bazelon held, the NRC had a duty to investigate that alternative and explain why it did not deserve further consideration, id. at 628. Judge Bazelon further found the NRC's Advisory Committee on Reactor Safeguards (ACRS) report evaluating the proposed plant's safety insufficiently detailed to apprise the public of potential health hazards. Id. at 630-32. The Vermont Yankee II Court reversed both rulings. Vermont Yankee II 435 U.S. at 555, 558, 98 S.Ct. at 1217, 1219.
 
 
 [43]
 Vermont Yankee II at 551, 98 S.Ct. at 1215 (citing 42 U.S.C. § 4332(C))
 
 
 [44]
 Id. at 553, 98 S.Ct. at 1216
 
 
 [45]
 Citing Judge Leventhal's discussion in Portland Cement Ass'n v. Ruckelshaus, 486 F.2d 375, 394 (D.C.Cir.1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974), Justice Rehnquist noted that when challengers "are requesting the agency to embark upon an exploration of uncharted territory ... 'comments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern.' " Vermont Yankee II 435 U.S. at 553, 98 S.Ct. at 1216
 
 
 [46]
 To make an impact statement something more than an exercise in frivolous boilerplate the concept of alternatives must be bounded by some notion of feasibility.... Common sense also teaches us that the "detailed statement of alternatives" (required by NEPA) cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable to the mind of man. Time and resources are simply too limited to hold that an impact statement fails because the agency has failed to ferret out every possible alternative
 Id. 435 U.S. at 551, 98 S.Ct. at 1215 (citing with approval NRDC v. Morton, 458 F.2d 827, 837-38 (D.C.Cir.1972)).
 
 
 [47]
 (T)he concept of "alternatives" is an evolving one, requiring the agency to explore more or fewer alternatives as they become better known and understood. This was well understood by the Commission, which, unlike the Court of Appeals, recognized that the Licensing Board's decision had to be judged by the information then available to it. And judged in that light we have little doubt the Board's actions were well within the proper bounds of its statutory authority
 Id. 435 U.S. at 552-53, 98 S.Ct. at 1216.
 
 
 [48]
 See, e.g., North Slope Borough v. Andrus, 642 F.2d 589, 605-06 (D.C.Cir.1980) (discussing degree of detail necessary to EIS when considerable uncertainties exist):
 The (agency) plainly cannot be expected or required to wait until the totality of environmental effects is known.
 (This case) presents a record of facts and doubts that have not yet fully matured.... Uncertainty over remote hazards can be rectified as more information is collected (necessary to) ... instruct the (agency) in (its) developing view of costs and benefits. It is more logical and efficient to ask certain questions when the truth of their premises is unveiled.
 See also Scientists' Inst. for Pub. Information v. AEC, 481 F.2d 1079, 1091-92 (D.C.Cir.1973) (NEPA requirement that agency describe anticipated environmental effects of proposed action is subject to rule of reason); NRDC v. Morton, 458 F.2d 827, 837-38 (D.C.Cir.1972) (NEPA does not require agency to discuss in detail "remote and speculative" alternatives whose environmental effects "cannot be readily ascertained.")
 
 
 [49]
 481 F.2d 1079 (D.C.Cir.1973)
 
 
 [50]
 Id. at 1091-92
 
 
 [51]
 Vermont Yankee II 435 U.S. at 557-58, 98 S.Ct. at 1218-19
 
 
 [52]
 See supra p. 521
 
 
 [53]
 Vermont Yankee I concurrence at 661 n.11
 
 
 [54]
 Compare Ethyl Corp. v. EPA, 541 F.2d 1 (D.C.Cir.) (en banc), cert. denied, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976), with id. at 70 (dissenting opinion) (debating whether dichotomy exists between facts and risks)
 
 
 [55]
 See e.g., Amoco Oil Co. v. EPA, 501 F.2d 722 (D.C.Cir.1974); Industrial Union Dep't v. Hodgson, 499 F.2d 467 (D.C.Cir.1974)
 
 
 [56]
 Vermont Yankee I concurrence at 661 n.10 (quoting Amoco Oil Co. v. EPA, 501 F.2d at 741) (emphasis added). Drawing some initial distinctions between the factual and policy determinations made by the NRC in the original rulemaking, Judge Tamm noted that the agency's decisions to treat the waste storage issue generically, to license reactors, and to postpone until later the question of which method of waste storage to adopt were policy or risk assessment judgments reviewable only for "clear abuse of discretion." Id
 
 
 [57]
 See Bazelon op. at 478-481
 
 
 [58]
 The majority opinion in effect concedes this, noting that a "factual finding" interpretation of these figures, including the "zero-release" figures, is the less likely of the two possibilities-the other being that the figures were intended only as decisionmaking devices. Id. at 481
 
 
 [59]
 Looking to the future, and commanded by Congress to make policy, a rule-making agency necessarily deals less with "evidentiary" disputes than with normative conflicts, projections from imperfect data, experiments and simulations, educated predictions, differing assessments of possible risks, and the like. The process is quasi -legislative in character
 Amoco Oil Co. v. EPA, 501 F.2d 722, 735 (D.C.Cir.1974). Accord, Ethyl Corp. v. EPA, 541 F.2d 1 (D.C.Cir.) (en banc), cert. denied, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976) (holding that agency may promulgate rules based on qualitative appraisal of risk when scientific knowledge provides no answer to crucial issues of fact).
 
 
 [60]
 The original S-3 rulemaking record on waste management and reprocessing consisted solely of a twenty-page statement by the Director of the AEC's Division of Waste Management professing confidence that long-term waste disposal would someday be achieved. See Vermont Yankee I maj. op. at 647-51. Although the Commission had concluded almost without reflection that waste disposal would contribute insignificantly to the overall environmental effects of the fuel cycle, it permitted no further discussion of those effects in individual proceedings beyond use of Table S-3 itself
 In the wake of Vermont Yankee I however, the Commission reopened the rulemaking proceeding to supplement the record on waste reprocessing and management. 41 Fed.Reg. 34,707 (1976). The Commission Staff produced an extensive report entitled Environmental Survey of the Reprocessing and Waste Management Portions of the LWR Fuel Cycle (NUREG-0116 (1976)) (hereinafter NUREG-0116). That Survey discussed gaps in existing information about waste management assessment, made educated, conservative estimates of release levels, and included discussions of those waste management technologies currently available. 42 Fed.Reg. 13,805 (1977). The Commission also acknowledged for the first time that uncertainties existed with respect to risks from long-term repository failure. 41 Fed.Reg. 45,849-45,850 (1976). The Commission promised to consider new data in its analysis as it became available. Id.
 At the same time, the Energy Research and Development Administration (ERDA) began preparation of a generic environmental impact statement on high-level waste management, a study of repository sites, and a study of interim waste storage plans, including waste solidification. In March 1978 President Carter established an Interagency Nuclear Waste Management Task Force to coordinate the activities of the various agencies conducting long-term waste research, with the ultimate goal of establishing a comprehensive federal program for long-term waste management. 43 Fed.Reg. 53,262 (1978). After hearings, that Task Force issued a report concluding that "there is no scientific or technical reason that would prevent selection of a suitable site for a waste depository." Nuclear Reg.Rep. (CCH) No. 190, at 4 (16 Mar. 1979). See generally U. S. Dep't of Energy, Report TID-29442, Report to the President by the Interagency Review Group on Nuclear Waste Management (1979).
 Congress has also stayed abreast of the long-term waste storage problem since Vermont Yankee I. For a partial listing of Congressional hearings on spent fuel storage and nuclear waste disposal, see Hearings on Pub. Works and Energy Research Appropriations, FY 1978, Senate Appropriations Comm., Part 5, 95th Cong., 1st Sess. 397, 518, 548 (1977); Hearings on FY 1979 Budget Review Before the Senate Comm. on Environment and Pub. Works, 95th Cong., 1st Sess. 473-482, 505, 523 (1978); Hearings on Energy and Water Dev. Appropriations, Senate Appropriations Comm., 1980 (H.R. 4388)-Part 3, 96th Cong., 1st Sess. 402, 517, 647 (1979); Hearings on Nuclear Waste Disposal Before the Senate Subcomm. on Nuclear Regulation, 96th Cong., 2nd Sess. 20, 60-234 (1980); Hearings on H.R. 6390 Before the House Subcomm. on Energy and the Environment, 96th Cong., 2d Sess., 18 March 1980 (testimony of Chairman Ahearne); Oversight Hearings on Nuclear Waste Facility Siting Before the House Subcomm. on Energy and the Environment, 96th Cong., 1st Sess. 3, 71 (1979); Hearings on Nuclear Waste Facility Siting Before the House Subcomm. on Energy and Power, 96th Cong., 1st Sess. 3, 71-88 (1979); Hearings on H.R. 7418 Before the House Subcomm. on Energy Research and Production, 96th Cong., 1st Sess., 29 May 1980 (testimony of John G. Davis, Deputy Director of Nuclear Material Safety and Safeguards, NRC).
 Finally, numerous states and localities have begun to regulate in the area of long-term nuclear waste management. See generally Note, Nuclear Waste Management: What the States Can Do, 1 Va.J.Nat.Resources Law 103 (1980) (describing state efforts). Before leaving office, President Carter took steps toward establishing a comprehensive Radioactive Waste Management Program in which state and local governments would play a key role in developing and implementing short- and long-term management programs. See Exec. Order No. 12,192 (12 Feb. 1980); see also 16 Weekly Comp. of Pres. Doc. 296-301 (12 Feb. 1980).
 In sum, since the original S-3 rule was first challenged in this court, the problem of long-term waste disposal-a problem little understood or studied in the early 1970's-has become a major concern of several federal agencies, Congress, the President, and the states, all of whom are bent on finding a long-range solution to the permanent disposal problem.
 
 
 [61]
 Final Rule Statement of Basis and Purpose at 45,362
 
 
 [62]
 Id. The Commission announced that the narrative would seek to explain both the environmental significance of the release values in the table as well as "important fuel cycle issues now outside the scope of the Table, including socioeconomic and cumulative impacts, where these are appropriate for generic treatment." Id. On 4 March 1981 the Commission submitted a version of the narrative for public comment as a proposed amendment to the final fuel cycle rule. See 46 Fed.Reg. 15,154 (1981). See also note 66 infra
 
 
 [63]
 Final Rule Statement of Basis and Purpose at 45,363. Since Vermont Yankee II, the courts as well as the agencies had been active in the area of long-range waste disposal. Cf. note 61 supra. In mid-1978, the Second Circuit held in NRDC v. NRC, 582 F.2d 166 (2d Cir. 1978) that the Atomic Energy Act did not require the NRC either to condition its licenses on the availability of a method for permanent disposal of high-level radioactive wastes or to conduct a rulemaking to determine whether permanent waste disposal would be possible without undue risk to public health and safety. The Second Circuit concluded that the congressional intent underlying the Act would be satisfied so long as the Commission found "reasonable assurance" that a safe method for permanent waste disposal would be available when needed. Id. at 171-75
 Shortly thereafter, in Minnesota v. NRC, 602 F.2d 412 (D.C.Cir.1979), this court upheld an NRC decision allowing two plants to expand their on-site storage of high-level wastes, in the process unequivocally reaffirming the Commission's power to "consider the complex issue of nuclear waste disposal in a 'generic' proceeding." Id. at 416-17. This court remanded for further consideration, however, the question "whether there is reasonable assurance that an off-site storage solution will be available by the years 2007-09" (the expiration dates of the plant licenses being challenged in that case).
 In response to that decision, the NRC has been conducting a generic "waste confidence" proceeding, to "assess generically the degree of assurance now available that radioactive waste can be safely disposed of, to determine when such disposal or off-site storage will be available, and to determine whether radioactive wastes can be safely stored on-site" until off-site storage is available. 44 Fed.Reg. 61,372 (1979). While regarding the "waste confidence" issue as separate and different in scope and purpose from either the S-3 rule-making, the general S-3 update, or the S-3 narrative rule-making, the NRC intends to use the waste confidence proceeding to review and update the S-3 proceeding's conclusions regarding waste disposal. 44 Fed.Reg. 45,363.
 In that proceeding, the Department of Energy has filed a lengthy initial statement reviewing the state of the art on permanent waste disposal, estimating that a geological waste repository can be achieved around the year 2000. See DOE-NE-0007, "Statement of Position of the USDOE, In the Matter of Proposed Rulemaking on the Storage and Disposal of Nuclear Waste (Waste Confidence Rulemaking)" (15 Apr. 1980). The positions of the more than fifty participants in the proceeding have now been summarized in Report of the NRC Working Group on the Proposed Rulemaking on the Storage and Disposal of Nuclear Wastes (29 Jan. 1981). Comments on that study, which identifies information gaps and issues still in controversy, are currently being solicited from the rulemaking participants.
 
 
 [64]
 See Final Rule Statement of Basis and Purpose at 45,363:
 The rule need not be comprehensive in scope to be a useful and valid exercise of rulemaking authority. A record is not yet available to support a comprehensive rule dealing with all generic aspects of fuel cycle impacts relevant to reactor licensing, but the Commission is free to adopt a narrower rule that for the present leaves some of these matters for consideration in individual proceedings.
 (emphasis added).
 
 
 [65]
 Id. (emphasis added)
 
 
 [66]
 Id. (emphasis added). In its proposed explanatory narrative, the Commission now expresses the conclusion "that the fuel cycle impacts addressed by Table S-3 cannot significantly affect the cost-benefit balance for a light water reactor." 46 Fed.Reg. 15,154, 15,155 (1981) (emphasis added). Based on that conclusion, the Commission has proposed that, once the narrative is formally adopted as part of the final rule, "no further consideration of fuel cycle impacts addressed by Table S-3 and the explanatory narrative will be required or allowed in individual reactor licensing proceedings." Id. If supported by the supplementary rulemaking record, the Commission's finding of "no significant effect" would relieve the NRC of any responsibility under NEPA to consider fuel cycle impacts in future licensing adjudication. For the purposes of our review today, however, I make reference only to the contemporaneous explanation offered by the Commission in support of its table, namely, the Statement of Basis and Purpose issued in 1979
 
 
 [67]
 Final Rule Statement of Basis and Purpose at 45,363
 
 
 [68]
 "A reasonable degree of uncertainty is unavoidable and is acceptable, given that basic decisions have not yet been made regarding reprocessing and the technology of waste disposal." Id. (emphasis added)
 
 
 [69]
 Id. (emphasis added)
 
 
 [70]
 Id. at 45,364
 
 
 [71]
 Id. at 45,363
 
 
 [72]
 Id. at 45,368 & n.22 (noting that salt deposits have been found in 24 of the 50 states). See also NUREG-0116 at 4-73 & Ref. 53 (showing locations of significant rock-salt deposits in continental United States)
 
 
 [73]
 Final Rule Statement of Basis and Purpose at 45,368 n.21 (noting that geologic formation of existing salt beds have remained undisturbed for many millions of years already). See also NUREG-0116 at 2-11
 
 
 [74]
 See NUREG-0116 at 4-77 to 4-79 (showing probable layout of bedded salt repository and describing how provisional repository would be converted to permanent repository)
 
 
 [75]
 Id. at 4-86 to 4-88
 
 
 [76]
 Id
 
 
 [77]
 Id. at 4-88 to 4-89
 
 
 [78]
 Id. at 4-89 to 4-94
 
 
 [79]
 See, e.g., id. at 4-94 (listing remaining areas of uncertainty)
 
 
 [80]
 See Final Rule Statement of Basis and Purpose at 45,367-69
 
 
 [81]
 Id. at 45,368
 
 
 [82]
 Id
 
 
 [83]
 Id. at 45,368-69. The Commission noted that the Department of Energy would make the initial judgment regarding which waste disposal technology to select, and that any NRC judgments regarding the likelihood of successful long-term waste disposal would be made in the waste confidence proceeding. See note 64 supra
 
 
 [84]
 Id. at 45,369 (emphasis added). The Commission's statement that it sees "no advantage in having licensing boards repeatedly weigh for themselves the effect of uncertainties on the selection of fuel cycle impacts" is clearly consistent with the rule's statement that licensing boards "shall not be required " to consider generic uncertainties. No fair reading of the Commission's stated intent at this time supports Judge Bazelon's conclusion that "the Commission's final Rule, like its two predecessors, does not permit licensing boards to consider either the risk that permanent waste management facilities will not be developed, or the risk that they will fail to perform as intended if they are developed." Bazelon op. at 475 (emphasis added)
 
 
 [85]
 Final Rule Statement of Basis and Purpose at 45,369. The staff had evaluated two types of unusual occurrences which might cause accidental breach of repository containment: natural rapid events uninfluenced by humans, such as meteor strikes, and unexpected human intervention, such as sabotage or random drilling. The first type of unusual occurrence, the staff found, would likely occur only once every 50 trillion years. As for the second type of unusual occurrence, the staff found evidence that even a surface burst of a 50-megaton nuclear weapon was unlikely to breach a repository buried at 600-meter depth, and that random drilling would cause repository breach only once in 2500 years. See NUREG-0116 at 4-87
 With respect to the more commonplace form of repository breach-gradual erosion and infiltration of the repository by the surrounding groundwater-the staff's major finding was that bedded salt is an enormously plastic, highly impermeable medium. Id. at 4-75. So long as the repository was located in a setting known to have little contact with circulating groundwater, the staff reckoned that hundreds of thousands of years could elapse before leached radionuclides would migrate to a well or surface discharge point, exposing humans to radiation via the food chain. Id. at 4-89 to 4-93.
 
 
 [86]
 Final Rule Statement of Basis and Purpose at 45,369 n.27
 
 
 [87]
 Id. at n.26
 
 
 [88]
 5 U.S.C. § 706, governing scope of review, provides,
 To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall-
 (1) compel agency action unlawfully withheld or unreasonably delayed; and
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be-
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 (B) contrary to constitutional right, power, privilege, or immunity;
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
 (D) without observance of procedure required by law;
 (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
 (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
 In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.
 
 
 [89]
 See supra p. 520
 
 
 [90]
 See supra p. 520
 
 
 [91]
 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)
 
 
 [92]
 The separate standards under § 706(2)(B)-(D) thus have been rendered largely redundant by a broad reading of (A)'s "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."
 
 
 [93]
 401 U.S. at 415-16, 91 S.Ct. at 823-24
 
 
 [94]
 Id. at 417, 91 S.Ct. at 824 (emphasis added)
 
 
 [95]
 5 U.S.C. § 553 (1976), discussed in note 14 supra
 
 
 [96]
 42 U.S.C. § 4332(2)(C) (1976), discussed in note 17 supra
 
 
 [97]
 When the matter under review arises in the context of a trial-type proceeding conducted under 5 U.S.C. §§ 556-57, a reviewing court must ensure that the agency decision was supported by "substantial evidence" based on the record as a whole. See 5 U.S.C. § 706(2)(E), reprinted in note 88 supra. Some statutes also require that agency rulemakings conducted under the statute be supported by substantial evidence. See, e.g., Mobil Oil Corp. v. FPC, 483 F.2d 1238 (D.C.Cir.1973) (discussing Natural Gas Act)
 Judicial review of the agency's evidentiary record in an informal rulemaking like this one, however, must be guided by the "arbitrary (and) capricious" standard of 5 U.S.C. § 706(2)(A). There is little doubt that the NRC's extensive evidentiary record here satisfies that test since the arbitrary and capricious standard is even less stringent than the lenient "substantial evidence" standard of review. See Wright, The Courts and the Rulemaking Process: The Limits of Judicial Review, 59 Cornell L.Rev. 375, 392 (1974):
 If weightings on conflicting evidence need be only "reasonable" to pass the substantial evidence test, it follows that they can be less than reasonable and still survive the "arbitrary, capricious" test. If this is so, the latter standard subjects a rulemaker to only the most rudimentary command of rationality. In drawing empirical conclusions, he must give actual, good faith consideration to all relevant evidentiary factors. If he has in fact given serious attention to a factor, the weight which he assigns to it in his final judgments is of virtually no concern to the reviewing court.
 
 
 [98]
 See, e.g., Communications Investment Corp. v. FCC, 641 F.2d 954, 972 (D.C.Cir.1980). In Trans-Pacific Freight v. Federal Maritime Comm'n, 650 F.2d 1235 (D.C.Cir.1980), cert. denied, 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981), we summarized our narrow scope of review under the arbitrary and capricious standards as follows:
 After satisfying ourselves that the agency has acted within its statutory authority and that this action was accompanied by the appropriate procedural protections and was supported by sufficient evidence, we must inquire whether the rationale of the agency is both discernible and defensible. In undertaking this inquiry, we may not substitute our judgment for that of the Commission, but may only assure ourselves that the agency decision was rational and based on a consideration of the relevant factors.
 Id. at 1251 (footnotes omitted).
 
 
 [99]
 401 U.S. at 416, 91 S.Ct. at 823-24 (emphasis added)
 
 
 [100]
 See, e.g., National Lime Ass'n v. EPA, 627 F.2d 416 (D.C.Cir.1980); Culpeper League for Envtl. Protection v. NRC, 574 F.2d 633, 634 (D.C.Cir.1978) (per curiam); Greater Boston Television Corp. v. FCC, 444 F.2d 841, 851, 859 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); Pikes Peak Broadcasting Co. v. FCC, 422 F.2d 671, 682 (D.C.Cir.), cert. denied, 395 U.S. 979, 89 S.Ct. 2134, 23 L.Ed.2d 767 (1969)
 
 
 [101]
 See, e.g., NRDC v. Morton, 458 F.2d 827, 838 (D.C.Cir.1972). See also Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 2730 n.21, 49 L.Ed.2d 576 (1976). See generally Leventhal, Environmental Decisionmaking and the Role of the Courts, 122 U.Pa.L.Rev. 509 (1974)
 
 
 [102]
 See National Lime Ass'n v. EPA, 627 F.2d 416, 451 n.126 (D.C.Cir.1980) (describing evolution of this phenomenon)
 
 
 [103]
 Id. at 451-54 (discussing cases)
 
 
 [104]
 See, e.g., Byse, Scope of Judicial Review of Informal Rulemaking, 33 Ad.L.Rev. 183 (1981); DeLong, Informal Rulemaking and the Integration of Law and Policy, 65 Va.L.Rev. 257 (1979) (hereinafter DeLong); McGowan, Reflections on Rulemaking Review, 53 Tulane L.Rev. 681 (1979); Rodgers, A Hard Look at Vermont Yankee: Environmental Law Under Close Scrutiny, 67 Geo.L.J. 699, 704 (1979); Breyer, Vermont Yankee and the Courts' Role in the Nuclear Energy Controversy, 91 Harv.L.Rev. 1833, 1834 (1978) (hereinafter Breyer)
 
 
 [105]
 627 F.2d 416 (D.C.Cir.1980)
 
 
 [106]
 Id. at 453 (footnotes omitted)
 
 
 [107]
 See, e.g., North Anna Envtl. Coalition v. NRC, 533 F.2d 655, 662 (D.C.Cir.1976); Citizens for Safe Power, Inc. v. NRC, 524 F.2d 1291 (D.C.Cir.1975); Union of Concerned Scientists v. AEC, 499 F.2d 1069, 1079 (D.C.Cir.1974); Siegel v. AEC, 400 F.2d 778, 783 (D.C.Cir.1968)
 
 
 [108]
 400 F.2d 778, 783 (D.C.Cir.1968)
 
 
 [109]
 See supra p. 521 & note 30
 
 
 [110]
 Judge Bazelon expressly concedes this point, see Bazelon op. at 472, which Judge Tamm also specified in his Vermont Yankee I concurrence:
 (T)he decision to treat the waste storage issue through generic rulemaking because it is common to all licensing decisions is clearly a policy determination within the agency's special expertise which we should review only for clear abuse of discretion.
 Vermont Yankee I concurrence at 661 n.11.
 
 
 [111]
 Judge Leventhal stated this emphatically in Minnesota v. NRC, 602 F.2d 412 (D.C.Cir.1979), discussed in note 63 supra :
 No one disputes that solutions to the commercial waste dilemma are not currently available. The critical issue is the likelihood (or probability) that solutions, either ultimate or interim, will be reached in time.... We agree with the Commission's position that it could properly consider the complex issue of nuclear waste disposal in a "generic" proceeding such as rulemaking, and then apply its determinations in subsequent adjudicatory proceedings. Where factual issues do not involve particularized situations, an agency may proceed by a comprehensive resolution of the questions rather than relitigating the question in each proceeding in which it is raised. Petitioners hypothesize the need for individualized determinations, but we think it clear that the central issue posed by petitioners-the feasibility of interim or ultimate nuclear waste disposal solutions-is one essentially common to all nuclear facilities.
 ... We do not dictate the procedures of the "generic" proceeding. The breadth of the questions involved and the fact that the ultimate determination can never rise above a prediction suggest that the determination (of the probability of finding a feasible solution) may be a kind of legislative judgment for which rulemaking would suffice.
 Id. at 416-17 (citations omitted) (emphasis added).
 
 
 [112]
 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961)
 
 
 [113]
 In Power Reactor, the Commission interpreted its own licensing provisions to allow nuclear power plant construction permits to be granted based on a less complete finding of plant safety than would have been required to grant plant operating licenses. The Supreme Court deferred to the Commission's interpretation of its own statute, noting that
 nuclear reactors are fast-developing and fast-changing. What is up to date now may not, probably will not, be as acceptable tomorrow. Problems which seem insuperable now may be solved tomorrow, perhaps in the very process of construction itself. We see no reason why we should not accord the Commission's interpretation of its own regulation and governing statute that respect which is customarily given to a practical administrative construction of a disputed provision. Particularly is this respect due when the administrative practice at stake "involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new."
 Id. at 408, 81 S.Ct. at 1535 (citations omitted).
 
 
 [114]
 Amoco Oil Co. v. EPA, 501 F.2d 722, 741 (D.C.Cir.1974). Accord, Industrial Union Dep't v. Hodgson, 499 F.2d 467, 474-75 & n. 18 (D.C.Cir.1974)
 Judge Mikva has recently pointed out that
 (t)he thoroughness and persuasiveness of the explanation we can expect from the agency will, of course, vary with the nature of the prediction undertaken. "Where existing methodology or research in a new area of regulation is deficient, the agency necessarily enjoys broad discretion to attempt to formulate a solution to the best of its ability on the basis of available information." Industrial Union Dep't v. Hodgson, 499 F.2d 467, 474 n.18 (D.C.Cir.1974) .... At the other extreme, this court's inquiry into agency methodology in the physical sciences has been far more exacting "where the facts pertinent to (a) standard's feasibility are available and easily discoverable by conventional technical means." National Lime Ass'n v. EPA, 627 F.2d 416, 454 (D.C.Cir.1980).
 NRDC v. EPA, 655 F.2d 318, 326 (D.C.Cir.1981) (emphasis added). There can be little doubt that the agency prediction here-that a long-term solution to the waste disposal problem will be found-lies within the area where existing research is deficient and the agency necessarily enjoys broad discretion.
 
 
 [115]
 Ethyl Corp. v. EPA, 541 F.2d 1, 28 (D.C.Cir.) (en banc), cert. denied, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). See also EDF v. EPA, 598 F.2d 62, 83-85 (D.C.Cir.1978)
 
 
 [116]
 International Harvester Co. v. Ruckelshaus, 478 F.2d 615, 629 (D.C.Cir.1973). Accord, NRDC v. EPA, 655 F.2d 318, 328-29 (D.C.Cir.1981)
 
 
 [117]
 See supra pp. 523-524
 
 
 [118]
 Vermont Yankee II 435 U.S. at 549 n.21, 98 S.Ct. 1214 n.21
 
 
 [119]
 Id. 435 U.S. at 549, 98 S.Ct. at 1214. That the Commission satisfied the procedural requirements for informal rulemaking under the APA was virtually dictated to us at that time: "(T)here is little doubt that the agency was in full compliance with all the applicable requirements of the Administrative Procedure Act." Id. at 549 n.21, 98 S.Ct. at 1214 n.21
 
 
 [120]
 Vermont Yankee II at 558, 98 S.Ct. at 1219
 
 
 [121]
 Id. at 548, 98 S.Ct. at 1214
 
 
 [122]
 See Bazelon op. at 476
 
 
 [123]
 42 U.S.C. § 4432(2)(C) (1976)
 
 
 [124]
 Andrus v. Sierra Club, 442 U.S. 347, 350, 99 S.Ct. 2335, 2337, 60 L.Ed.2d 943 (1979)
 
 
 [125]
 Even a close scrutiny for compliance with the procedural details is tempered by a "rule of reason"-a recognition that a court can require no more than a discussion of reasonably foreseeable impacts and reasonable alternatives. See NRDC v. Morton, 458 F.2d 827, 834 (D.C.Cir.1972)
 
 
 [126]
 The error in Judge Bazelon's approach on remand is thus the same (albeit in a slightly different form) as that identified by the Supreme Court in its review of Vermont Yankee I. This court originally held that the rulemaking procedures provided by the Commission were inadequate because they were not designed to ventilate the environmental issues to the majority's satisfaction, or to afford the best possible consideration to environmental impacts. It therefore saw fit to dictate that agencies "develop new procedures to accomplish the innovative task of implementing NEPA through rulemaking." Vermont Yankee I at 653. This much of the Vermont Yankee I decision was unanimously reversed by the Supreme Court, which held that a court must not use NEPA to assign procedure to a rulemaking which is both beyond that prescribed by the APA and not clearly required by NEPA. The court stated,
 Absent constitutional constraints or extremely compelling circumstances the "administrative agencies 'should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.' " FCC v. Schreiber, 381 U.S. (279), at 290 (85 S.Ct. 1459 at 1467, 14 L.Ed.2d 383), quoting from FCC v. Pottsville Broadcasting Co., 309 U.S. (134), at 143 (60 S.Ct. 437 at 441, 84 L.Ed. 656). Indeed, our cases could hardly be more explicit in this regard.
 Vermont Yankee II 435 U.S. at 543-44, 98 S.Ct. at 1211-12.
 
 
 [127]
 Bazelon op. at 483
 
 
 [128]
 Id. (emphasis added)
 
 
 [129]
 Id. at 483 (emphasis added)
 
 
 [130]
 Id. at 483. See also note 17 supra
 
 
 [131]
 Id. at 483
 
 
 [132]
 Id. at 483
 
 
 [133]
 Id. at 483, quoting Calvert Cliffs'
 
 
 [134]
 The majority has simply couched in procedural review a disagreement with reasoned policy decisions by the Commission. Among those, made only after reasoned consideration of uncertainties, was its determination that the effect of uncertainties on the selection of fuel cycle impacts was a generic question properly dealt with "as part of choosing what impact values should go into the fuel cycle rule." Final Rule Statement of Basis and Purpose at 45,369. A related conclusion was that, since uncertainties had been considered as part of selecting the rule's impact values, they need not be reflected explicitly in the fuel cycle rule. These are not rulings on procedural infirmities but are by their nature substantive holdings, the result of a review process at odds with the limits of our scrutiny under the APA. See section III.D.3. infra
 
 
 [135]
 See supra p. 535
 
 
 [136]
 See Weinberger v. Catholic Action of Hawaii/Peace Educ. Project, 454 U.S. 138, ----, 102 S.Ct. 197, 201, 70 L.Ed.2d 298 (1981)
 
 
 [137]
 Vermont Yankee II; Kleppe v. Sierra Club, 427 U.S. 390 (1976); Flint Ridge Development Co. v. Scenic Rivers Ass'n, 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976); Aberdeen & Rockfish v. SCRAP Comm., 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975)
 
 
 [138]
 Bazelon op. at 484
 
 
 [139]
 Id
 
 
 [140]
 Id. at 478-481
 
 
 [141]
 Final Rule Statement of Basis and Purposes at 45,369
 
 
 [142]
 Bazelon op. at 481
 
 
 [143]
 Id. at 485
 
 
 [144]
 Id. at 481 n.118 (emphasis added)
 
 
 [145]
 See id. at 484
 
 
 [146]
 As this court observed in North Slope Borough v. Andrus, 642 F.2d 589 (D.C.Cir.1980),
 Given a "fully informed" and "well-considered" decision, an agency decision is entitled to judicial deference; in other words, an informed and deliberate agency decisionmaker is entitled to be arguably "wrong," a court's differing view of wisdom in administration notwithstanding. Obedience to NEPA is a matter of the administrative agency acquiring and digesting useful information about the environmental ramifications of major federal projects.
 Id. at 599.
 
 
 [147]
 As such, the decision hardly seems in violation of NEPA. As one commentator has noted:
 Decisions based on extreme uncertainty are quintessential policy judgments. Although the nature and degree of risk underlying an official endorsement of continued nuclear waste generation may be highly contested issues, the correctness of the official position is not assailable in the courts on policy grounds. NEPA sets no standards for factual predicate sufficiency. If the full scope of uncertainty is exposed and duly considered, the NEPA mandate is satisfied. Dissatisfied rulemaking participants may enlist the aid of the courts if they can prove that agency officials are being disingenuous about the unknowns involved, but they must turn to avenues of political redress if they simply disagree that the full data base is sufficient to predict a negligible environmental impact.
 Comment, Implementing the National Environmental Policy Act through Rulemaking, 126 U.Pa.L.Rev. 148, 190 (1977) (emphasis added).
 
 
 [148]
 Cf. Union of Concerned Scientists v. AEC, 499 F.2d 1069, 1093 (D.C.Cir.1974) ("Considering the unpredictable nature of some of the factors (before the Commission) ... it would actually be surprising if it had attempted to incorporate the probability of their occurrence into its estimate of environmental impact.")
 
 
 [149]
 This court has long recognized that when an agency's environmental impact statement
 involves educated predictions rather than certainties, it is entirely proper, and necessary, to consider the probabilities as well as the consequences of certain occurrences in ascertaining their environmental impact. There is a point at which the probability of an occurrence may be so low as to render it almost totally unworthy of consideration.
 Carolina Envtl. Study Group v. AEC, 510 F.2d 796, 799 (D.C.Cir.1975) (emphasis added).
 
 
 [150]
 Indeed, two Commissioners who expressed concern about the zero release figure concurred in the final statement of basis and purpose for just the reasons I have given. Commissioner Bradford concurred in the table "with the understanding that it is to be extensively supplemented" by the explanatory narrative and the update proceedings, and concurred in the zero-release figure because it appeared "better founded than the same figure in the present interim version and because, as the Commission states, this assumption does not appear to affect the S-3 table's overall conservatism." Final Rule Statement of Basis and Purpose at 45,372 (Separate Views of Commissioner Bradford on S-3) (emphasis added). Commissioner Gilinsky, also stating his views separately, expressed similar concern about the zero figure, but noted that the forthcoming "waste confidence" proceeding was the "appropriate vehicle for a thoroughgoing evaluation of the problems involved in the government's commitment to a waste disposal solution and the likelihood that such a program is not only feasible but is also on course." Id. at 45,374 (Separate Views of Commissioner Gilinsky on Final Adoption of S-3 Rule)
 
 
 [151]
 See supra p. 522
 
 
 [152]
 Bazelon op. at 491
 
 
 [153]
 Id. at 494
 
 
 [154]
 The Commission's working assumption that safe waste-disposal methods are technologically feasible is no less reasoned than its assumption that economic resources will be available to meet disposal needs. There is no justification for labeling either conclusion arbitrary or capricious in this case. Both involve a mixture of factual and policy judgments, many of which the Commission is in the best position to make
 
 
 [155]
 See supra p. 524
 See also Judge Edwards' concurring opinion, which admits that
 (i)t is not the function of the judicial branch either to initiate or to halt the development of a nuclear power industry. These national policy choices are constitutionally vested in the President and the Congress of the United States, and they have been made in favor of proceeding.
 Edwards' op. at 2.
 
 
 [156]
 Cf. NRDC v. EPA, 655 F.2d 318, 334-36 (D.C.Cir.1981) (discussing agency's duty to predict)
 
 
 [157]
 In Geller v. FCC, 610 F.2d 973 (D.C.Cir.1979), we held that the FCC was required to reconsider rules issued in 1972 because the factual predicate upon which the regulations had been based had changed. Similarly, in United States Steelworkers of America v. Marshall, 647 F.2d 1189 (D.C.Cir.1980), we applied similar reasoning to the question whether an agency had discretion not to implement new standards if standards originally thought "feasible" turned out not to be so:
 (W)here employers believe that a standard originally determined to be feasible has proved infeasible, they could petition the agency to initiate a new rulemaking to review the standard.... (W)here time does demonstrate the infeasability of a standard once approved as feasible, so that the very predicate for the original rule and its statutory basis have disappeared, a court may well be able to deny the agency any discretion to refuse a new rulemaking.
 Id. at 1273 (emphasis added).
 
 
 [158]
 See Vermont Yankee II 435 U.S. at 546, 1213
 
 
 [159]
 See, e.g., Bazelon op. at 484
 
 
 [160]
 As one recent analysis of nuclear power decisionmaking has noted,
 An appreciation of the associated hazards (of long-term nuclear waste disposal) requires an understanding of the long-term integrity of the geologic environment into which wastes are placed, the seismic integrity of rock formations, the rates of exchange between ions in ground water and in dissolved wastes, and the transport rates of water through the ground. Moreover, the waste materials have toxicities ranging from negligible to lethal in microscopic quantities, and there is controversy over the dose-mortality relationships involved. There also exist unanswered questions of rock mechanics, large-scale hydrology, and uptake of toxic metals by vegetation.
 Yellin, High Technology and the Courts: Nuclear Power and the Need for Institutional Reform, 94 Harv.L.Rev. 489, 533-34 (1981) (hereinafter Yellin).
 
 
 [161]
 Professor Yellin's penetrating study of judicial review of nuclear power decisionmaking extensively surveys existing scientific studies on long-term waste disposal and concludes that that problem should rank relatively low on the list of NRC environmental concerns:
 The NRC is justified in concluding that the disposal of nuclear wastes is not intrinsically a major concern. Permanent geologic disposal of wastes can create widespread contamination of ground water and soil, but at very low levels of radioactivity. On emplacing wastes hundreds of meters or more below ground, the earth itself becomes a substantial barrier to contamination of the biosphere, effective for centuries or more.... (A)ssuming reasonable efforts are made to choose a site isolated from ground water in a suitable medium, with waste dispersed in a geometric configuration that in itself will guard against water intrusion and ground diffusion, the dominant risks are associated with migration over millenia of heavy isotypes, principally plutonium-239, and of a few fission products, such as iodine-129 and technetium-99. While it is conceivable that these materials will cause low-level, widespread ground and water contamination, no major risk to individuals is foreseeable.
 Id. at 541 n.317 (citations omitted) (emphasis added).
 
 
 [162]
 The words of the Research Director of the Administrative Conference of the United States seem particularly apt here:
 Anyone confronted with uncertainty naturally tends to hope that another study or consideration of an additional set of factors will resolve the issues. Information is not costless, however, and an administrator allocating a budget has to focus on the value of the information versus the costs of collection. A court has no practical incentive to weigh such costs in deciding whether an agency should have investigated more thoroughly and as a result courts might tend to demand the collection of information even when the decision at issue is not sensitive to the additional information.
 DeLong, supra note 104, at 310 (emphasis added).
 
 
 [163]
 Risk values are never exact numbers, but rather imprecise representations of a range of hazards considered probable. Agencies usually compute levels of risk by assuming a conservative set of assumptions, then setting boundary levels of risk which establish the range of probabilities for a particular type of event. Id. at 346-47
 
 
 [164]
 (I)n most cases (where a policymaker is stuck with a choice) the relevant datum for the decision is precisely the fact that the matter is uncertain. In other words, he must confront the uncertainty rather than convert it into a fictional certainty. The crucial questions are how to narrow the uncertainty and decide the proper course under conditions of uncertainty, given the consequences of error
 ... The issue for the court is whether the agency structured its decision to highlight uncertainty problems and deal with them rationally.
 Id. In this case, the Commission expressly chose to accept the "risk of uncertainty" at the generic rulemaking stage. See text and accompanying note 68 supra. The only question before us is whether that decision was an abuse of discretion. See note 147 supra.
 
 
 [165]
 (I)t is reasonable to conclude that court-imposed delays in the process of nuclear plant approval are not "neutral." They affect the decisionmaking process, tending to move the decisions of those who actually build power plants in the direction of coal, which may well prove more hazardous and environmentally destructive than nuclear plants. In these circumstances it is wrong for the courts to impose a specially stringent standard of review that requires regulatory agencies to take a specially "hard look" at all relevant factors before approving nuclear power plants. This would allow the courts to play too prominent a role in determining how the United States will produce its energy in the future
 Breyer, supra note 104, at 1840 (emphasis in original).
 One commenting physicist has noted that notwithstanding that the environmental effects of wastes from coal-burning plants remain largely unquantified, the sulphur oxides from a single plant (emitted at a rate of about 10 pounds per second), are estimated to cause about 25 fatalities and 60,000 cases of respiratory disease ... (and) about $25 million in property damage annually." Cohen, High Level Radioactive Waste, 21 Nat.Resources J. 703, 703 (1981). By comparison, "(e)stimates show that radioactive emissions from a nuclear plant may cause about one fatality every 50 years." Id. at 704.
 
 
 [166]
 See Breyer, supra note 104, at 1845
 
 
 [167]
 The impact of regulatory uncertainty on the incentive of public utilities to innovate has been well-chronicled. See, e.g., Cohen, Innovation and Atomic Energy: Nuclear Power Regulation, 1966-Present, 43 Law & Contemp.Probs. 67 (1979) (time, expense, and uncertainty in acquiring NRC licenses are key factors inhibiting innovation); Braeutigam, The Effect of Uncertainty in Regulatory Delay on the Rate of Innovation, 43 Law & Contemp.Probs. 98 (1979)
 
 
 [168]
 I must assume that this particular risk is one which Judge Bazelon would include among those reflected in his "uncertainty concerning the integrity of the permanent repository." See Bazelon op. at 483
 
 
 [169]
 Rothschild, Coming to Grips with Risk, Wall St.J. (13 Mar. 1979) at 22, col. 4 (emphasis in original) (hereinafter Rothschild)
 
 
 [170]
 Professor Yellin points out the deceptiveness of citing 250,000 years-ten times the half-life of plutonium-239-as the appropriate figure for measuring repository life. By citing the same figure in Vermont Yankee I, Professor Yellin suggested, this
 court responded to perhaps the public's deepest anxieties concerning nuclear energy, failing to realize that a defensible index of the hazards of radioactive waste does not follow simply from the long half-lives of some of the more toxic waste constituents, but from a complex of considerations such as the repository design, the biologic effects of remnant radioactive species, and possible modes of releasing the wastes into the biosphere.
 Yellin, supra note 160, at 538-39.
 I would further suggest the irrelevancy of worrying 250,000 years into the future. I, for one, find it difficult to plan that far ahead.
 
 
 [171]
 In fact, a careful summary of the available scientific data suggests that this would not be the case:
 Unlike major reactor accidents, ... release of wastes from a mined repository cannot cause catastrophic events threatening public health. At worst, it can lead to widespread contamination of groundwater and soil at very low levels of radioactivity.
 Id. at 534-35.
 Professor Cohen notes that, even if ground water were contaminated at the projected depths of a repository,
 ground water moves quite slowly, typically only inches per day, ... (and) ordinarily travels many miles before reaching the surface from 2,000 feet underground. Hence, even if dissolved radioactive material moved with the ground water, it would take about 1,000 years to reach the surface. Additionally, processes which constantly filter the radioactive materials out of the ground water cause the material to migrate about a thousand times slower than the water itself. Thus, it would take most of the radioactive materials about a million years to reach the surface even if it were already dissolved in ground water. Moreover, most of the radioactive materials are highly insoluble under most geological conditions. If the materials were in solution when the water encountered normal conditions (chemically reducing, alkaline), they would precipitate out and form new rock material.
 Finally, if radioactivity did reach surface waters it would very easily be detected. One millionth of the amounts that can be harmful are readily detected. Measures could be taken to prevent the waste from getting into drinking water or food.
 Cohen, supra note 165,at 714-15.
 
 
 [172]
 The eruption of Krakatoa in 1883, which killed some 36,000 humans, was not even the worst volcanic eruption to occur in the last 2500 years. See Encyclopedia Brittanica, vol. K at 498-99
 
 
 [173]
 Lord Rothschild estimates the risk of dying from influenza in a single year is 55 times as great as that of dying as a result of a nuclear power station disaster in a country where there are 100 nuclear plants. See Rothschild, note 169 supra, at 22 col. 6
 
 
 *
 Sitting by designation pursuant to Title 28 U.S.C. § 291(a)
 
 
 *
 Circuit Judge Wright did not participate in making this order
 
 
 **
 Sitting by designation pursuant to Title 28 U.S.C. § 291(a)